1 | SEDGWICK LLP
Karen Woodward (State Bar No. 205543)
2 | Christopher P. Norton (State Bar No. 234621)
801 S. Figueroa Street, 19th Floor
3 | Los Angeles, California 90017-5556
karen.woodward@sedgwicklaw.com
4 | Christopher.norton@sedgwicklaw.com
Telephone: (213) 426-6900
5 | Facsimile: (213) 426-6921

6 | *Attorneys for Xanodyne*
*Pharmaceuticals, Inc.*

7

FILED
CLERK, U.S. DISTRICT COURT

NOV 21 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA

10

11 | MARGALIT CORBER; RENE CARO;
STEVE DANTZLER; LINDA
12 | SOWARDS; LORI HUISMAN;
JOHNNY GEORGE SR.; TERRY
13 | PERRY; WILLIAM RACKLEY;
ANGELA YOUNG; PAMELA
14 | RODRIGUEZ; STEVEN SYVERSON;
OLGA CAICOYA; JANET
15 | CARROLL; ROSE CASH; ULAD
CELENTANO; VIRGINIA
16 | COSTANZO; KIMBERLY FILLIGIM;
ARMELDIA SMITH; CARLA WEST;
17 | JOANNE BIERZYNSKI
INDIVIDUALLY AND AS NEXT OF
18 | KIN TO ELEANOR WOJCIK;
SHARLEY MORRIS; WYOMIA
19 | TIMMONS; DEAN REINKING;
DANIEL THORNE; WENDELEN
20 | ASHBY; CARMEN BEDFORD;
CLAUDE COMMODORE; JAMES
21 | HENSON; NANCY LOCKE;
MILDRED SCOTT; BILLIE
22 | BURNETT; SHEENA HALL;
BRENDA ROBERGE
23 | INDIVIDUALLY AND AS NEXT OF
KIN TO ERNEST ROBERGE;
24 | DEBORAH WOODSUM; AND
RICHARD PASCUITO.

25

Plaintiffs,

26

27 | v.

MCKESSON CORPORATION; ELI

CASE NO. **CV12 9986-GHK (RCx)**

**NOTICE OF REMOVAL BY
DEFENDANT XANODYNE
PHARMACEUTICALS, INC.
UNDER 28 U.S.C. §§ 1331, 1332,
1367, 1441, 1446, AND 1453**

28

1

1  LILLY AND COMPANY;
   AAIPHARMA, INC; AAIPHARMA
2  LLC; AAI DEVELOPMENT
   SERVICES, INC.; NEOSAN
3  PHARMACEUTICALS INC;
   XANODYNE PHARMACEUTICALS,
4  INC; QUALITEST
   PHARMACEUTICALS, INC.;
5  VINTAGE PHARMACEUTICALS,
   INC.; PROPST DISTRIBUTION, INC.;
6  BRENN DISTRIBUTION, INC.;
   BRENN MANUFACTURING, INC.;
7  VINTAGE PHARMACEUTICALS,
   LLC; GENERICS INTERNATIONAL
8  (US), INC.; GENERICS BIDCO I,
   LLC; GENERICS BIDCO II, LLC;
9  GENERICS INTERNATIONAL (US
   PARENT), INC.; ENDO
10 PHARMACEUTICALS, INC.; ENDO
   PHARMACEUTICALS HOLDINGS
11 INC.; CORNERSTONE
   BIOPHARMA, INC.;
12 CORNERSTONE BIOPHARMA
   HOLDINGS, INC.; TEVA
13 BIOPHARMACEUTICALS, INC.;
   TEVA PHARMACEUTICALS USA,
14 INC.; MYLAN
   PHARMACEUTICALS, INC.;
15 MYLAN, INC.; COVIDIEN PLC;
   COVIDIEN INC.; MALLINCKRODT
16 INC.; WATSON
   PHARMACEUTICALS, INC.; ABLE
17 LABORATORIES; ARISTOS
   PHARMACEUTICALS, INC.; and
18 DOES 1 through 50, inclusive,

19              Defendants.

20

21        Defendant Xanodyne Pharmaceuticals, Inc. ("Xanodyne")[1] hereby removes to

22 this Court the state court action described below.  Removal is warranted under 28

23 _____

24        [1] Xanodyne should be dismissed from this action because it is not subject to
   personal jurisdiction on the claims of any plaintiff who is not a California resident.
25 *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. ___ , 131 S. Ct. 2846,
   180 L. Ed. 2d 796, 2011 U.S. LEXIS 4801 (2011) and *J. McIntyre Machinery, Ltd. v.
26 Nicastro*, 564 U.S. ___ , 131 S. Ct. 2780, 180 L. Ed. 2d 765, 2011 U.S. LEXIS 4800
   (2011) (plurality opinion).)  Xanodyne will fully brief its objection to personal
27 jurisdiction pursuant to the requirements of Rule 81(c) of the Federal Rules of Civil
   Procedure.

28

1  U.S.C. §§ 1441(b), 1446, and 1453 because this is a civil action over which this

2  Court has original jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1367.  In support

3  of removal, Xanodyne states as follows:

4                                    **BACKGROUND**

5          1.      On or about November 15, 2012, Plaintiffs commenced this action by

6  filing a complaint in the Superior Court of Los Angeles County, in the State of

7  California, bearing case number BC495753.  Plaintiffs are 35 individuals who allege

8  cardiovascular injuries as a result of ingestion of prescription pain medications

9  containing the active ingredient propoxyphene.  (*See* Ex. A, Compl. ¶ 100.)  Plaintiffs

10  improperly fail to allege which form of propoxyphene they took, which Defendant

11  manufactured it, or what cardiovascular injury they allegedly experienced.

12         2.      Plaintiffs assert claims against numerous entities they allege are or were

13  involved in the manufacture of brand name and generic prescription pain medications

14  containing propoxyphene (*id.* ¶¶ 27-98) and also against one purported distributor of

15  prescription medications, McKesson Corporation ("McKesson").  (*Id.* ¶¶ 20-26.)

16  Plaintiffs seek to recover compensatory and punitive damages against all Defendants

17  under numerous legal theories, including that the entities allegedly involved in the

18  manufacture of generic prescription medications containing propoxyphene (the

19  "Generic Defendants") have improperly breached their duty to use the same FDA-

20  approved labeling as the brand companies.  (*See id.* ¶¶ 5-7.)

21         3.      The instant action is one of more than twenty multi-plaintiff lawsuits

22  alleging injuries from ingestion of propoxyphene-containing pain products filed from

23  approximately November 9, 2012 to November 16, 2012, in numerous California

24  counties.  These lawsuits join seven other lawsuits alleging injury resulting from

25  ingestion of propoxyphene pain products filed in Los Angeles and San Francisco

26  Counties in late 2011 and early 2012.

27

28

                                            3

1      4.     On October 23, 2012, attorneys from Khorammi, LLP (Oakland CA),

2 Davis & Crump PC (Gulfport MS), The Sill Law Group PLLC (Edmond OK) and

3 Pearson Randall & Schumacher, PA (Minneapolis, MN)  ("Coordination Counsel")

4 filed a petition with the California Judicial Counsel to establish a coordinated

5 proceeding before a single trial judge for California state-court products liability

6 actions alleging personal injuries due to prescription pain medications containing

7 propoxyphene.  (*See* Ex. B, Pet. for Coord.)  In support of the Petition, Coordination

8 Counsel claims that "[o]ne judge hearing all of the actions for all purposes in a

9 selected site or sites will promote the ends of justice."  (Ex. C, Mem. in Support of

10 Pet. for Coord. at 8.)

11      5.     The Petition for Coordination specifically identifies the seven "original"

12 actions described in paragraph 3 above, which embrace the claims of more than 100

13 individual Plaintiffs, and specifically states that Coordination Counsel intends to

14 include in the coordination additional, then-unfiled claims.  (*Id.*)  Significantly,

15 subsequent to the filing of the Petition for Coordination, Elise Sanguinetti, whose

16 firm Khorrami LLP serves as Coordination Counsel and who submitted a declaration

17 in support of the Petition for Coordination, has moved to stay the seven original

18 actions pending a ruling on coordination, stating that "[c]oordination of *all* the

19 California Propoxyphene cases makes sense." (*See* Ex. D, Mem. in Supp. of Mot. to

20 Stay at 4, Freitas v. McKesson Corp., No. CGC 11-515537 (Cal. Super. Ct. S.F.

21 County Nov. 9, 2012) (emphasis added).)[2]  Thus, the Petition now embraces the

22 claims of more than 500 individual Plaintiffs.

23

24

25      [2] Since the Petition for Coordination was filed Xanodyne has become aware of

26 at least 21 additional multi-plaintiff actions filed, not including the above captioned
action, alleging injury from the ingestion of propoxyphene containing products

27 consisting of well over 500 additional plaintiffs.  These actions have been identified
in the Notice of Related Actions, filed concurrently herewith.

28

6. As set forth more fully below, this case is properly removed to this Court pursuant to 28 U.S.C. § 1441 because there is federal jurisdiction on three independent grounds – (a) as a mass action, pursuant to 28 U.S.C. § 1332(d)(11); and (b) under federal question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367– and Xanodyne has satisfied the procedural requirements for removal set forth in 28 U.S.C. §§ 1446 and 1453.

## THIS CASE IS REMOVABLE AS A MASS ACTION

7. This case is removable pursuant to the mass action provisions of the diversity jurisdiction statute. 28 U.S.C. § 1332(d)(11). An action is removable as a mass action where it meets the following requirements:

      a. It involves the monetary relief claims of 100 or more persons that are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, *see id.* § 1332(d)(11)(B)(i);

      b. The aggregate amount in controversy exceeds $5,000,000 and the claims of the individual plaintiffs each exceed the amount of $75,000, *see id.* §§ 1332(a), (d)(2), (d)(11)(B)(i); and

      c. Any plaintiff is a citizen of a State different from any defendant, *see id.* § 1332(d)(2)(A).

8. As set forth below, this action and the other propoxyphene actions embraced by the Petition for Coordination satisfy all the jurisdictional requirements for a mass action. In addition, Xanodyne has satisfied all procedural requirements for removal of a mass action pursuant to 28 U.S.C. §§ 1446 and 1453. Accordingly, mass action removal is proper.

### A. The Petition for Coordination Proposes Joint Trial of the Claims of 100 or More Persons

9. This action is removable as a mass action because the Petition for Coordination proposes to try this case jointly with numerous other propoxyphene

1  actions embracing the claims of more than 500 individuals.  (*See* Pet. for Coord. at 3-

2  7.)  As the Seventh Circuit recently held in *In re Abbott Laboratories, Inc.*, No. 12-

3  8020, 2012 WL 4875584 (7th Cir. Oct. 16, 2012) (to be published in F.3d), a petition

4  for state-court coordination of individual actions may render those actions a "mass

5  action" for purposes of removal where, as here, the coordination petition proposes

6  joint trial of the individual actions.  *See id.* at *1.  And while a mass action does not

7  result where individual actions are joined "upon motion of a defendant," 28 U.S.C. §

8  1332(d)(11)(B)(ii)(II); *see also Tanoh v. Dow Chemical Co.*, 561 F.3d 945, 953 (9th

9  Cir. 2009); *Anderson v. Bayer Corp.*, 610 F.3d 390, 393 (7th Cir. 2010), there is no

10  such barrier where, also as here, the proposal for joint trial originates with the

11  plaintiffs.  *See Abbott*, 2012 WL 4875584, at *3.

12       10.    Here, the proposal for joint trial in the Petition for Coordination is even

13  clearer than it was in *Abbott*.  In that case, the Seventh Circuit held that a petition for

14  coordination need not specifically request joint trial because "a proposal for a joint

15  trial can be implicit."  *Id.* at *3; *see also Bullard v. Burlington N. Santa Fe Ry. Co.*,

16  535 F.3d 759, 762 (7th Cir. 2008); *Koral v. Boeing Co.*, 628 F.3d 945, 947 (7th Cir.

17  2011).  The Seventh Circuit found that the plaintiffs' coordination petition implicitly

18  requested a joint trial where it sought coordination "'through trial'" and "'not solely

19  for pretrial proceedings'" and asserted that coordination "through trial 'would also

20  facilitate the efficient disposition of a number of universal and fundamental

21  substantive questions applicable to all or most Plaintiffs' cases *without the risk of*

22  *inconsistent adjudication* in those issues between various courts.'"  *Abbott* , 2012 WL

23  4875584, at *3 (citation omitted).

24       11.    Here, the Petition for Coordination presents all of the factors (and more)

25  that the Seventh Circuit held constituted a request for a joint trial in *Abbott*.  Initially,

26  like the *Abbott* plaintiffs' request for coordination "through trial," the Petition here

27  proposes "*[o]ne judge* hearing *all of the actions* for *all purposes* in a selected site or

28

6

1  sites" in order to "promote the ends of justice." (Mem. in Supp. of Pet. for

2  Coordination at 8 (emphasis added).)  Coordination for "all purposes" naturally

3  embraces coordination for trial.

4         12.     Moreover, like the *Abbott* plaintiffs' assertions concerning the "*risk of*

5  *inconsistent adjudication*," the Petition for Coordination here emphasizes that

6  "[f]ailure to coordinate these actions will result in the disadvantages of duplicate and

7  inconsistent rulings, orders, or judgments" as to "issues pertaining to liability,

8  allocation of fault and contribution, as well as the same wrongful conduct of

9  defendants." (Mem. in Supp. of Pet. for Coordination at 10; *see also id.* at 6, 8; Ex.

10  E, Sanguinetti Decl. in Supp. of Coordination ¶ 11 ("Without coordination, two or

11  more separate courts will decide essentially the same issues and may render different

12  rulings on liability and other issues.").)  In the same vein, the Petition for

13  Coordination here argues that there are "common issues" among each of the

14  constituent actions, including *whether the plaintiffs are entitled to compensatory and*

15  *punitive damages*. (*See* Sanguinetti Decl. in Supp. of Coordination ¶ 7.)  The

16  Petition's proposal to resolve the determinations of liability, allocation of fault, and

17  award of compensatory and punitive damages as "common issues" necessarily

18  requires a joint trial.[3]

19         13.     Indeed, the Seventh Circuit cited similar remarks by plaintiffs

20  concerning the risk of inconsistent adjudication of purported common issues when it

21  observed that "it is difficult to see how a trial court could consolidate the cases as

22  requested by plaintiffs and not hold a joint trial or an exemplar trial with the legal

23  issues applied to the remaining cases.  In either situation, plaintiffs' claims would be

24  tried jointly." *Abbott*, 2012 WL 4875584, at *3; *see also* 28 U.S.C. §

25  ――――――――――――――

26      [3] Xanodyne does not concede that Plaintiffs are entitled to a joint trial, but
merely notes that the Petition for Coordination proposes one, thereby entitling

27  Defendants to remove the cases pursuant to the mass action provisions of 28 U.S.C. §
1332.

28

1  1332(d)(11)(B)(i) (providing that the mass action standard is satisfied where joint

2  trial is proposed "on the ground that the plaintiffs' claims involve common questions

3  of law or fact").  Thus, even a joint trial as to certain issues, which the Petition for

4  Coordination repeatedly suggests in its discussion of avoiding inconsistent rulings as

5  to "common issues," is sufficient to establish mass action jurisdiction pursuant to 28

6  U.S.C. § 1332(d)(11).

7      14.    In addition, the Petition for Coordination envisions that a joint trial

8  would put pressure on Defendants to settle all California propoxyphene cases.

9  Coordination Counsel's declaration in support of the Petition states that one of the

10  primary motivating factors for settling cases is "the avoidance of the risk of an

11  adverse judgment at trial."  (Sanguinetti Decl. in Supp. of Coordination ¶ 12.)

12  Coordination Counsel argues that coordination is mandated here because if the cases

13  are not coordinated, "[s]ettlement of one of these cases may not end the litigation in

14  the other . . . cases."  (*Id.*)  Implicit in this call for settlement is a proposal for joint

15  trial:  in order for the threat of adverse judgment at trial to compel settlement or end

16  litigation in the other cases, there must be either a joint trial of all cases, or a

17  judgment at an exemplar trial that is binding on the other cases.  Thus, "[i]n either

18  situation" there is a proposal for joint trial and the first mass action requirement is

19  satisfied. *Abbott*, 2012 WL 4875584, at *3.

20      15.    Finally, as in *Abbott*, Plaintiffs have done nothing to suggest that they

21  propose coordination "solely for pretrial proceedings."  28 U.S.C. §

22  1332(d)(11)(B)(ii)(IV); *see also Abbott*, 2012 WL 4875584, at *3.  To the contrary,

23  for all the reasons set forth above, the Petition for Coordination necessarily

24  constitutes a proposal for coordination for trial.

25      16.    Accordingly, the Petition for Coordination proposes joint trial of the

26  monetary claims of more than 100 individuals, and the first requirement of mass

27  action removal is satisfied.

28

8

**B.     The Amount in Controversy Is Satisfied**

17.     Both the individual $75,000 and aggregate $5,000,000 amount in controversy requirements for mass action removal are readily satisfied. *See* 28 U.S.C. §§ 1332(a), (d)(2), (d)(11)(B)(i).  Indeed, the Petition for Coordination itself admits that there are "multi-millions of dollars at stake" in these cases (Pet. for Coord. at 10), and Coordination Counsel has publicly stated that the propoxyphene litigation "has the potential to be in the billions of dollars for recoveries around the country."[4]

18.     First, it is apparent from the face of the Complaint, and the serious nature of the "severe cardiovascular injuries" alleged by each Plaintiff (*see* Compl. ¶ 100), that the amount in controversy exceeds $75,000 for each Plaintiff, just as it is for the claims in the other actions embraced by the Petition.  Where, as here, Plaintiffs allege serious bodily injuries, courts have readily found that the amount-in-controversy requirement is satisfied. *See In re Rezulin Prods. Liab. Litig.*, 133 F. Supp. 2d 272, 296 (S.D.N.Y. 2001).  In addition, compensatory and punitive damages in excess of the jurisdictional amount of $75,000 have been awarded in products liability cases in California. *See, e.g., Stewart v. Union Carbide Corp.*, 190 Cal. App. 4th 23, 38, 117 Cal. Rptr. 3d 791, 804 (2010); *Karlsson v. Ford Motor Co.*, 140 Cal. App. 4th 1202, 1223-24, 45 Cal. Rptr. 3d 265, 282-83 (2006); *Jones v. John Crane, Inc.*, 132 Cal. App. 4th 990, 1012, 35 Cal. Rptr. 3d 144, 161 (2005).  Other federal courts have thus concluded that the amount in controversy exceeded $75,000 in similar pharmaceutical cases. *See, e.g., Smith v. Wyeth, Inc.*, 488 F. Supp. 2d 625, 630-31 (W.D. Ky. 2007) (denying motion to remand); *accord Copley v. Wyeth, Inc.*, No. 09-722, 2009 WL 1089663, at *3 (E.D. Pa. Apr. 22, 2009).  In addition, because

---

[4] Olivia Whitaker, *Oklahoma Attorney Predicts Billions of Dollars in Darvocet Lawsuit Recoveries* (Feb. 9, 2011), *available at* http://www.articlesbase.com/mental-health-articles/oklahoma-attorney-predicts-billions-of-dollars-in-darvocet-lawsuit-recoveries-4199525.html.

1  Plaintiffs' demands for punitive damages are also includable in the amount in

2  controversy, *see Guglielmino v. McKee Foods Corp.*, 506 F.3d 696, 700 (9th Cir.

3  2007), it is evident, from the face of the Complaint, that the amount of recovery

4  sought by each Plaintiff exceeds $75,000.[5]

5          19.     Second, because each individual Plaintiff's claim exceeds $75,000, the

6  aggregate amount in controversy for putative coordinated litigation, which embraces

7  the claims of more than 500 individuals, necessarily exceeds $5,000,000, since

8  $75,000 multiplied by 500 is $37,500,000.

9          20.     Accordingly, the amount-in-controversy requirement is satisfied.

10         **C.      The Diversity Requirement Is Satisfied**

11         21.     The diversity requirements for mass action removal have been satisfied.

12  *See* 28 U.S.C. § 1332(d)(2)(A).  While diversity removal normally requires complete

13  diversity between plaintiffs and defendants, for removal of a mass action, only

14  "minimal diversity" is required – i.e., that at least one plaintiff be diverse from one

15  defendant. *See id.*  This requirement is readily satisfied here:  Plaintiff Margalit

16  Corber, a citizen of California (Compl. ¶ 101), is diverse from Lilly, a citizen of

17  Indiana. (*Id.* ¶ 27.)

18         22.     Accordingly, all the jurisdictional requirements of mass action removal

19  are satisfied.

20  <u>**THIS CASE IS REMOVABLE UNDER FEDERAL QUESTION AND**</u>

21  <u>**SUPPLEMENTAL JURISDICTION**</u>

22         23.     This action is removable under the CAFA "mass action" provisions

23  alone.  However, as a separate and independent basis for removal, this action is also

---

24          [5] Xanodyne notes that it is not required to concede that Plaintiffs are, in fact,

25  entitled to recover more than $75,000.  *See Kelderman v. Remington Arms Co.*, 734
   F. Supp. 1527, 1528 (S.D. Iowa 1990) (rejecting a plaintiff's attempt to "place [a]

26  defendant in the awkward position of embracing a concession on the important issue
   of damages," to establish jurisdiction, noting that a "defendant need not go that far").

27  Indeed, Xanodyne specifically denies that Plaintiffs are entitled to recover any
   damages.

28

1   properly removable under 28 U.S.C. §§ 1331 and 1367.  Plaintiffs' claims against

2   Generic Defendants are removable because they necessarily raise a substantial and

3   disputed question of federal law.  In addition, all remaining claims are removable

4   subject to the Court's supplemental jurisdiction.

5        **A.**    **Plaintiffs' Claims Against Generic Defendants Are Removable**

6            **Because They Necessarily Raise Substantial Issues of Federal Law**

7        24.     Plaintiffs' claims against Generic Defendants are removable because

8   they necessarily raise a substantial and disputed question of federal law.  The

9   Supreme Court has held that state-law claims are removable under federal question

10  jurisdiction pursuant to 28 U.S.C. § 1331 where they "necessarily raise a stated

11  federal issue, actually disputed and substantial, which a federal forum may entertain

12  without disturbing any congressionally approved balance of federal and state judicial

13  responsibilities." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S.

14  308, 314 (2005).

15       25.     Federal jurisdiction exists where a state law claim necessarily involves

16  the construction or application of federal law.  *See, e.g., D'Alessio v. New York Stock*

17  *Exchange, Inc.*, 258 F.3d 93, 99 (2d Cir. 2001) ("[A] case is deemed 'to arise under'

18  federal law 'where the vindication of a right under state law necessarily turn[s] on

19  some construction of federal law.'") (alteration in original) (quoting *Franchise Tax*

20  *Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 9 (1983)).

21       26.     In addition, this Court has original and removal jurisdiction of civil

22  actions, such as this one, that arise "under the Constitution, laws, or treaties of the

23  United States." 28 U.S.C. § 1331, 1441(a).  Among the civil actions that "arise

24  under" federal law are "state-law claims that implicate significant federal issues."

25  *Grable*, 545 U.S. at 312.  Such claims capture the "commonsense notion that a

26  federal court ought to be able to hear claims recognized under state law that

27  nonetheless turn on substantial questions of federal law, and thus justify resort to the

28

11

1   experience, solicitude, and hope of uniformity that a federal forum offers on federal

2   issues." *Id.*

3       27.    Thus, federal question jurisdiction also exists where, as here, a "state

4   law claim necessarily raise[s] a stated federal issue, actually disputed and substantial,

5   which a federal forum may entertain without disturbing any congressionally approved

6   balance of federal and state judicial responsibilities." *Id.* at 314.

7       28.    The claims asserted in Plaintiffs' Complaint meet both of these

8   standards for federal question jurisdiction.  As the Eastern District of New York has

9   recently held, claims against generic defendants are removable under *Grable* where,

10   like Plaintiffs' claims here, they allege that the generic defendants are liable in

11   failure-to-warn due to breach of their federal duty to use the same FDA-approved

12   labeling as the brand defendants.  *Bowdrie v. Sun Pharm. Indus. Ltd.*, No. 12-CV-853

13   (WFK) (MDG), 2012 WL 5465994 (E.D.N.Y. Nov. 9, 2012).

14       29.    As recognized by the Supreme Court in *PLIVA, Inc. v. Mensing*, 131 S.

15   Ct. 2567 (2011), generic defendants are prohibited by federal law from independently

16   changing the labeling for their products, but are instead required by federal law to use

17   labeling identical to the FDA-approved labeling used by the brand defendant.  *See id.*

18   at 2578.  The plaintiffs in *Bowdrie* alleged that the generic defendants were liable on

19   state-law failure-to-warn claims because they breached their duty to employ the same

20   labeling as the brand defendants.  2012 WL 5465994, at *1.

21       30.    The *Bowdrie* court held that the plaintiffs' state-law claims that generic

22   defendants "failed to meet their ongoing duty of sameness by failing to . . . update

23   their FDA-approved labeling to mirror updated [brand drug] labeling . . . . necessarily

24   raise[d] a federal question."  2012 WL 5465994, at *3 ("A question of federal law is

25   a necessary element of Plaintiffs' state law causes of action.").  The court further held

26   that this federal question was substantial because it:

27

28

> goes far beyond simply incorporating a federal standard into a state law cause of action. To the extent they invoke the "federal duty of sameness," Plaintiffs' causes of action implicate the labeling requirements for generic drug manufacturers nationwide. The federal question present in this case involves a responsibility that is in the first instance, and primarily, federal: regulation of the manufacture, marketing, and distribution of drugs.

*Id.* at *4. Thus, the court held, the Plaintiffs' claims were removable under federal question jurisdiction under the rule of *Grable*. *Id.* at *3.

31.     The same reasoning applies to this action, where, just like in *Bowdrie*, Plaintiffs claim that Generic Defendants are liable in failure-to-warn due to their alleged failure to update their labeling to conform to the brand. (*See* Compl. ¶¶ 6-7.)

32.     It is irrelevant that Plaintiffs may not have intended to plead a state law cause of action that raises a substantial and disputed issue of federal law to establish a basis for jurisdiction arising from a federal question. In *Grable*, the Supreme Court held that federal question jurisdiction exists when a state law cause of action raises a substantial federal question that is in dispute. *Grable*, 545 U.S. at 316-20. Plaintiffs may not avoid this result through artful pleading. *See Rivet v. Regions Bank*, 522 U.S. 470, 475 (1998) (holding that "[i]f a court concludes that plaintiff has 'artfully pleaded' claims" by omitting to plead federal questions, "it may uphold removal even though no federal question appears on the face of the plaintiff's complaint").

33.     Accordingly, Plaintiffs' failure-to-update claims against Generic Defendants are properly removable under federal question jurisdiction pursuant to the rule of *Grable* because they necessarily (indeed, affirmatively) raise a substantial, disputed issue of federal law.

**B.     Supplemental Jurisdiction Extends to All Other Claims**

34.     This Court has "supplemental jurisdiction over all other claims that are so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States

Constitution." 28 U.S.C. § 1367(a).  As set forth above, Plaintiffs' claims against Generic Defendants are within the Court's original jurisdiction pursuant to 28 U.S.C. § 1331.  On an individual, per-Plaintiff basis, all other claims in this action arise out of the same case or controversy in that they seek relief in connection with personal injuries allegedly due to the ingestion of a propoxyphene-containing pain medication.

35.    Accordingly, there is supplemental jurisdiction over all other claims in this action.

**ALL REMOVAL PROCEDURES ARE SATISFIED**

36.    Because this case is removable as a mass action together with the other actions embraced by the Petition for Coordination, all of those cases are being removed upon substantially the same grounds.

37.    Xanodyne has not yet been served in this action.  Accordingly, this removal is timely, since Xanodyne was not required to remove until 30 days from service of the Complaint.  *See* 28 U.S.C. § 1446(b)(1).

38.    All defendants properly joined and served consent to the removal of this action, since Xanodyne is informed that only McKesson has been served in this action and that McKesson consents to its removal.  *See id.* § 1446(b)(2)(A).  In addition, Xanodyne states that, with respect to the mass action removal, the consent of other Defendants to remove is not required.  *See id.* § 1453(b).

39.    Removal is not barred by the California citizenship of any Defendant. *See id.* §§ 1441(a), 1453(b).

40.    As Xanodyne has not been served in this action, no pleadings and process have been served on the removing defendant.  *See id.* § 1446(d).

41.    Written notice of this removal is being provided to all adverse parties and is being filed with the clerk of the California Superior Court.  *See id.*

42.    Xanodyne hereby reserves the right to amend this notice of removal.

14

1    WHEREFORE, Xanodyne respectfully removes this action from the Superior

2  Court of the County of Log Angeles, in the State of California, bearing Number

3  BC495753, to this Court.

4  DATED:  November 20, 2012              Respectfully submitted,

5

6                                    SEDGWICK LLP

7                                    By:

8                                        Karen Woodward
                                         Christopher P. Norton
9                                        Attorneys for Defendant
                                         Xanodyne Pharmaceuticals, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

ORIGINAL

1  ELISE R. SANGUINETTI, SBN 191389
   AMANDA J. GREENBURG, SBN 255767
2  Khorrami, LLP
   360 22nd Street, Suite 640
3  Oakland, CA 94612
   Telephone: (866) 546-7266
4  Facsimile:  (866) 546-7377

5
   STEPHEN J. RANDALL, SBN 165025
6  Pearson, Randall & Schumacher, PA
   Ste. 1025 Fifth Street Towers
7  100 S. Fifth Street
   Minneapolis, MN 55402
8  Telephone:  (612) 767-7500
   Facsimile (612) 767-7501
9
10 STEPHEN D. BEHNKE, SBN 225836
   Wright & Schulte, LLC
11 812 E. National Rd.
   Dayton, Ohio 45377
12 Telephone: (937) 435-7500
   Facsimile: (937) 435-7511
13

14 Attorneys for Plaintiffs

15

FILED
Los Angeles Superior Court

NOV 15 2012

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
        SHAUNYA WESLEY

16       IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

17         IN AND FOR THE COUNTY OF LOS ANGELES

18 MARGALIT CORBER; RENE CARO;  STEVE
19 DANTZLER; LINDA SOWARDS; LORI
   HUISMAN; JOHNNY GEORGE SR.; TERRY
20 PERRY; WILLIAM RACKLEY; ANGELA
   YOUNG; PAMELA RODRIGUEZ; STEVEN
21 SYVERSON; OLGA CAICOYA; JANET
22 CARROLL; ROSE CASH; ULAD CELENTANO;
   VIRGINIA COSTANZO; KIMBERLY FILLIGIM;
23 ARMELDIA SMITH; CARLA WEST; JOANNE
   BIERZYNSKI INDIVIDUALLY AND AS NEXT
24 OF KIN TO ELEANOR WOJCIK; SHARLEY
   MORRIS; WYOMIA TIMMONS; DEAN
25 REINKING; DANIEL THORNE; WENDELEN
   ASHBY; CARMEN BEDFORD; CLAUDE
26 COMMODORE; JAMES HENSON; NANCY
27 LOCKE; MILDRED SCOTT; BILLIE BURNETT;
   SHEENA HALL; BRENDA ROBERGE
28 INDIVIDUALLY AND AS NEXT OF KIN TO

CASE NO.:  BC 495 753

COMPLAINT FOR DAMAGES
DEMAND FOR JURY TRIAL

Causes of Action:
(As to All Defendants)
1.  Strict Products Liability – Design Defect
2.  Strict Products Liability – Failure to Warn
3.  Strict Liability in Tort
4.  Negligent Design
5.  Negligence
6.  Negligent Failure to Warn
7.  Fraudulent Non-Disclosure
8.  Negligent Misrepresentation

- 1 -

| | |
|---|---|
| 1   ERNEST ROBERGE; DEBORAH WOODSUM; AND RICHARD PASCUITO. | )   9. Fraudulent Misrepresentation and Concealment |
| 2 | )   10. Negligence Per Se |
|   | )   11. Breach of Express Warranty |
| 3            Plaintiffs, | )   12. Breach of Implied Warranty |
| 4   vs. | )   13. Deceit by Concealment – Violation of California Civil Code §§ 1709, 1710 |
| 5   MCKESSON CORPORATION; ELI LILLY AND | )   14. Violation of Business and Professions Code § 17200 |
| 6   COMPANY; AAIPHARMA, INC; AAIPHARMA LLC; AAI DEVELOPMENT SERVICES, INC.; | )   15. Violation of Business and Professions Code § 17500 |
| 7   NEOSAN PHARMACEUTICALS INC; XANODYNE PHARMACEUTICALS, INC.; | )   16. Violation of Civil Code § 1750, et seq. |
| 8   QUALITEST PHARMACEUTICALS, INC.; VINTAGE PHARMACEUTICALS, INC.; | )   (As to Innovator and Brand Defendants) |
| 9   PROPST DISTRIBUTION, INC.; BRENN | )   17. Negligence |
| 10   DISTRIBUTION, INC.; BRENN MANUFACTURING, INC.; VINTAGE | )   18. Fraudulent Non-Disclosure |
| 11   PHARMACEUTICALS, LLC; | )   19. Negligent Misrepresentation |
|   | )   20. Fraudulent Misrepresentation and |
| 12   GENERICS INTERNATIONAL (US), INC.; GENERICS BIDCO I, LLC; GENERICS BIDCO | )   Concealment |
| 13   II, LLC; GENERICS INTERNATIONAL (US PARENT), INC.; ENDO PHARMACEUTICALS, | )   (As to All Defendants) |
|   | )   21. STRICT LIABILITY: STATE OF |
| 14   INC.; ENDO PHARMACEUTICALS HOLDINGS INC.; CORNERSTONE BIOPHARMA, INC.; | )   ALABAMA Code of Alabama §§ 6-5-500 through 6-5-504 and 6-5-520 through 6-5-525 |
| 15   CORNERSTONE BIOPHARMA HOLDINGS, INC.; TEVA BIOPHARMACEUTICALS, INC.; | )   22. STRICT LIABILITY: STATE OF ARKANSAS Ark. Code Ann. § 16-116-102 |
| 16   TEVA PHARMACEUTICALS USA, INC.; MYLAN PHARMACEUTICALS, INC.; MYLAN, | )   23. STRICT LIABILITY: STATE OF COLORADO C.R.S.A. § 13-21-401 to |
| 17   INC.; COVIDIEN PLC; COVIDIEN INC.; | )   § 13-21-406 and Restatement (Second) |
| 18   MALLINCKRODT INC.; WATSON PHARMACEUTICALS, INC.; ABLE | )   Torts, Section 402A |
| 19   LABORATORIES; ARISTOS | )   24. STRICT LIABILITY: STATE OF FLORIDA Restatement (Second) |
| 20   PHARMACEUTICALS, INC.; and DOES 1 through 50, inclusive, | )   Torts, Section 402A |
| 21            Defendants. | )   25. LIABILITY: STATE OF GEORGIA § 51-1-11 OF THE GEORGIA CODE |
| 22 | )   26. STRICT LIABILITY: STATE OF |
| 23 | )   ILLINOIS Restatement (Second) Torts, Section 402A |
| 24 | )   27. STRICT LIABILITY: STATE OF INDIANA CLAIMS UNDER THE |
| 25 | )   IPLA: Ind. Code. Ann. §24-20 et seq. |
| 26 | )   28. LIABILITY: STATE OF KANSAS K.S.A. § 60-3302 et seq. |
| 27 | )   29. STRICT LIABILITY: STATE OF MAINE Strict Liability Pursuant to |
| 28 | )   Me. Rev. Stat. Ann. tit 14, § 221 (2008) |

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1                       )    **30. VIOLATION OF CONSUMER**
                        )    **PROTECTION ACTS AND**
2                       )    **DECEPTIVE TRADE PRACTICES**
                        )    **ACTS**
3                       )    **31. PUNITIVE DAMAGES**
                        )    **32. Wrongful Death**
4                       )    **33. Survivorship**

## INTRODUCTION

1.     This lawsuit concerns personal injury and wrongful death related to Plaintiffs' and Decedent's ingestion of prescription medication containing the active ingredient propoxyphene for treatment of mild to moderate pain, marketed and sold as generic and/or brand-name drugs under various names. All such medications that contain propoxyphene, in their various generic and brand-name forms, are referred to in this Complaint as "Propoxyphene Products".

2.     Plaintiffs allege that Defendants MCKESSON CORPORATION; ELI LILLY AND COMPANY; AAIPHARMA, INC; AAIPHARMA LLC; AAI DEVELOPMENT SERVICES, INC.; NEOSAN PHARMACEUTICALS INC.; XANODYNE PHARMACEUTICALS, INC.; QUALITEST PHARMACEUTICALS, INC.; VINTAGE PHARMACEUTICALS, INC.; PROPST DISTRIBUTION, INC.; BRENN DISTRIBUTION, INC.; BRENN MANUFACTURING, INC.; VINTAGE PHARMACEUTICALS, LLC; GENERICS INTERNATIONAL (US), INC.; GENERICS BIDCO I, LLC; GENERICS BIDCO II, LLC; GENERICS INTERNATIONAL (US PARENT), INC.; ENDO PHARMACEUTICALS, INC.; ENDO PHARMACEUTICALS HOLDINGS INC.; CORNERSTONE BIOPHARMA, INC.; CORNERSTONE BIOPHARMA HOLDINGS, INC.; TEVA BIOPHARMACEUTICALS, INC.; TEVA PHARMACEUTICALS USA, INC.; MYLAN PHARMACEUTICALS, INC.; MYLAN, INC.; COVIDIEN PLC; COVIDIEN INC.; MALLINCKRODT INC.; WATSON PHARMACEUTICALS, INC.; ABLE LABORATORIES, INC.; ARISTOS PHARMACEUTICALS, INC., and DOES 1 through 50, inclusive, inclusive knowingly or negligently manufactured, marketed, distributed, and sold defectively designed Propoxyphene Products without adequate warnings.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1        3.      In July, 2009, the FDA ordered Defendant Xanodyne Pharmaceuticals, Inc.,

2 (hereinafter "Xanodyne") to make changes to the labels of its Propoxyphene Products.  These

3 changes included:  (a) an addition to the Clinical Pharmacology section of the label discussing the

4 cardiac effects of propoxyphene; (b) a revised boxed warning concerning the risks of both intentional

5 and accidental overdose; (c) the reiteration of this warning regarding the risk of overdose in the

6 Warnings section of the label; and (d) the addition of bolded warnings in the Dosage and

7 Administration section of the label warning against exceeding the maximum daily dose.

8        4.      Without further discovery, it is unclear to Plaintiffs whether Xanodyne implemented

9 these required actions during the time that Propoxyphene Products remained on the market.

10        5.      By ordering the RLD holder to make these changes to its label, the FDA empowered

11 Generic Manufacturer Defendants to make the same changes to their own product labels through the

12 "Changes Being Effected" (CBE) process that does not require prior FDA approval.  21 C.F.R.

13 §314.70(c).  This is true whether or not Xanodyne ever implemented the labeling change.

14        6.      The Generic Defendants could have made these labeling changes without running

15 afoul of the requirement of "sameness" because federal law expressly permits generic labeling to

16 differ from RLD labeling where the labeling revision is "made to comply with current FDA labeling

17 guidelines or other guidance."  21 C.F.R. §314.94(a)(8)(iv).

18        7.      While Plaintiffs cannot know for certain without further discovery, it appears that

19 certain Generic Defendants never implemented these FDA-approved labeling changes between the

20 time that the FDA ordered the changes in July 2009 and the time that they withdrew Propoxyphene

21 Products from the market.  Many of the Plaintiffs used and were injured by Propoxyphene Products

22 during this period and allege that their physicians would not have prescribed Propoxyphene Products

23 to them if they had been informed of these new warnings.

24        8.      On information and belief, Defendant McKesson distributed Propoxyphene Products

25 with outdated and inaccurate labeling after July 2009, specifically, (a) an addition to the Clinical

26 Pharmacology section of the label discussing the cardiac effects of propoxyphene; (b) a revised

27 boxed warning concerning the risks of both intentional and accidental overdose; (c) the reiteration of

28 this warning regarding the risk of overdose in the Warnings section of the label; and (d) the addition

- 4 -

1 | of bolded warnings in the Dosage and Administration section of the label warning against exceeding
2 | the maximum daily dose.

3 |     9.      On information and belief, Defendant McKesson, which distributes more
4 | Propoxyphene Products throughout the United States than any other entity, is directly responsible for
5 | distributing the Propoxyphene Products with outdated and inaccurate labeling ingested by multiple
6 | Plaintiffs in this action.

7 |     10.     Defendants knew or should have known that Propoxyphene Products were ineffective,
8 | or at best, marginally effective, and that any benefits of propoxyphene were outweighed by its risks,
9 | including serious risks of adverse cardiovascular events that could result in death, as well as other
10 | injuries.

11 |     11.     The serious health risks associated with Propoxyphene Products and the many safer
12 | alternatives that were available led the British government to declare in a 2005 recall that it could not
13 | identify *any* group of patients for whom the benefits of propoxyphene outweighed its risks.

14 |     12.     In turn, in November 2010, the limited utility and significant risks associated with
15 | Propoxyphene Products led the United States Food and Drug Administration ("FDA") to take action
16 | to get all such products withdrawn from the market, and to get physicians to stop prescribing
17 | Propoxyphene Products, but the FDA's actions came too late to prevent Plaintiffs' injuries.

18 |     13.     All Defendants involved in the manufacture, marketing, distribution and sale of those
19 | defectively designed drugs must be held liable for those injuries.

20 | **PARTIES AND JURISDICTION**

21 |     14.     Plaintiffs allege an amount in controversy in excess of the minimal jurisdictional
22 | limits of this Court. A substantial part of the events giving rise to this claim occurred within the
23 | County of Los Angeles, State of California. For example, Plaintiff Margalit Corber, a citizen and
24 | resident of Los Angeles County, was prescribed Darvocet and suffered injuries as a result, within Los
25 | Angeles County.

26 |     15.     The true names or capacities, whether individual, corporate, or otherwise, of
27 | Defendants DOES 1 through 50, inclusive, are unknown to Plaintiffs despite Plaintiffs' reasonable
28 | attempts to identify Defendant DOES 1 through 50, who therefore sue said Defendants by such

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1   fictitious names.  Plaintiffs believe and allege that each of the Defendants designated herein by

2   fictitious names is in some manner legally responsible for the events and happenings herein referred

3   to and caused damages proximately and foreseeably to Plaintiffs as alleged herein.

4        16.    At all times herein alleged, unless specified otherwise, "Defendants" include all herein

5   named Defendants as well as Defendants DOES 1 through 50, inclusive.

6        17.    DOES 1 through 50, and each of them, acted independently of, or jointly with, other

7   Defendants, and are in some manner legally responsible for the events and happenings herein referred

8   to, and caused damages proximately and foreseeably to Plaintiffs as alleged herein.

9        18.    **"Plaintiff" and "Plaintiffs"**:  As used through-out this Complaint, the singular

10  version of "plaintiff" is also intended to include the plural version of all "plaintiffs" for whom that

11  section or cause of action applies to.  Likewise, the plural version of "plaintiffs" is also intended to

12  include each individual "plaintiff."

13       19.    **"Defendant" and "Defendants"**:  As used through-out this Complaint, the singular

14  version of "defendant" is also intended to include the plural version of all "defendants" for whom that

15  section or cause of action applies to.  Likewise, the plural version of "defendants" is also intended to

16  include each individual "defendant."

17                          **DISTRIBUTOR DEFENDANTS**

18       20.    Defendant MCKESSON CORPORATION (hereinafter, "McKesson"), at all times

19  alleged herein, is and was a corporation organized and existing under the laws of the State of

20  Delaware, with its principal place of business in the city of San Francisco, County of San Francisco,

21  California, duly authorized to transact business in the State of California.  At all times alleged herein,

22  McKesson is and was engaged in the business of marketing, distributing, promoting, advertising and

23  selling Propoxyphene Products nationwide and specifically within the State of California, including

24  Los Angeles County, where Plaintiff Margalit Corber and other Plaintiffs resided and/or ingested

25  Propoxyphene Products.

26       21.    On information and belief, McKesson has been integrally involved in marketing,

27  promoting, distributing, advertising, and merchandising propoxyphene products, including

28

                                    - 6 -

1  propoxyphene with inaccurate and outdated labeling, nationally, and specifically in the State of

2  California.

3        22.     Upon information and belief and subject to discovery of information within the

4  exclusive control of Defendants, McKesson distributed the Propoxyphene Products ingested by

5  multiple Plaintiffs alleged herein to have ingested Propoxyphene Products. McKesson, maintains

6  comprehensive distribution agreements with major retail pharmacies including, but not limited to,

7  CVS, Wal-Mart, and Rite Aid.

8        23.     The Drug Price Competition and Patent Term Restoration Act (the "Hatch-Waxman

9  Amendments"), which amended the federal Food, Drug, and Cosmetic Act, does not address

10  distributor liability.

11        24.     McKesson is not only one of the major national distributors of prescription drugs, it is

12  also involved in several levels of marketing, advertising, and promoting products for its drug

13  manufacturing clients.

14        25.     On its website, McKesson announces that it delivers to pharmaceutical drug

15  companies, "an unmatched combination of communication, promotion, distribution, and packaging

16  options, plus targeted analytics of exclusive data. McKesson Manufacturing Marketing enables

17  brands to set strategies that prioritize opportunities, optimize resources, and maximize profitability."

18  McKesson further advertises in its National Consumer Outreach Campaigns, to:

19

20        [o]ffer bother pharmacists and manufacturers a high-profile public platform to increase
      awareness about a variety of health concerns, from general wellness to guidance on

21        complying with specific therapies. McKesson works with manufacturers to tailor
      campaigns to their specific goals, and enhances the partnership between manufacturers

22        and pharmacists to enhance the success of national consumer outreach campaigns.

23        Moreover, according to its website, McKesson builds "patient awareness through retail

24  merchandising, promotions, and advertising," it increases "patient acquisition by fostering new trial

25  usage," an enhances "pharmacists' brand awareness through multiple communication platforms,

26  online ordering, and in-store promotions." McKesson advertises to pharmaceutical manufacturers,

27  including those manufacturing propoxyphene, promising not only to deliver drugs, but once there,

28

- 7 -

1    [y]ou need help promoting your products, getting them on the right shelves, reducing out-
2    of-stocks, and increasing your sales. Working with McKesson, we empower you to reach
     regional and independent pharmacies nationwide. And by supporting you with
3    merchandising, front-end promotions, and other strategic programs, we help you grow
     your profits.

4         26.    At all times alleged herein, McKesson includes any and all parents, subsidiaries,

5    affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their

6    predecessors, successors and assigns and their offices, directors, employees, agents, representatives

7    and any and all other persons acting on their behalf.

8                        **INNOVATOR AND BRAND DEFENDANTS**

9         27.    Defendant Eli Lilly and Company ("Eli Lilly") was at all relevant times a corporation

10   organized under the laws of Indiana, with its principal place of business located at Lilly Corporate

11   Center, Indianapolis, Indiana 46285.

12        28.    Defendant, aaiPharma, Inc., ("aaiPharma") was at all relevant times a corporation

13   organized under the laws of Delaware, with its principal place of business located at 2320 Scientific

14   Park Drive, Wilmington, North Carolina 28405.

15        29.    Defendant aaiPharma LLC ("aaiPharma LLC") was at all relevant times a limited

16   liability company organized under the laws of Delaware, with its principal place of business located

17   at 2320 Scientific Park Drive, Wilmington, North Carolina 28405.

18        30.    Defendant AAI Development Services, Inc. ("AAI DS") was at all relevant times a

19   corporation organized under the laws of Delaware, with its principal place of business located at 2320

20   Scientific Park Drive, Wilmington, North Carolina 28405. AAI DS was at all relevant times a

21   division of aaiPharma.

22        31.    Defendant NeoSan Pharmaceuticals Inc. ("NeoSan") was at all relevant times a

23   corporation organized under the laws of Delaware, with its principal place of business located at 2320

24   Scientific Park Drive, Wilmington, North Carolina 28405. NeoSan was at all relevant times a

25   commercialization business unit of aaiPharma.

26        32.    Defendant's aaiPharma, aaiPharma LLC, AAI DS, and NeoSan shall be referred to

27   herein individually by name or jointly as the "aaiPharma Entities."

28

- 8 -

33.   Defendant Xanodyne Pharmaceuticals, Inc. ("Xanodyne") was at all relevant times a corporation organized under the laws of Delaware, with its principal place of business located at One Riverfront Place, Newport, Kentucky 41071.

34.   For reference sake only, Defendant Eli Lilly, the Defendant aaiPharma Entities, and Defendant Xanodyne shall be referred to herein individually by name or jointly as the "Innovator and Brand Defendants," as these Defendants have, at various times as more fully set forth below, held the approved New Drug Application ("NDA") for Darvocet and Darvon, brand-name prescription medications containing propoxyphene as their sole or primary active ingredient for treatment of mild to moderate pain.

35.   Upon information and belief, other entities besides Defendant Eli Lilly, the Defendant aaiPharma Entities and Defendant Xanodyne, including but not limited to one or more other named Defendants or other entities not yet named, were involved in the testing, manufacture, marketing, sales and/or distribution of brand-name Propoxyphene Products, and to the extent such an entity has done so, then such entity is also a "Innovator and Brand Defendant," although Plaintiffs are still in the process of investigating the extent of such relationships.

36.   Defendant Eli Lilly first introduced propoxyphene to the United States market in 1957, and held the approved NDAs for Darvocet (propoxyphene) and Darvon (propoxyphene plus acetaminophen) until 2002.   Defendant Eli Lilly is credited as Innovator of both Darvon and Darvocet.

37.   In 2002, Defendant Eli Lilly sold its approved NDAs for Darvocet and Darvon to the Defendant aaiPharma Entities, subject to numerous restrictions, as set forth below.  Pursuant to this agreement, Eli Lilly retained an ongoing role and interest in the manufacture and marketing of Darvocet and Darvon, and on information and belief, Eli Lilly also continued to manufacture generic propoxyphene products for certain generic drug companies.

38.   In 2007, the Defendant aaiPharma Entities, as part of their bankruptcy reorganization, sold their approved NDAs for Darvocet and Darvon to Defendant Xanodyne.

39.   The Innovator and Brand Defendants were in the business of and did (either directly or indirectly through subsidiaries, related entities, third parties, predecessors or successors in interest)

- 9 -

1    develop, design, research, test, license, manufacture, label, advertise, promote, market, sell, distribute

2    and introduce into interstate commerce throughout the United States, including in California and Los

3    Angeles County, Darvon and Darvocet for use as prescription pain management medications for mild

4    to moderate pain.

5        40.    Upon information and belief, the Innovator and Brand Defendants entered into

6    contractual relationships related to the development, design, research, testing, licensing,

7    manufacturing, labeling, advertising, promotion, marketing, sale, distribution and/or introduction of

8    Darvon and Darvocet into interstate commerce throughout the United States, including within

9    California and Los Angeles County.

10                    **GENERIC QUALITEST DEFENDANTS**

11        41.    Defendant Qualitest Pharmaceuticals, Inc. ("Qualitest") was at all relevant times a

12   corporation organized under the laws of Alabama, with its principal place of business located at 130

13   Vintage Drive, Huntsville, Alabama 35811.

14        42.    On or about November 7, 2007, Defendant Qualitest changed its name to Propst

15   Distribution, Inc. ("Propst"), but continued doing business under the name Qualitest Pharmaceuticals,

16   Inc.

17        43.    Defendant Vintage Pharmaceuticals, Inc. ("Vintage") was at all relevant times a

18   corporation organized under the laws of Alabama, with its principal place of business located at 140

19   Vintage Drive, Huntsville Alabama 35811.

20        44.    On or about November 5, 2007, Defendant Vintage changed its name to Propst

21   Distribution, Inc. ("Propst").

22        45.    Defendant Propst was at all relevant times a corporation organized under the laws of

23   Alabama, with its principal place of business located at 130 Vintage Drive, Huntsville, Alabama

24   35811, and its reporting address located at 401 Meridian Street N, Huntsville, Alabama 35801.

25        46.    On or about June 23, 2011, Defendant Qualitest and Defendant Propst changed their

26   legal names to Brenn Distribution, Inc. ("Brenn Distribution") and Defendant Vintage changed its

27   name to Brenn Manufacturing, Inc., but all continued doing business under the name Qualitest

28   Pharmaceuticals, Inc.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1       47.   Defendant Brenn Distribution was at all relevant times a corporation organized under

2  the laws of Alabama, with its principle place of business located at 301 Meridian Street, Huntsville,

3  Alabama 35801.

4       48.   Defendant, Brenn Manufacturing was at all relevant times a corporation organized

5  under the laws of Alabama, with its principle place of business located at 301 Meridian Street,

6  Huntsville, Alabama 35801.

7       49.   Defendant Vintage Pharmaceuticals, LLC ("Vintage LLC") was at all relevant times a

8  corporation organized under the laws of Delaware, with its principal place of business located at 130

9  Vintage Drive, Huntsville, Alabama 35811, and may have also done business under the name

10  Qualitest Pharmaceuticals.

11      50.   Defendant Generics International (US), Inc. ("Generics US") was at all relevant times

12  a corporation organized under the laws of Delaware, with its principal place of business located at

13  130 Vintage Drive, Huntsville, Alabama 35811.

14      51.   Defendant Generics Bidco I, LLC ("Generics Bidco I") was at all relevant times a

15  corporation organized under the laws of Delaware, with its principal place of business located at 130

16  Vintage Drive, Huntsville, Alabama 35811.

17      52.   Defendant Generics Bidco II, LLC ("Generics Bidco II") was at all relevant times a

18  corporation organized under the laws of Delaware, which may have had its principal place of

19  business located at 130 Vintage Drive, Huntsville, Alabama 35811.

20      53.   Defendant Generics International (US Parent), Inc. ("Generics US Parent") was at all

21  relevant times a corporation organized under the laws of Delaware, with its principal place of

22  business located at 130 Vintage Drive, Huntsville, Alabama 35811.

23      54.   Defendant Endo Pharmaceuticals, Inc. ("Endo") was at all relevant times a corporation

24  organized under the laws of Delaware, with its principal place of business located at 100 Endo

25  Boulevard, Chadds Ford, Pennsylvania 19317.

26      55.   Defendant Endo Pharmaceuticals Holdings Inc. ("Endo Holdings") was at all relevant

27  times a corporation organized under the laws of Delaware, with its principal place of business located

28  at 100 Endo Boulevard, Chadds Ford, Pennsylvania 19317.

- 11 -

1    56.    Defendant, Cornerstone BioPharma, Inc. ("Cornerstone BioPharma"), was at all

2    relevant times a corporation organized under the laws of the State of Nevada, with its principal place

3    of business located at 1255 Crescent Green Drive, Suite 250, Cary, NC 27511.

4    57.    Defendant, Cornerstone BioPharma Holdings, Inc., ("Cornerstone Holdings"), was at

5    all relevant times a corporation organized under the laws of the State of Delaware, with its principal

6    place of business located at 1255 Crescent Green Drive, Suite 250, Cary, NC 27511.

7    58.    Defendant Qualitest, Defendant Vintage, Defendant Propst, Defendant Brenn

8    Distribution, Defendant, Brenn Manufacturing, Defendant Vintage LLC, Defendant Generics US,

9    Defendant Generics Bidco I, Defendant Generics Bidco II, Defendant Generics US Parent, Defendant

10   Endo, Defendant Endo Holdings, Defendant Cornerstone BioPharma and Defendant, Cornerstone

11   Holdings shall be referred to herein individually by name or jointly as the "Generic Qualitest

12   Defendants."

13   59.    At all relevant times, Defendant Generics US Parent owned Defendant Generics Bidco

14   I, Defendant Generics Bidco II and Defendant Generics US.

15   60.    Until on or about December 1, 2010, Defendant Qualitest, Defendant Vintage,

16   Defendant Propst, Defendant Brenn Distribution, Defendant, Brenn Manufacturing and/or Defendant

17   Vintage LLC were owned by Defendant Generics US, Defendant Generics Bidco I, Defendant

18   Generics Bidco II and/or Defendant Generics US Parent.

19   61.    On or about December 1, 2010, Defendant Endo Holdings acquired Defendant

20   Generics US, Defendant Generics Bidco I, Defendant Generics Bidco II and Defendant Generics US

21   Parent, and presumably indirectly acquired through one or all of them Defendant Qualitest,

22   Defendant Vintage, Defendant Propst, Defendant Brenn Distribution, Defendant, Brenn

23   Manufacturing and/or Defendant Vintage LLC.

24   62.    The businesses of Defendant Qualitest, Defendant Vintage, Defendant Propst,

25   Defendant Brenn Distribution, Defendant, Brenn Manufacturing, and/or Defendant Vintage LLC may

26   have been combined thereafter into a single business unit with Defendant Endo.

27   63.    Additionally, Cornerstone BioPharma entered into a certain Asset Purchase

28   Agreement and/or Manufacturing Agreement, as amended, with one or more of the other Qualitest

- 12 -

1   Defendants, including but not necessarily limited to Defendant, Vintage, LLC on or about July 20,

2   2004 for the sale, manufacture, marketing, supply, distribution and/or testing of Propoxyphene

3   Products including but not necessarily limited to Propoxyphene Napsylate/APAP 100 in 325mg and

4   500 mg forms.

5          64.     Upon information and belief Defendant Cornerstone Holdings is a parent, subsidiary,

6   affiliate, or other related company through merger or otherwise with Defendant Cornerstone

7   BioPharma.

8          65.     The extent to which Defendant Endo and/or Defendant Endo Holdings may have

9   assumed responsibility for the acts, omissions or liability of other Generic Qualitest Defendants,

10  contractually or otherwise, is unknown at this time, and Plaintiffs requires discovery as to this issue.

11         66.     It is believed that at all relevant times, Defendant Qualitest, Defendant Vintage,

12  Defendant Propst, Defendant Brenn and/or Defendant Vintage LLC were the holders of approved

13  Abbreviated New Drug Applications ("ANDAs") for prescription pain management medications

14  containing propoxyphene that were generic formulations of Darvocet and/or Darvon.

15         67.     It is possible, however, that the ANDA for these generic drugs may have been owned

16  by another of the Generic Qualitest Defendants, or one or more of their subsidiaries, parents or

17  related entities, but Plaintiffs have been unable to determine this, despite diligent and reasonable

18  investigations.

19         68.     Despite diligent and reasonable investigations, Plaintiff has been unable to determine

20  the exact relationship between and among the Generic Qualitest Defendants, but believe that each has

21  been in the business of, and been involved with, either directly or indirectly (through each other or

22  other subsidiaries, related entities, third parties, predecessors or successors in interest), developing,

23  designing, researching, testing, licensing, manufacturing, labeling, advertising, promoting, marketing,

24  selling, distributing and introducing into interstate commerce throughout the United States, including

25  in California and Los Angeles County, generic Propoxyphene Products for use as prescription pain

26  management medications.

27

28

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    69.    Upon information and belief, the Generic Qualitest Defendants manufactured the

2  majority of the Propoxyphene Products sold at national retailers, including CVS and Wal-Mart, as

3  distributed by McKesson Defendants.

4                            **GENERIC TEVA DEFENDANTS**

5    70.    Defendant TEVA Biopharmaceuticals, Inc. ("TEVA Biopharmaceuticals") was at all

6  relevant times a corporation organized under the laws of Delaware, with its principal place of

7  business located at 9410 Key West Avenue, Rockville, Maryland 20850-3345.

8    71.    Defendant TEVA Pharmaceuticals USA, Inc. ("TEVA Pharmaceuticals") was at all

9  relevant times a corporation organized under the laws of Delaware, with its principal place of

10  business located at 1090 Horsham Road, North Wales, Pennsylvania 19454.

11    72.    Defendant TEVA Biopharmaceuticals and Defendant TEVA Pharmaceuticals shall be

12  collectively referred to as the "Generic TEVA Defendants."

13    73.    It is believed that at all relevant times, one or a combination of the Generic TEVA

14  Defendants were holders of approved Abbreviated New Drug Applications ("ANDAs") for

15  prescription pain management medications containing propoxyphene that were generic formulations

16  of Darvocet and/or Darvon.

17    74.    The Generic TEVA Defendants were in the business of and did (either directly or

18  indirectly through subsidiaries, related entities, third parties, predecessors or successors in interest)

19  develop, design, research, test, license, manufacture, label, advertise, promote, market, sell, distribute

20  and introduce into interstate commerce throughout the United States, including in California and Los

21  Angeles County, generic Propoxyphene Products for use as prescription pain management

22  medications for mild to moderate pain.

23                          **GENERIC MYLAN DEFENDANTS**

24    75.    Defendant Mylan Pharmaceuticals, Inc. ("Mylan Pharmaceuticals") was at all relevant

25  times a corporation organized under the laws of West Virginia, with its principal place of business

26  located at 781 Chestnut Ridge Road, Morgantown, West Virginia 26505.

27

28

- 14 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

76.     Defendant Mylan, Inc. ("Mylan") was at all relevant times a corporation organized under the laws of Pennsylvania, with its principal place of business located at 1500 Corporate Drive, Canonsburg, Pennsylvania 15317, and is the parent corporation of Mylan Pharmaceuticals.

77.     Defendant Mylan Pharmaceuticals and Defendant Mylan shall be collectively referred to as the "Generic Mylan Defendants."

78.     It is believed that at all relevant times, one or a combination of the Generic Mylan Defendants were holders of approved Abbreviated New Drug Applications ("ANDAs") for prescription.

79.     It is believed that at all relevant times, one or a combination of the Generic Mylan Defendants were holders of approved Abbreviated New Drug Applications ("ANDAs") for prescription pain management medications containing propoxyphene that were generic formulations of Darvocet and/or Darvon.

80.     The Generic Mylan Defendants were in the business of and did (either directly or indirectly through subsidiaries, related entities, third parties, predecessors or successors in interest) develop, design, research, test, license, manufacture, label, advertise, promote, market, sell, distribute and introduce into interstate commerce throughout the United States, including in California and Los Angeles County, generic Propoxyphene Products for use as prescription pain management medications for mild to moderate pain.

## GENERIC COVIDIEN DEFENDANTS

81.     Defendant Covidien PLC was at all relevant times a corporation organized under the laws of Ireland, with its United States headquarters located at 15 Hampshire Street, Mansfield, Massachusetts 02048.

82.     Defendant Covidien Inc. ("Covidien") was at all relevant times a corporation organized under the laws of Delaware, with its principal place of business located at 15 Hampshire Street, Mansfield, Massachusetts.  It has appointed The Corporation Trust Company as its registered agent at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

- 15 -

1    83.    Upon information and belief, Defendant Mallinckrodt Inc. ("Mallinckrodt") was at all

2   relevant times a corporation organized under the laws of Missouri or Delaware or New York, with its

3   principal place of business located at 675 McDonnell Boulevard., Hazelwood, Missouri 63042.

4    84.    Defendants Covidien and Mallinckrodt are wholly-owned subsidiaries of Defendant

5   Covidien PLC.

6    85.    Defendant Covidien PLC, Defendant Covidien and Defendant Mallinckrodt shall be

7   collectively referred to as the "Generic Covidien Defendants."

8    86.    It is believed that at all relevant times, one or a combination of the Generic Covidien

9   Defendants were the holders of approved Abbreviated New Drug Applications ("ANDAs") for

10   prescription pain management medications containing propoxyphene that were generic formulations

11   of Darvocet and/or Darvon.

12    87.    The Generic Covidien Defendants were in the business of and did (either directly or

13   indirectly through subsidiaries, related entities, third parties, predecessors or successors in interest)

14   develop, design, research, test, license, manufacture, label, advertise, promote, market, sell, distribute

15   and introduce into interstate commerce throughout the United States, including in California and Los

16   Angeles County, generic Propoxyphene Products for use as prescription pain management

17   medications for mild to moderate pain.

18   **GENERIC WATSON DEFENDANTS**

19    88.    Defendant Watson Pharmaceuticals, Inc. ("Watson" or "Generic Watson Defendant")

20   was at all relevant times a corporation organized under the laws of Nevada, with its principal place of

21   business located at 311 Bonnie Circle, Corona, California 92880-2882.

22    89.    It is believed that at all relevant times, Defendant Watson was the holder of approved

23   Abbreviated New Drug Applications ("ANDAs") for prescription pain management medications

24   containing propoxyphene that were generic formulations of Darvocet and/or Darvon.

25    90.    Defendant Watson was in the business of and did (either directly or indirectly through

26   subsidiaries, related entities, third parties, predecessors or successors in interest) develop, design,

27   research, test, license, manufacture, label, advertise, promote, market, sell, distribute and introduce

28   into interstate commerce throughout the United States, including in California and Los Angeles

- 16 -

1   County, generic Propoxyphene Products for use as prescription pain management medications for

2   mild to moderate pain.

### GENERIC ABLE DEFENDANT

4   91.   Defendant Able Laboratories, Inc. ("Able") was at all relevant times a corporation

5   organized under the laws of Delaware, with its principal place of business located at 1 Able Drive,

6   Cranbury, New Jersey 08512-3609.

7   92.   Defendant Able Laboratories, Inc., shall herein be referred to as "Generic Able

8   Defendant."

9   93.   It is believed that at all relevant times, the Generic Abel Defendant was a holder of

10   approved Abbreviated New Drug Applications ("ANDAs") for prescription pain management

11   medications containing propoxyphene that were generic formulations of Darvocet and/or Darvon.

12   94.   The Generic Able Defendants were in the business of and did (either directly or

13   indirectly through subsidiaries, related entities, third parties, predecessors or successors in interest)

14   develop, design, research, test, license, manufacture, label, advertise, promote, market, sell, distribute

15   and introduce into interstate commerce throughout the United States, including in California and Los

16   Angeles County generic Propoxyphene Products for use as prescription pain management

17   medications for mild to moderate pain.

### GENERIC ARISTOS DEFENDANT

19   95.   Defendant Aristos Pharmaceuticals, Inc. ("Aristos" or "Generic Aristos Defendant")

20   was at all relevant times a corporation organized under the laws of Delaware, with its principal place

21   of business located at 1255 Crescent Green Drive, Suite 250, Cary, North Carolina 27518.

22   96.   Defendant Aristos Pharmaceuticals, Inc. shall herein be referred to as "Generic Aristos

23   Defendant."

24   97.   It is believed that at all relevant times, the Generic Aristos Defendant was the holder

25   of approved Abbreviated New Drug Applications ("ANDAs") for prescription pain management

26   medications containing propoxyphene that were generic formulations of Darvocet and/or Darvon.

27   98.   The Generic Aristos Defendants were in the business of and did (either directly or

28   indirectly through subsidiaries, related entities, third parties, predecessors or successors in interest)

- 17 -

1 | develop, design, research, test, license, manufacture, label, advertise, promote, market, sell, distribute

2 | and introduce into interstate commerce throughout the United States, including in California and Los

3 | Angeles County, generic Propoxyphene Products for use as prescription pain management

4 | medications for mild to moderate pain.

5 | ### GENERIC DEFENDANTS

6 | 99.     For reference sake only, the Generic Qualitest Defendants, the Generic Covidien

7 | Defendants, the Generic TEVA Defendants, the Generic Mylan Defendants, the Generic Watson

8 | Defendants and any other Defendant and/or entity involved in the testing, manufacture, sale,

9 | distribution and/or marketing of generic Propoxyphene Products shall be referred to herein

10 | individually by name or jointly as the "Generic Defendants."

11 | ### PLAINTIFFS

12 | 100.     Plaintiffs are individuals who ingested Propoxyphene Products manufactured,

13 | marketed, distributed, and sold by Defendants, and suffered severe cardiovascular injuries as a result

14 | of said ingestion.

15 | 101.     Plaintiff Margalit Corber is and was at all times relevant a resident and citizen of the

16 | State of California. This Plaintiff purchased prescription Propoxyphene containing products on

17 | various dates including but not necessarily limited to August 8, 2008, within the state of California.

18 | This Plaintiff ingested the Propoxyphene containing medication at various times thereafter and as a

19 | direct and proximate result of this Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was

20 | diagnosed an arrhythmia and/or other heart related injuries on or around August 28, 2009 within the

21 | state of California. The Propoxyphene ingested by this Plaintiff was manufactured by one or more of

22 | the Generic Defendants.

23 | 102.     Plaintiff Rene Caro is and was at all times relevant a resident and citizen of the State

24 | of California. This Plaintiff purchased prescription Propoxyphene containing products within the

25 | state of California on or before November 2008 and on other dates. This Plaintiff ingested the

26 | Propoxyphene containing medication at various times thereafter and as a direct and proximate result

27 | of this Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed with arrhythmia

28 |

- 18 -

1   and/or other heart related injuries on or around November 2008, within the state of California. The

2   Propoxyphene ingested by this Plaintiff was manufactured by one or more of the Defendants.

3       103.   Plaintiff Steve Dantzler is and was at all times relevant a resident and citizen of the

4   State of Alabama. This Plaintiff purchased prescription Propoxyphene containing products from 2000

5   to 2005 and other dates, within the state of Alabama. This Plaintiff ingested the Propoxyphene

6   containing medication at various times thereafter and as a direct and proximate result of this

7   Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed with bradycardia,

8   tachycardia and other heart related injuries on various dates from 2000 to 2005 and/or other heart

9   related injuries within the state of Alabama.  The Propoxyphene ingested by this Plaintiff was

10  manufactured by one or more of the Defendants.

11      104.   Plaintiff Linda Sowards is and was at all times relevant a resident and citizen of the

12  State of Alabama. This Plaintiff purchased prescription Propoxyphene containing products on various

13  dates including but not necessarily limited to November 3, 2010, within the state of Alabama. This

14  Plaintiff ingested the Propoxyphene containing medication at various times thereafter and as a direct

15  and proximate result of this Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed

16  with myocardial infarction and/or other heart related injuries on or around November 2010, within

17  the state of Alabama.  The Propoxyphene ingested by this Plaintiff was manufactured by one or more

18  of the Generic Defendants.

19      105.   Plaintiff Lori Huisman is and was at all times relevant a resident and citizen of the

20  State of Arizona. This Plaintiff purchased prescription Propoxyphene containing products within the

21  state of Arizona on or before July 31, 2009 and on other dates. This Plaintiff ingested the

22  Propoxyphene containing medication at various times thereafter and as a direct and proximate result

23  of this Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed with tachycardia

24  resulting in pacemaker placement and/or other heart related injuries on or around July 31, 2009,

25  within the state of Arizona. The Propoxyphene ingested by this Plaintiff was manufactured by one or

26  more of the Defendants.

27      106.   Plaintiff Johnny George Sr. is and was at all times relevant a resident and citizen of the

28  State of Arkansas. This Plaintiff purchased prescription Propoxyphene containing products within the

- 19 -

1   state of Arkansas on or before January 18, 2010 and on other dates. This Plaintiff ingested the

2   Propoxyphene containing medication at various times thereafter and as a direct and proximate result

3   of this Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed with an arrhythmia

4   and/or other heart related injuries on or around January 18, 2010, within the state of Arkansas. The

5   Propoxyphene ingested by this Plaintiff was manufactured by one or more of the Defendants.

6       107.    Plaintiff Terry Perry is and was at all times relevant a resident and citizen of the State

7   of Arkansas. This Plaintiff purchased prescription Propoxyphene containing products on various

8   dates including but not necessarily limited to October 5, 2010, within the state of Arkansas. This

9   Plaintiff ingested the Propoxyphene containing medication at various times thereafter and as a direct

10  and proximate result of this Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed

11  with syncope and arrhythmia and/or other heart related injuries on or around November 1, 2010,

12  within the state of Arkansas. The Propoxyphene ingested by this Plaintiff was manufactured by one

13  or more of the Generic Defendants.

14      108.    Plaintiff William Rackley is and was at all times relevant a resident and citizen of the

15  State of Arkansas. This Plaintiff purchased prescription Propoxyphene containing products on

16  various dates including but not necessarily limited to June 1, 2001, within the state of Arkansas. This

17  Plaintiff ingested the Propoxyphene containing medication at various times thereafter and as a direct

18  and proximate result of this Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed

19  with right bundle block, irregular heartbeat, and/or other heart related injuries on or around August

20  31, 2001, within the state of Arkansas. The Propoxyphene ingested by this Plaintiff was

21  manufactured by one or more of the Generic Defendants.

22      109.    Plaintiff Angela Young is and was at all times relevant a resident and citizen of the

23  State of Arkansas. This Plaintiff purchased prescription Propoxyphene containing products within the

24  state of Arkansas on or before August 21, 2007. This Plaintiff ingested the Propoxyphene containing

25  medication at various times thereafter and as a direct and proximate result of this Plaintiff's

26  Propoxyphene use, this Plaintiff suffered and/or was diagnosed with an arrhythmia resulting in

27  pacemaker placement and/or other heart related injuries on or around August 27, 2007 within the

28

- 20 -

1  state of Arkansas. The Propoxyphene ingested by this Plaintiff was manufactured by one or more of

2  the Defendants.

3      110.    Plaintiff Pamela Rodriguez is and was at all times relevant a resident and citizen of the

4  State of Colorado. This Plaintiff purchased prescription Propoxyphene containing products within the

5  state of Colorado in or before 1986 and other dates. This Plaintiff ingested the Propoxyphene

6  containing medication at various times thereafter and as a direct and proximate result of this

7  Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed with tachycardia and/or

8  other heart related injuries in or around 1986, within the state of Colorado. The Propoxyphene

9  ingested by this Plaintiff was manufactured by one or more of the Defendants.

10     111.    Plaintiff Steven Syverson is and was at all times relevant a resident and citizen of the

11  State of Colorado. This Plaintiff purchased prescription Propoxyphene containing products within the

12  state of Colorado on or before 1992 and on other dates. This Plaintiff ingested the Propoxyphene

13  containing medication at various times thereafter and as a direct and proximate result of this

14  Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed with supraventricular

15  tachycardia, myocardial infarction, atrial fibrillation, and/or other heart related injuries on or around

16  1992, 2001, and 2002, within the state of Colorado.  The Propoxyphene ingested by this Plaintiff was

17  manufactured by one or more of the Defendants.

18     112.    Plaintiff Olga Caicoya is and was at all times relevant a resident and citizen of the

19  State of Florida. This Plaintiff purchased prescription Propoxyphene containing products within the

20  state of Florida on or before November 26, 2010 and on other dates. This Plaintiff ingested the

21  Propoxyphene containing medication at various times thereafter and as a direct and proximate result

22  of this Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed with tachycardia

23  and/or other heart related injuries on or around November 26, 2010, within the state of Florida. The

24  Propoxyphene ingested by this Plaintiff was manufactured by one or more of the Generic Defendants.

25     113.    Plaintiff Janet Carroll is and was at all times relevant a resident and citizen of the State

26  of Florida. This Plaintiff purchased prescription Propoxyphene containing products within the state of

27  Florida in or before her injury in 2001 and on other dates. This Plaintiff ingested the Propoxyphene

28  containing medication at various times thereafter and as a direct and proximate result of this

- 21 -

1   Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed with syncope, arrhythmia

2   and/or other heart related injuries in or around 2001 within the state of Florida. The Propoxyphene

3   ingested by this Plaintiff was manufactured by one or more of the Defendants.

4        114.    Plaintiff Rose Cash is and was at all times relevant a resident and citizen of the State

5   of Florida.  This Plaintiff purchased prescription Propoxyphene containing products on various dates

6   within the state of Florida. This Plaintiff ingested the Propoxyphene containing medication at various

7   times thereafter and as a direct and proximate result of this Plaintiff's Propoxyphene use, this

8   Plaintiff suffered and/or was diagnosed with heart rhythm abnormalities and tachycardia in 2005, and

9   a heart attack in 2009, and other heart related injuries, within the state of Florida.  The Plaintiff

10  ingested Propoxyphene Products manufactured by Defendants before suffering injuries as described

11  in this paragraph.

12       115.    Plaintiff Ulad Celentano is and was at all times relevant a resident and citizen of the

13  State of Florida.  This Plaintiff purchased prescription Propoxyphene containing products on various

14  dates within the state of Florida. This Plaintiff ingested the Propoxyphene containing medication at

15  various times thereafter and as a direct and proximate result of this Plaintiff's Propoxyphene use, this

16  Plaintiff suffered and/or was diagnosed with bradycardia necessitating a pacemaker installation, and

17  other heart related injuries, within the state of Florida.  The Plaintiff ingested Propoxyphene Products

18  manufactured by Defendants before suffering injuries as described in this paragraph.

19       116.    Plaintiff Virginia Costanzo is and was at all times relevant a resident and citizen of the

20  State of Florida. This Plaintiff purchased prescription Propoxyphene containing products on various

21  dates within the state of Florida. This Plaintiff ingested the Propoxyphene containing medication at

22  various times thereafter and as a direct and proximate result of this Plaintiff's Propoxyphene use, this

23  Plaintiff suffered and/or was diagnosed with tachycardia, prolonged QT and a borderline prolonged

24  PR interval on April 9, 2004 and/or other heart related injuries within the state of Florida.  The

25  Propoxyphene ingested by this Plaintiff was manufactured by one or more of the Defendants.

26       117.    Plaintiff Kimberly Filligim is and was at all times relevant a resident and citizen of the

27  State of Florida. This Plaintiff purchased prescription Propoxyphene containing products within the

28  state of Florida on or before June 25, 2002 and on other dates. This Plaintiff ingested the

- 22 -

1  Propoxyphene containing medication at various times thereafter and as a direct and proximate result
2  of this Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed with premature
3  ventricular contractions, bundle branch block and/or other heart related injuries on or around June 25,
4  2002, within the state of Florida. The Propoxyphene ingested by this Plaintiff was manufactured by
5  one or more of the Defendants.

6      118.    Plaintiff Armeldia Smith is and was at all times relevant a resident and citizen of the
7  State of Florida. This Plaintiff purchased prescription Propoxyphene containing products on various
8  dates including but not necessarily limited to October 30, 2009, within the state of Florida. This
9  Plaintiff ingested the Propoxyphene containing medication at various times thereafter and as a direct
10 and proximate result of this Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed
11 with prolonged QT interval and/or other heart related injuries on or around February 2010, within the
12 state of Florida. The Propoxyphene ingested by this Plaintiff was manufactured by one or more of the
13 Generic Defendants.

14     119.    Plaintiff Carla West is and was at all times relevant a resident and citizen of the State
15 of Florida. This Plaintiff purchased prescription Propoxyphene containing products, within the state
16 of Florida in or before 2003. This Plaintiff ingested the Propoxyphene containing medication at
17 various times thereafter and as a direct and proximate result of this Plaintiff's Propoxyphene use, this
18 Plaintiff suffered and/or was first diagnosed with an arrhythmia and subsequent supraventricular
19 tachycardia and/or other heart related injuries in or around 2003, within the state of Florida. The
20 Propoxyphene ingested by this Plaintiff was manufactured by one or more of the Defendants.

21     120.    Plaintiff Joanne Bierzynski individually and as next of kin to Decedent Eleanor
22 Wojcik brings this action individually and on behalf of next of kin of Decedent Joanne
23 Bierzynski. Before this Decedent's death, she was at all times relevant a resident and citizen of the
24 State of Florida. This Decedent purchased prescription Propoxyphene containing products on various
25 dates including but not necessarily limited to January 15, 2004, within the state of Florida. This
26 Decedent ingested the Propoxyphene containing medication at various times thereafter and as a direct
27 and proximate result of this Decedent's Propoxyphene use, this Decedent suffered and/or was
28 diagnosed with cardiac standstill and an arrhythmia and/or other heart related injuries which directly

- 23 -

1   led to her death on or around February 2, 2004, within the state of Florida. The Propoxyphene

2   ingested by this Decedent was manufactured by one or more of the Generic Defendants.

3        121.   Plaintiff Sharley Morris is and was at all times relevant a resident and citizen of the

4   State of Georgia. This Plaintiff purchased prescription Propoxyphene containing products within the

5   state of Georgia on or before December 28, 2007 and on other dates. This Plaintiff ingested the

6   Propoxyphene containing medication at various times thereafter and as a direct and proximate result

7   of this Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed with bradycardia

8   with pacemaker placement and/or other heart related injuries on or around December 28, 2007,

9   within the state of Georgia. The Propoxyphene ingested by this Plaintiff was manufactured by one or

10   more of the Defendants.

11        122.   Plaintiff Wyomia Timmons is and was at all times relevant a resident and citizen of

12   the State of Georgia. This Plaintiff purchased prescription Propoxyphene containing products on

13   various dates including but not necessarily limited to October 9, 2010, within the state of Georgia.

14   This Plaintiff ingested the Propoxyphene containing medication at various times thereafter and as a

15   direct and proximate result of this Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was

16   diagnosed with an irregular heartbeat and/or other heart related injuries on or around November 2010,

17   within the state of Georgia. The Propoxyphene ingested by this Plaintiff was manufactured by one or

18   more of the Generic Defendants.

19        123.   Plaintiff Dean Reinking is and was at all times relevant a resident and citizen of the

20   State of Hawaii. This Plaintiff purchased prescription Propoxyphene containing products within the

21   state of Hawaii in or before 2004, 2008 and other dates. This Plaintiff ingested the Propoxyphene

22   containing medication at various times thereafter and as a direct and proximate result of this

23   Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed with tachycardia in or

24   about 2004, myocardial infarction in or about 2008, and/or other heart related injuries within the state

25   of Hawaii. The Propoxyphene ingested by this Plaintiff was manufactured by one or more of the

26   Defendants.

27        124.   Plaintiff Daniel Thorne is and was at all times relevant a resident and citizen of the

28   State of Illinois. This Plaintiff purchased prescription Propoxyphene containing products within the

1   state of Illinois on or before November 15, 2009 and other dates. This Plaintiff ingested the

2   Propoxyphene containing medication at various times thereafter and as a direct and proximate result

3   of this Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed with

4   supraventricular tachycardia, prolonged QT interval and/or other heart related injuries on or around

5   November 15, 2009, within the state of Illinois. The Propoxyphene ingested by this Plaintiff was

6   manufactured by one or more of the Generic Manufacturers.

7       125.   Plaintiff Wendelen Ashby is and was at all times relevant a resident and citizen of the

8   State of Indiana. This Plaintiff purchased prescription Propoxyphene containing products on various

9   dates including but not necessarily limited to May 2, 2004, June 23, 2004, and September 19, 2004,

10  within the state of Indiana. This Plaintiff ingested the Propoxyphene containing medication at various

11  times thereafter and as a direct and proximate result of this Plaintiff's Propoxyphene use, this

12  Plaintiff suffered and/or was diagnosed with an arrhythmia and/or other heart related injuries in or

13  around 2004 within the state of Indiana. The Propoxyphene ingested by this Plaintiff was

14  manufactured by one or more of the Generic Defendants.

15      126.   Plaintiff Carmen Bedford is and was at all times relevant a resident and citizen of the

16  State of Indiana. This Plaintiff purchased prescription Propoxyphene containing products on various

17  dates including but not necessarily limited to July 17, 2008, within the state of Indiana. This Plaintiff

18  ingested the Propoxyphene containing medication at various times thereafter and as a direct and

19  proximate result of this Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed

20  with heart arrhythmia, bradycardia, and tachycardia and/or other heart related injuries on or around

21  2008, within the state of Indiana. The Propoxyphene ingested by this Plaintiff was manufactured by

22  one or more of the Generic Defendants.

23      127.   Plaintiff Claude Commodore is and was at all times relevant a resident and citizen of

24  the State of Indiana. This Plaintiff purchased prescription Propoxyphene containing products within

25  the state of Indiana on or before 2006 and on other dates. This Plaintiff ingested the Propoxyphene

26  containing medication at various times thereafter and as a direct and proximate result of this

27  Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed with an arrhythmia and

28

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1 tachycardia and/or other heart related injuries in or around 2006, within the state of Indiana. The

2 Propoxyphene ingested by this Plaintiff was manufactured by one or more of the Generic Defendants.

3      128.   Plaintiff James Henson is and was at all times relevant a resident and citizen of the

4 State of Indiana. This Plaintiff purchased prescription Propoxyphene containing products on various

5 dates including but not necessarily limited to August 26, 2010, within the state of Indiana. This

6 Plaintiff ingested the Propoxyphene containing medication at various times thereafter and as a direct

7 and proximate result of this Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed

8 with bradycardia resulting in pacemaker placement and/or other heart related injuries in or around

9 April 2010, within the state of Indiana. The Propoxyphene ingested by this Plaintiff was

10 manufactured by one or more of the Generic Defendants.

11      129.   Plaintiff Nancy Locke is and was at all times relevant a resident and citizen of the

12 State of Indiana. This Plaintiff purchased prescription Propoxyphene containing products on various

13 dates including but not necessarily limited to June 7, 2010, within the state of Indiana. This Plaintiff

14 ingested the Propoxyphene containing medication at various times thereafter and as a direct and

15 proximate result of this Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed

16 with right bundle branch block and syncope and/or other heart related injuries on or around June 7,

17 2010, within the state of Indiana. The Propoxyphene ingested by this Plaintiff was manufactured by

18 one or more of the Generic Defendants.

19      130.   Plaintiff Mildred Scott is and was at all times relevant a resident and citizen of the

20 State of Indiana. This Plaintiff purchased prescription Propoxyphene containing products, within the

21 state of Indiana in or before May 2010 and on other dates. This Plaintiff ingested the Propoxyphene

22 containing medication at various times thereafter and as a direct and proximate result of this

23 Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed with arrhythmia,

24 tachycardia and/or other heart related injuries in or around May 2010, within the state of Indiana. The

25 Propoxyphene ingested by this Plaintiff was manufactured by one or more of the Defendants.

26      131.   Plaintiff Billie Burnett is and was at all times relevant a resident and citizen of the

27 State of Kansas. This Plaintiff purchased prescription Propoxyphene containing products within the

28 state of Kansas in or before 2002 and on other dates. This Plaintiff ingested the Propoxyphene

- 26 -

1   containing medication at various times thereafter and as a direct and proximate result of this

2   Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was first diagnosed with an arrhythmia

3   resulting in pacemaker placement and/or other heart related injuries in or around 2002, within the

4   state of Kansas. The Propoxyphene ingested by this Plaintiff was manufactured by one or more of the

5   Defendants.

6       132.    Plaintiff Sheena Hall is and was at all times relevant a resident and citizen of the State

7   of Maine. This Plaintiff purchased prescription Propoxyphene containing products on various dates

8   including but not necessarily limited to 2009, within the state of Maine. This Plaintiff ingested the

9   Propoxyphene containing medication at various times thereafter and as a direct and proximate result

10  of this Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed with arrhythmia

11  and/or other heart related injuries on or around 2009, within the state of Maine. The Propoxyphene

12  ingested by this Plaintiff was manufactured by one or more of the Defendants.

13      133.    Plaintiff Brenda Roberge individually and as next of kin to Decedent Ernest Roberge

14  brings this action individually and on behalf of next of kin and of Decedent Ernest Roberge. Before

15  this Decedent's death, he was at all times relevant a resident and citizen of the State of Maine. This

16  Decedent purchased prescription Propoxyphene containing products within the state of Maine on or

17  before May 2, 2010 and on other dates. This Decedent ingested the Propoxyphene containing

18  medication at various times thereafter and as a direct and proximate result of this Decedent's

19  Propoxyphene use, this Decedent suffered and/or was diagnosed with cardiac arrest, cardiomyopathy,

20  and/or other heart related injuries which directly led to his death on or around May 2, 2010, within

21  the state of Maine. The Propoxyphene ingested by this Decedent was manufactured by one or more

22  of the Defendants.

23      134.    Plaintiff Deborah Woodsum is and was at all times relevant a resident and citizen of

24  the State of Maine. This Plaintiff purchased prescription Propoxyphene containing products on

25  various dates including but not necessarily limited to October 7, 2008, within the state of Maine. This

26  Plaintiff ingested the Propoxyphene containing medication at various times thereafter and as a direct

27  and proximate result of this Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed

28  with arrhythmia and/or other heart related injuries on or around October 7, 2008, within the state of

- 27 -

1   Maine. The Propoxyphene ingested by this Plaintiff was manufactured by one or more of the Generic

2   Defendants.

3         135.    Plaintiff Richard Pascuito is and was at all times relevant a resident and citizen of the

4   State of Massachusetts. This Plaintiff purchased prescription Propoxyphene containing products

5   within the state of Massachusetts on or before April 28, 1992 an on other dates. This Plaintiff

6   ingested the Propoxyphene containing medication at various times thereafter and as a direct and

7   proximate result of this Plaintiff's Propoxyphene use, this Plaintiff suffered and/or was diagnosed

8   with ventricular fibrillation, cardiac arrest and/or other heart related injuries on or around April 28,

9   1992, within the state of Massachusetts. The Propoxyphene ingested by this Plaintiff was

10  manufactured by one or more of the Defendants.

11        136.    Upon information and belief all of Plaintiff's injuries, as set forth in the preceding

12  paragraphs were directly and proximately caused by Plaintiff's ingestion of propoxyphene products.

13        137.    The medical treatment and injuries described above are not necessarily a full and

14  complete description of each Plaintiff's injuries, as Plaintiff may have or did incur further treatment

15  and injuries not specifically set forth herein.

16                            FACTUAL BACKGROUND

17

18  I.      THE DANGERS AND DUBIOUS EFFECTIVENESS OF PROPOXYPHENE
            PRODUCTS

19

20          A.      Propoxyphene is a dangerous, ineffective drug.

21        138.    Propoxyphene is a centrally-acting opiate analgesic that is structurally related to

22  methadone.

23        139.    Propoxyphene is a pain reliever used to treat mild to moderate pain.

24        140.    Propoxyphene is marketed in two chemical forms (propoxyphene hydrochloride and

25  propoxyphene napsylate), and is sold both as a single chemical entity and also in combination with

26  either acetaminophen or aspirin.

27        141.    Branded products with the name "Darvocet" contain both propoxyphene and

28  acetaminophen.

- 28 -

142.    Branded products with the name "Darvon" do not contain acetaminophen.

143.    In 1971, Eli Lilly conducted seven identically designed efficacy trials for propoxyphene, six of which demonstrated that propoxyphene alone was not significantly superior to placebo.  The trials showed, in contrast, that acetaminophen was significantly superior to placebo.

144.    Propoxyphene also has been plagued by concerns of its potential toxicity for decades.

145.    for instance, in as early as 1978, the Health Research Group filed a Citizen Petition to the FDA requesting the recall of Darvon, claiming it was a dangerous drug of questionable effectiveness.

146.    Non-clinical studies conducted in response to the 1978 Citizen Petition supported the hypothesis of certain clinical findings that deaths due to overdoses of propoxyphene could be due to cardiotoxicity from propoxyphene.

147.    Upon information and belief, Defendants knew of the risks and questionable effectiveness of Propoxyphene Products for decades and failed to convey those concerns to the public and/or properly investigate the concerns.

148.    According to the FDA, in 2009, approximately ten million people in the United States received prescriptions for Propoxyphene Products.

149.    However, propoxyphene, when taken as prescribed and intended, causes and contributes to a greatly increased risk of serious and dangerous side effects including, without limitation, heart arrhythmias, myocardial infarctions, other adverse cardiovascular events and/or sudden death.

150.    These unique and dangerous risks are not present with other practical and medically-feasible alternate pain management medications that do not contain propoxyphene.

151.    The FDA's adverse event data has confirmed that staggering, serious adverse events have been associated with propoxyphene-containing drugs, including but not limited to heart arrhythmias, atrial fibrillations, tachycardias, bradycardias, myocardial infarctions and/or sudden death.

B.      Great Britain and Europe Withdrew Propoxyphene Products.

- 29 -

152.    In January 2005, health officials in Great Britain called for a phased withdrawal of propoxyphene-containing products because of concerns about the cardiac effects associated with the use of propoxyphene.

153.    In the announcement of the phased withdrawal of propoxyphene-containing products in Great Britain, health officials stated that "it has not been possible to identify any patient group in whom the risk benefit (ratio) may be positive."

154.    British officials further stated that propoxyphene's efficacy "is poorly established and the risk of toxicity in overdose, both accidental and deliberate, is unacceptable" even in "normal therapeutic doses."

155.    In other words, the British officials found, as Plaintiff herein alleges, that propoxyphene is a dangerous drug even in standard therapeutic doses.

156.    In addition, a 2009 study titled "Effect of Withdrawal of Co-Proxamol [propoxyphene-acetaminophen] on Prescribing and Deaths from Drug Poisoning in England and Wales: Time Series Analysis" concluded that the phased withdrawal of propoxyphene-containing products in Great Britain resulted in a substantial decline in suicides and accidental deaths involving such products during the phased withdrawal.

157.    In June 2009, the European Medicines Agency ("EMEA") recommended that the marketing authorizations for propoxyphene-containing medications be withdrawn across the European Union because of safety concerns.

158.    When deciding to ban propoxyphene-containing medications, the EMEA stated that "the available evidence suggests that the combination of propoxyphene and acetaminophen (as in Tylenol) is no more effective that acetaminophen on its own."

159.    The EMEA further stated that "the benefits of all medicines containing propoxyphene, either on its own or in combination, do not outweigh their risks."

C.    **The FDA called for the recall of Propoxyphene Products after determining that their risks outweighed their benefits.**

- 30 -

160.    A 2008 report titled "Drugs Identified in Deceased Persons by Florida Medical Examiners" reported that propoxyphene caused eighty deaths in Florida during 2008.

161.    A 2009 report titled "Drugs Identified in Deceased Persons by Florida Medical Examiners," produced by the Florida Department of Law Enforcement, demonstrated that propoxyphene caused 460 deaths in Florida alone from 2003 through 2007.  This death toll equates to 4.2 causally-related deaths per 100,000 propoxyphene prescriptions, significantly higher than comparable ratios for alternative drugs examined in the report, such as tramadol, which caused only 2.2 deaths per 100,000 prescriptions.  A drug was only indicated as the cause of death when, after examining all the evidence and the autopsy and toxicology results, the medical examiner determined the drug played a causal role in the death.

162.    In 2009, data from the Drug Abuse Warning Network (DAWN) presented to an FDA Advisory Committee demonstrated that in seven of the eight states examined, the number of drug-related deaths per 100,000 prescriptions was higher for propoxyphene than for tramadol or hydrocodone from 2004 through 2007.  In the eighth state, propoxyphene resulted in more deaths per 100,000 prescriptions than hydrocodone and only slightly less than tramadol.

163.    Despite overwhelming evidence of the risks of all propoxyphene-containing medications, their withdrawal from European markets, and evidence that Propoxyphene Products were no more effective than Tylenol, Defendants continued to actively market, produce and distribute Propoxyphene Products in the United States, causing injuries that included but were not limited to heart arrhythmias, atrial fibrillations, tachycardias, bradycardias, myocardial infarctions, and/or sudden death.

164.    In light of these concerns, public interest groups petitioned for an investigation into whether propoxyphene-containing drugs were linked to serious and potentially fatal heart arrhythmias.

165.    In 2009, in light of these concerns and renewed efforts to recall Propoxyphene Products, the FDA Advisory Committee voted against the continued marketing of propoxyphene-containing products.

- 31 -

166.    Although the FDA did not follow the Advisory Committee's recall recommendation at that time, it did order Xanodyne to conduct clinical trials to assess the potential for cardiotoxicity associated with propoxyphene use, to prepare a Medication Guide ("MedGuide") as part of a Risk Evaluation and Minimization Strategy ("REMS") to highlight important safeguards for use of the drug, and to issue a Public Health Advisory to underscore safety issues.

167.    The FDA also ordered Xanodyne to include a "Black Box" warning on its label, effective July 9, 2009, concerning the risk of fatal overdose, the relevant portion of which states as follows:

> There have been numerous cases of accidental and intentional overdose with propoxyphene products either alone or in combination with other CNS depressants, including alcohol. Fatalities within the first hour of overdosage are not uncommon. Many of the propoxyphene-related deaths have occurred in patients with previous histories of emotional disturbances or suicidal ideation/attempts and/or concomitant administration of sedatives, tranquilizers, muscle relaxants, antidepressants, or other CNS-depressant drugs. Do not prescribe propoxyphene for patients who are suicidal or have a history of suicidal ideation.

168.    The FDA also required Xanodyne to add a Clinical Pharmacology section to its label to include the following warning about dangers associated with propoxyphene:

> Propoxyphene is a centrally acting opiate analgesic. In vitro studies demonstrated propoxyphene and the metabolite norpropoxyphene inhibit sodium channels (local anesthetic effect) with norpropoxyphene being approximately 2-fold more potent than propoxyphene and propoxyphene approximately 10-fold more potent than lidocaine. Propoxyphene and norpropoxyphene inhibit the voltage-gated potassium current carried by cardiac rapidly activating delayed rectifier (hERG) channels) with approximately equal potency. It is unclear if the effects on ion channels occur within therapeutic dose range.

169.    The FDA also required Xanodyne to add a Special Populations section to its label to include the following warning about the special dangers propoxyphene poses to geriatric patients:

> After oral administration of propoxyphene in elderly patients (70-78 years), much longer half-lives of propoxyphene and norpropoxyphene have been reported (propoxyphene 13 to 35 h, norpropoxyphene 22 to 41 h). In addition,

- 32 -

the AUC was an average of 3-fold higher and the Cmax was an average of 2.5-fold higher in the elderly when compared to a younger (20-28 years) population. Longer dosage intervals may be considered in the elderly because the metabolism of propoxyphene may be reduced in this patient population. After multiple oral doses of propoxyphene in elderly patients (70-78 years), the Cmax of the metabolite (norpropoxyphene) was increased 5-fold.

170.    Similarly, the FDA also required Xanodyne to add the following warning about the special dangers propoxyphene poses to elderly patients to the Precautions section of its label:

Clinical studies of DARVOCET-N did not include sufficient numbers of subjects aged 65 and over to determine whether they respond differently from younger subjects. However, postmarketing reports suggest that patients over the age of 65 may be more susceptible to CNS-related side effects. Therefore, dose selection for an elderly patient should be cautious, usually starting at the low end of the dosage range, reflecting the greater frequency of decreased hepatic, renal, or cardiac function, and of concomitant disease or other drug therapy. Decreased total daily dosage should be considered (See DOSAGE and ADMINISTRATION).

171.    The FDA also required Xanodyne to add the following warnings about propoxyphene's potential for abuse and dependence in a new Drug Abuse and Dependence section of its label:

**Controlled Substance**
DARVOCET-N is a Schedule IV narcotic under the U.S. Controlled Substances Act. DARVOCET-N can produce drug dependence of the morphine type, and therefore, has the potential for being abused. Psychic dependence, physical dependence and tolerance may develop upon repeated administration. DARVOCET-N should be prescribed and administered with the same degree of caution appropriate to the use of other narcotic-containing medications.

**Abuse**
Since DARVOCET-N is a mu-opioid agonist, it may be subject to misuse, abuse, and addition. Addiction to opioids prescribed for pain management has not been estimated. However, requests for opioids from opioid-addicted patients occur. As such, physicians should take appropriate care in prescribing DARVOCET-N.

**Dependence**

- 33 -

Opioid analgesics may cause psychological and physical dependence. Physical dependence results in withdrawal symptoms in patients who abruptly discontinue the drug after long term administration. Also, symptoms of withdrawal may be precipitated through the administration of drugs with mu-opioid antagonist activity, e.g., naloxone or mixed agonist/antagonist analgesics (pentazocine, butorphanol, nalbuphine, dezocine). (See also OVERDOSAGE section). Physical dependence usually does not occur to a clinically significant degree, until after several weeks of continued opioid usage. Tolerance, in which increasingly larger doses are required to produce the same degree of analgesia, is usually manifested by a shortened duration of an analgesic effect and subsequently, by decreases in the intensity of analgesia.

In chronic pain patients, and in opioid-tolerance cancer patients, the administration of DARVOCET-N should be guided by the degree of tolerance manifested and the doses needed to adequately relieve pain.

The severity of the DARVOCET-N abstinence syndrome may depend on the degree of physical dependence. Withdrawal is characterized by rhinitis, myalgia, abdominal cramping, and occasional diarrhea. Most observable symptoms disappear in 5 to 14 days without treatment; however, there may be a phase of secondary or chronic abstinence which may last for 2 to 6 months characterized by insomnia, irritability, and muscular aches. The patient may be detoxified by gradual reduction of the dose. Gastrointestinal disturbances or dehydration should be treated with supportive care.

172.  Finally, the FDA also required Xanodyne to add the following warnings about tolerance and dependence in the Precautions section of its label:

**Tolerance and Physical Dependence**
Tolerance is the need for increasing doses of opioids to maintain a defined effect such as analgesia (in the absence of disease progression or other external factors). Physical dependence is manifested by withdrawal symptoms after abrupt discontinuation of a drug or upon administration of an antagonist. Physical dependence and tolerance are not unusual during chronic opioid therapy.

The opioid abstinence or withdrawal syndrome is characterized by some or all of the following: restlessness, lacrimation, rhinorrhea, yawning, perspiration, chills, myalgia, and mydriasis. Other symptoms also may develop, including: irritability, anxiety, backache, joint pain, weakness, abdominal cramps, insomnia, nausea, anorexia, vomiting, diarrhea, or increased blood pressure, respiratory rate, or heart rate. In general, opioids should not be abruptly discontinued (see DOSAGE AND ADMINISTRATION: Cessation of Therapy).

> If DARVOCET-N is abruptly discontinued in a physically dependent patient, an abstinence syndrome may occur (See DRUG ABUSE AND DEPENDENCE). If signs and symptoms of withdrawal occur, patients should be treated by reinstitution of opioid therapy followed by gradual tapered dose reduction of DARVOCET-N combined with symptomatic support (see DOSAGE AND ADMINISTRATION: Cessation of Therapy).

173.  Upon information and belief, Xanodyne did not comply with the FDA's mandate to prepare the MedGuide or issue the Public Health Advisory.

174.  Upon information and belief, Xanodyne also did not timely implement the Black Box warning or revise the labels for Darvocet or Darvon.

175.  Upon information and belief, Xanodyne also did not publish the information in the Physicians' Desk Reference ("PDR"), the primary source of drug warning information for physicians.

176.  Upon information and belief, Xanodyne also did not communicate the information to prescribing physicians in Dear Health Care Professional letters or by other means.

177.  The FDA mandate likewise effectively required the Generic Defendants to issue the Black Box warning and label changes, but upon information and belief, the Generic Defendants did not timely implement the Black Box warning or revise the labels for their Propoxyphene Products, or publish the information in the PDR, or communicate the information to prescribing physicians in Dear Health Care Professional letters or by other means.

178.  Xanodyne did, however, follow part of the FDA mandate by starting to conduct a multiple-ascending dose (MAD) study in July 2009, which confirmed that even when taken at recommended doses, propoxyphene can cause significant changes to the electrical activity of the heart that can be seen on an electrocardiogram (ECG), such as prolonged PR intervals, widened QRS complexes, and prolonged QT intervals.

179.  An ECG is a recording of the electrical activity generated by the heart as it undergoes depolarization and repolarization, which is the process that causes the muscles in the heart to contract rhythmically and pump blood throughout the body.

180.  The different waves that comprise the ECG, including the PR intervals, QRS complexes, and QT intervals, represent the sequence of depolarization and repolarization of the atria

- 35 -

and ventricles.  Abnormalities in the ECG indicate abnormalities in the electrical activity of the heart, specifically the depolarization and repolarization process.

181.  Changes in the electrical activity of the heart can increase the risk for serious abnormal heart rhythms that have been linked to serious adverse effects, including sudden death.

182.  Propoxyphene's principal metabolite, norpropoxyphene, is a Sodium channel and hERG channel blocker.  Blockage of either of these channels can lead to changes in the electrical activity of the heart and other cardiac injuries.

183.  The FDA concluded that the safety risks of propoxyphene, including the negative effects of propoxyphene on the electrical activity of the heart, outweigh its benefit for pain relief.

184.  On November 19, 2010, the FDA announced that Xanodyne had agreed to stop marketing its Propoxyphene Products in the United States.

185.  Also on November 19, 2010, the FDA requested that the generic manufacturers also remove their Propoxyphene Products.

186.  Also on November 19, 2010, the FDA advised health care professionals to stop prescribing and dispensing Propoxyphene Products, and to ask their patients to stop taking those drugs.

187.  In its news release on November 19, 2010, the FDA said that the data showed "that even when taken at recommended doses, propoxyphene causes significant changes to the electrical activity of the heart" and that the changes in electrical activity of the heart "can increase the risk for serious abnormal heart rhythms that have been linked to serious adverse events, including sudden death."

II.  **DEFENDANTS' NEGLIGENT AND WRONGFUL MARKETING, DISTRIBUTING AND SALE OF DEFECTIVELY DESIGNED PROPOXYPHENE PRODUCTS**

188.  At all relevant time, Eli Lilly knew or should have known that Propoxyphene Products were defectively designed.

189.  As discussed above, in 1978, the Health Research Group filed a Citizen Petition with the FDA seeking the recall of Propoxyphene Products.

- 36 -

190.    Upon information and belief, the FDA rejected the 1978 recall in large part because of Eli Lilly's vocal and ultimately successful campaign, in which it made numerous false statements regarding the safety and efficacy of Propoxyphene Products, even though it knew or should have known that such statements were false.

191.    Upon information and belief, Eli Lilly also made commitments to the FDA about the manner in which it would market its Propoxyphene Products to address safety concerns, but failed to live up to these commitments.

192.    For example, a key factor in the FDA's decision to reject changing the regulatory status of Propoxyphene Products was Eli Lilly's commitment to an educational program to sensitize prescribers and patients to the hazards of propoxyphene products.

193.    Upon information and belief, Eli Lilly not only failed to emphasize the user warnings in the majority of its physician visits, but also converted that "educational program" into a marketing initiative.

194.    At all relevant times, Xanodyne focused its sales on pain management products, including Darvocet and Darvon, because the area of pain management offers attractive commercial opportunities in significant markets in the United States.

195.    At all relevant times, Xanodyne affirmatively decided not to take part in full discovery research of its products because it was and is more beneficial for it to advance products more quickly through abbreviated developmental pathways in order to decrease the time and cost of bringing a new drug to market.

196.    At all relevant times, Xanodyne extensively marketed Darvocet and Darvon as safe and effective treatments for pain to induce their widespread use, and has received significant profits from the sale of those drugs.

197.    Similar to Eli Lilly's efforts to defeat the 1978 Propoxyphene Products recall request, as discussed above, Xanodyne also acted to defeat petitions to the FDA to recall Propoxyphene Products.

198.    Upon information and belief, in April, 2006, Xanodyne made false and misleading statements that it knew or should have known were false and misleading concerning the safety and

- 37 -

1   effectiveness of Propoxyphene Products to the FDA in opposition to a 2006 Citizen Petition

2   requesting the recall of Propoxyphene Products.

3        199.   Upon information and belief, Xanodyne also failed to disclose information that was

4   inconsistent with allegations made in the Citizen Petition.

5        200.   Additionally, upon information and belief, Xanodyne made a presentation at the

6   FDA's Joint Meeting of the Aesthetic and Life Support Drugs Advisory Committee and Drug Risk

7   Management Committee on January 30, 2009 concerning the same 2006 Citizen Petition to recall

8   Propoxyphene Products, in which it made the following false representations, among others, about

9   Propoxyphene Products, even though it knew such statements to be false:

10            a.   that "Darvon and its combinations were effective analgesics";

11            b.   that Propoxyphene Products are "superior to placebo";

         c.   that "Propoxyphene products have a long history in the US of safe and
12                 effective use as labeled"; and

13

         d.   that "Petitioner [i.e., Public Citizen in its 2006 FDA Citizen Petition to recall
14                 Darvocet] presents no credible scientific evidence that propoxyphene drugs
              present an imminent hazard to public health or that they are unsafe and
15                 ineffective when used according to approved labeling."

16

17        201.   Upon information and belief, it is believed that the Generic Defendants likewise

18   represented that their Propoxyphene Products were safe and effective for pain management in order

19   to induce their widespread use, and have received significant profits from their sales of those drugs.

20        202.   Defendants knew or should have known of the dangers associated with Propoxyphene

21   Products, including but not limited to the risks of serious abnormal heart rhythms that may cause

22   serious adverse events, including death.

23        203.   Additionally, or in the alternative, Defendants should have started to investigate the

24   link between Propoxyphene Products and cardiac effects significantly before the FDA ordered such

25   an investigation.

26        204.   Had Defendants investigated propoxyphene safety on a timely basis, the associated

27   risks would have been confirmed in time to prevent Plaintiffs from being prescribed or filling

28

- 38 -

1  prescriptions for Propoxyphene Products, from ingesting or continuing to ingest Propoxyphene

2  Products, and from suffering injuries as a result of those ingestions.

3      205.   Independent of this, before Plaintiffs were injured by ingesting Propoxyphene

4  Products, there was a wealth of scientific and medical evidence available to Defendants – but not to

5  Plaintiffs or their prescribing physicians – to correlate the use of those drugs with the increased risk

6  of developing serious adverse cardiovascular effects, potentially resulting in death, which made those

7  drugs unreasonably dangerous to consumers.

8      206.   Despite what Defendants knew or should have known through the sources cited above,

9  they continued to manufacture and market and sell Propoxyphene Products.

10     207.   Upon information and belief, despite what Defendants knew or should have known

11  through the sources cited above, they failed to provide adequate information to the general public or

12  the health care community – including Plaintiffs and their prescribing physicians – about the

13  correlation between the use of Propoxyphene Products and the increased risk of developing

14  serious adverse cardiovascular effects, potentially resulting in death, which made those drugs

15  unreasonably dangerous to consumers due to the following:

16

17      a.   Defendants failed to convey the warnings in a method reasonably calculated to
           notify the public and the health care community of its risks.

18

19      b.   Defendants failed to convey the warning in a location or manner reasonably
           calculated to notify the public and the health care community of its risks.

20

21      c.   Defendants failed to convey the warning by use of facts or information that
           were known about the risks of Propoxyphene Products.

22

23      d.   Defendants failed to convey warnings in a manner that was clear, accurate and
           properly portrayed the intensity of the risks posed by Propoxyphene Products.

24      e.   Defendants failed to provide "Dear Health Care Professional" letters to the
           health care community, as authorized by the FDA at 21 CFR 201.100(d)(1), at

25          all and/or in a manner reasonably calculated to convey the risks associated
           with Propoxyphene Products.

26

27      f.   Defendants failed to provide "Dear Health Care Professional" letters after the
           inclusion of warning label changes approved and/or required by the FDA,

28

- 39 -

including but not necessarily limited to the 2009 label change requiring a "Black Box" warning, as discussed above.

g.    Defendants failed to take reasonable steps to otherwise notify the public and the health care community of the inclusion of warning label changes approved and/or required by the FDA, including but not necessarily limited to the 2009 label change requiring a "Black Box" warning, as discussed above.

h.    The Innovator and Brand Defendants failed to recommend to the FDA through the Changes Being Effected ("CBE") process that branded Propoxyphene Products include a warning identical or similar to the 2009 "Black Box" warning since Defendants knew or should have known of the risks conveyed in the "Black Box" warning for years prior to its inclusion in the warning label.

i.    Xanodyne failed to properly notify the public and the health care community about the health risks conveyed in the 2009 "Black Box" warning even though the FDA specifically instructed them to do so.

j.    Upon information and belief, Xanodyne continued to promote brand-name Propoxyphene Products as safe and effective even though it knew this was not correct, before and even after, the FDA ordered Xanodyne to include the "Black Box" warning in 2009.

k.    Upon information and belief, the Generic Defendants failed to update their labels with certain label changes that the FDA approved and/or ordered for use by the Innovator and Brand Defendants, although Plaintiff must conduct discovery to determine the extent of this failure since the Generic Defendants' warning labels are not included in the Physician's Desk Reference.

l.    Defendants could have and should have requested stronger warnings for Propoxyphene Products, which the FDA could have then ordered to be included in the label without the need to undertake negotiations with the branded manufacturer.

208.   As stated above, upon information and belief, Defendants failed to adequately convey or warn the public and the health care community as to the risks associated with Propoxyphene Products, though discovery is necessary as to these issues since this information is, in large part, in control of Defendants.

209.   Upon information and belief, Defendants continued to promote and affirmatively claim that Propoxyphene Products are safe and effective, although they knew or should have known this was not the case.

- 40 -

210. At least in part, the extent, dates and methods by which Defendants continued to promote the safety and effectiveness of Propoxyphene Products is not fully known, as this information is in the control of Defendants, and discovery is necessary to obtain this information.

211. Had Defendants stopped selling Propoxyphene Products when they knew or should have known about the increased and unreasonably dangerous risks associated with their use, Plaintiffs would not have been prescribed or would not have filled prescriptions for Propoxyphene Products, would not have ingested or would have stopped ingesting them, and would not have suffered injuries resulting from those ingestions.

212. Had the general public or the health care community – including Plaintiffs and their prescribing physicians – been adequately advised of the risks associated with the use of Propoxyphene Products, Plaintiffs would not have been prescribed or would not have filled prescriptions for Propoxyphene Products, would not have ingested or would have stopped ingesting them, and would not have suffered injuries resulting from those ingestions.

## III. INNOVATOR AND BRAND DEFENDANTS' OWNERSHIP AND TRANSFERS OF THE DARVOCET AND DARVON NDAs

### A. Eli Lilly owned and then transferred the Darvocet and Darvon NDAs.

213. Prior to 2002, Eli Lilly owned all rights to Darvocet and Darvon, including the NDAs to sell those products. It had held these rights since FDA approval of Darvon (in 1957) and Darvocet (in 1973).

214. On February 18, 2002, Eli Lilly sold the marketing rights to Darvocet and Darvon to NeoSan, pursuant to an Assignment, Transfer, and Assumption Agreement between the two.

215. Eli Lilly generated substantial revenue and other benefits from this sale.

216. Upon information and belief, this sale was made possible, at least in part, because of Eli Lilly's false and misleading statements regarding the safety and effectiveness of Propoxyphene Products.

217. Upon information and belief, the foregoing misleading statements were made to the FDA, to the public and to the health care community.

- 41 -

1   218. Plaintiff does not yet know the extent and specifics of such statements, as such

2   information is in the control of Defendants, and Plaintiff must engage in discovery to learn of same.

3   219. In connection with this transaction, NeoSan acquired the following from Eli Lilly:

5       a.   all rights, title and interest in Eli Lilly's propoxyphene or propoxyphene-based
            pharmaceutical products (including such products wherein propoxyphene is at
6            least one of the active ingredients) in all forms marketed or marketable in the
            United States under certain propoxyphene-related product NDAs owned by Eli
7            Lilly;

8       b.   all propoxyphene-related product NDAs owned by Eli Lilly;

9
        c.   intellectual property related to the transferred propoxyphene-related
10           pharmaceutical products, including (1) Eli Lilly's copyrights, including
            package inserts, (2) any unique appearance, look, shape, size, or color of the
11           products, and (3) Eli Lilly's trademarks, including those for the names
            Darvocet-N, Darvon-N, and Darvon.
12

13      d.   marketing and promotional materials related to the acquired products;

14      e.   all books and records related to the purchased products; and

15      f.   with regard to the acquired products, a license to use all Eli Lilly's experience
            and other know-how.
16

17  220. However, Eli Lilly specifically retained a combination patent related to

18  dextropropoxyphene, under patent number 4,594,358, and patent application number 60/188,135,

19  filed March 9, 2000.

20  221. NeoSan, in turn, granted Eli Lilly the following consideration in connection with the

21  transfer of assets:

22      a.   $211,400,000, which Eli Lilly amortized over three years;
23      b.   royalties based on sales of NeoSan's future developed improvements to the
            Darvon product line or other products containing the active ingredient
24           propoxyphene and any other pharmaceutical products sold under the name
            Darvon, Darvocet or other Eli Lilly trademarks, excluding the products
25           specifically acquired from Eli Lilly;

26
        c.   all licenses necessary for Eli Lilly to fulfill its obligations under a
27           manufacturing agreement between the parties (described further infra) or
            necessary for Eli Lilly to sell the acquired products outside of the United
28           States;

d.    the right to audit NeoSan as related to its "performance" and royalty payment obligations; and

e.    for products using the trademarks transferred in connection with the agreement, NeoSan was obligated to provide to Eli Lilly free of charge two then-current production samples of each such product (with then-current packaging) not manufactured by Eli Lilly, and (ii) permit Eli Lilly to inspect the manufacturing process for each such product, so long as the products were manufactured by parties other than Eli Lilly.

222.    Eli Lilly and the aaiPharma Entities further agreed to the following joint obligations:

a.    to cooperate in any inspection, investigation, or other inquiry from a government agency related to the acquired products, including the right to be present during any such inspection and to make the others party's employees available during such investigation;

b.    to form an implementation team to oversee the activities contemplated by the agreement;

c.    to prepare all necessary government filings;

d.    to agree to and execute a manufacturing agreement;

e.    to enter into a "Quality Agreement," which Plaintiff has not been able to discover through public sources;

f.    to permit audits to monitor compliance with the agreements;

g.    to enter into an agreement whereby aaiPharma guaranteed NeoSan's performance;

h.    to keep confidential all confidential information;

i.    to indemnify each other for losses caused by the indemnifying party's breaches of the agreement; and

j.    to bind all successors and assigns.

223.    The Assignment, Transfer, and Assumption Agreement specifically indicates that nothing therein would forbid Eli Lilly from fulfilling the requirements of a 1994 propoxyphene supply agreement that it had with Mylan and/or Mylan Pharmaceuticals.

- 43 -

224.    In connection with the Assignment, Transfer, and Assumption Agreement, NeoSan and Eli Lilly also entered into a Manufacturing Agreement on February 18, 2002, which was set to expire on December 31, 2004, subject to a six month extension at NeoSan's election.

225.    Under the Manufacturing Agreement, NeoSan agreed to purchase a set percentage of its Darvocet and Darvon from Eli Lilly, who would manufacture the products, which equaled 60% in the first year of the contract, 50% in the second contract year, and 40% in the third contract year.

226.    The Manufacturing Agreement also obligated Eli Lilly to transfer its existing inventory of Darvocet and Darvon products to NeoSan, and provided that the aaiPharma Entities would "not re-label or over-label any such Product inventory without the prior written consent of Lilly, which consent will not be unreasonably withheld."

227.    The publicly available Manufacturing Agreement Plaintiff has been able to discover did not include multiple exhibits and related documents to that agreement, including but not limited to a Quality Agreement setting forth certain quality and regulatory responsibilities relating to the manufacture and release for sale of the Product by Eli Lilly to NeoSan, a schedule setting forth the specifications for manufacturing and packaging the product, a schedule setting forth the amount of inventory transferred from Eli Lilly to the aaiPharma Entities and the prices paid for that product, and a Manufacturing Responsibility Document setting forth additional written instructions regarding the manufacture and sale of the products.

228.    In addition to NeoSan's agreement with Eli Lilly, aaiPharma LLC entered into a Manufacturing and Supply Agreement with DSM Pharmaceuticals, Inc. ("DSM") on January 26, 2004, which specified that DSM would exclusively manufacture and supply Darvocet-N 100 for aaiPharma LLC for five years from the first commercial production of the product.

229.    The agreement also stated that DSM would be responsible for distributing any product that had already been manufactured by aaiPharma LLC or any third party. Upon information and belief, these "third parties" included Eli Lilly and the products in question included at least the Darvocet-N 100 acquired by the aaiPharma Entities from Eli Lilly.

        **B.**    **The aaiPharma Entities Were Investigated for Securities Fraud and Filed for Bankruptcy.**

230.    After NeoSan acquired the marketing rights to Darvocet and Darvon, the aaiPharma Entities reported high sales for those products in their public filings with the Securities and Exchange Commission ("SEC").

231.    Certain analysts questioned the public numbers, noting that industry data on written prescriptions did not reflect increased demand for either Darvocet or Darvon and suggesting that the aaiPharma Entities had been engaging in "channel stuffing" for both products, i.e. counting shipped-but-unsold drugs as revenue, even though some of them likely would be returned.

232.    In 2003, the aaiPharma Entities received a letter from the SEC generally addressing the same issue.

233.    These issues came to a head in 2004, when the aaiPharma Entities announced an internal investigation and disclosed that they had received five subpoenas from a grand jury in Charlotte, North Carolina seeking information about the sales of Darvocet and Darvon.

234.    Ultimately, the aaiPharma Entities disclosed that they had overstated their revenue by counting shipped-but-not sold product (specifically including Darvocet and Darvon) as revenue, and in the wake of this revelation, the company filed for Chapter 11 bankruptcy on May 9, 2005.

235.    As a result of these events, the aaiPharma Entities' former CEO – David M. Hurley – pled guilty to fraud and financial misrepresentation, and settled civil charges with the SEC.

**C.    Xanodyne acquired the NDAs for Darvocet and Darvon and assumed the aaiPharma Entities' obligations to Eli Lilly**

236.    On July 25, 2005, the aaiPharma Entities (which were then in the process of bankruptcy proceedings) sold their drug business (including the propoxyphene products) to Xanodyne.

237.    Specific assets sold included the following:

a.    NDAs related to propoxyphene products, including NDA 10-996 (Darvon Compound, Darvon Compound-65 and Darvon with ASA), NDA 10-997 (Darvon 65mg capsules), NDA 16-862 (Darvon N (100 mg tablet)), NDA 17-122 (Darvocet N 50 and Darvocet N 100), NDA 17-507 (Darvocet N Suspension), and NDA 76-429 (Darvocet A500).

b.    drug manufacturing and investigative files related to propoxyphene products;

- 45 -

c. all of the aaiPharma Entities' existing inventory of propoxyphene products and propoxyphene bulk active ingredient;

d. certain intellectual property related to propoxyphene products; and

e. all of the aaiPharma Entities' rights under certain contracts, specifically including the aaiPharma Entities' rights under the 2002 Assignment, Transfer, and Assumption Agreement between NeoSan and Eli Lilly.

238. Xanodyne accordingly assumed NeoSan's obligation to pay Eli Lilly royalties for product reformulations, i.e. the royalty obligation created by the 2002 Assignment, Transfer, and Assumption Agreement.

239. Xanodyne also assumed all other obligations of NeoSan under the 2002 Assignment, Transfer, and Assumption Agreement.

240. The bankruptcy Court authorized assignment of NeoSan's obligations under the 2002 Assignment, Transfer, and Assumption agreement to Xanodyne in an order dated July 18, 2005. Bnkrpcy. Ct. Del. 05-11341-CSS, Dckt. # 296.

241. The purchase and sale agreement between the aaiPharma Entities and Xanodyne explicitly noted that the aaiPharma Entities were in default on payment obligations for raw propoxyphene purchased from Eli Lilly.

242. In conjunction with the purchase and sale agreement, Xanodyne entered into a "Master Services Agreement" with AAI DS.

243. Under that agreement, Xanodyne agreed that AAI DS would manufacture 100% of Xanodyne's Darvocet-N 50, Darvon, Darvon-N, and Darvon Compound 65.

244. This agreement continued until 2009, when the aaiPharma Entities sold their contract manufacturing assets to AAI Services, a newly created company. AAI Services appears to have manufactured propoxyphene products for Xanodyne until those products were removed from the market.

245. Darvocet A500, one of the Propoxyphene Products sold to Xanodyne by the aaiPharma Entities, was purchased by the aaiPharma Entities from Athlon Pharmaceuticals Inc. ("Athlon") in July 2003. Under the terms of the agreement, the aaiPharma Entities owe Athlon

- 46 -

1    royalties in an amount equal to 10% of the net sales of Darvocet A500 and any other combination

2    propoxyphene napsylate and acetaminophen products that they may sell in the future through 2023.

3         246.    Darvocet A500 was manufactured and supplied by Mikart, Inc. and was to be supplied

4    by Mikart, Inc. until 2013, but in June 2004, the aaiPharma Entities notified Athlon that Athlon had

5    breached a related services agreement, and initiated litigation.  Athlon brought counterclaims seeking

6    payment of unpaid monthly payments under the contract and additional litigation with respect to the

7    royalty provisions in the asset purchase agreement.  Despite Plaintiff's best efforts, it remains unclear

8    whether these royalty payments are still owed to Athlon by Xanodyne as the aaiPharma Entities'

9    successor-in-interest.

10        247.    On February 21, 2007 Xanodyne and DSM entered into an agreement for the

11   manufacture of Darvocet.  Upon information and belief, DSM continued to produce Darvocet-N 100

12   for Xanodyne pursuant to its prior agreement with the aaiPharma Entities, and entered into a separate

13   agreement with Xanodyne to continue manufacturing the same.  Therefore, DSM had separate

14   contractual agreements with both the aaiPharma Entities and Xanodyne to manufacture Darvocet.

15          **D.**    **Both the aaiPharma Entities and Xanodyne sold Darvocet and Darvon**

16                **labeled by Eli Lilly.**

17

18        248.    Because of the aaiPharma Entities' bankruptcy, the Delaware bankruptcy court had to

19   approve the asset sale.

20        249.    In connection with that sale, Eli Lilly filed documents indicating the aaiPharma

21   Entities was responsible for paying Medicare/Medicaid reimbursements for all Darvon or Darvocet

22   products sold after the effective date of the 2002 Assignment, Transfer and Assumption Agreement.

23        250.    As described above, the aaiPharma Entities acquired Eli Lilly's inventory of Darvon

24   and Darvocet products when the 2002 Assignment, Transfer and Assumption Agreement was

25   executed.  Eli Lilly's filings in the bankruptcy court indicate that this was "product manufactured and

26   labeled by Lilly."

27        251.    Individual state Medicaid agencies would invoice Eli Lilly for Medicare or Medicaid

28   reimbursements in connection with sale of the acquired inventory, i.e., Eli Lilly would be charged

- 47 -

1  when NeoSan sold Darvocet or Darvon drawn from Eli Lilly's pre-agreement inventory. Eli Lilly

2  would in turn invoice NeoSan/the aaiPharma Entities for these charges.

3     252.   As of July 6, 2005, Eli Lilly contended the aaiPharma Entities owed Eli Lilly

4  $1,093,931.78 in such charges. Eli Lilly indicated it expected further amounts would accrue between

5  January 1, 2005 and the effective date of Xanodyne's assumption of the 2002 Agreement, and that it

6  was likely that additional amounts would accrue even after Xanodyne assumed the contract, although

7  Plaintiff requires discovery to determine the extent and amount of these payments.

8     253.   This indicates that the aaiPharma Entities likely sold Eli Lilly-labeled product even

9  after buying the NDA, and that Xanodyne may have sold the same, although Plaintiff will require

10  discovery to determine the extent and amount of such sales.

11     254.   Statements made by Xanodyne in public filings confirm this. In a Form S-1 filed with

12  the Securities and Exchange Commission on June 8, 2008, Xanodyne noted that:

13

14        The products that we acquired from AAIPharma in July 2005 had been
          previously acquired by AAIPharma from various other third parties. Before

15        selling these products to us, AAIPharma continued to use the third parties'
          National Drug Code, or NDC, numbers for the products. Among other

16        purposes, state Medicare and Medicaid programs use NDC numbers to track
          product utilization. Because AAIPharma used the third parties' NDC

17        numbers, these third parties paid the Medicaid and Medicare rebates directly
          and billed AAIPharma in arrears. At the time of acquisition and for a period

18        of time following the acquisition, this created an unpredictable rebate history
          for these products on which to base our Medicaid and Medicare rebate

19        accruals.

20

21     255.   Upon information and belief, these "third parties" included Eli Lilly and the products

22  in question included the Propoxyphene Products acquired by the aaiPharma Entities from Eli Lilly.

23     256.   Xanodyne went on to indicate that they were able to pay the referred-to Medicare

24  rebates directly "after transitioning the NDC numbers for the products to Xanodyne NDC numbers."

25     257.   Xanodyne's Form S-1 also noted that Xanodyne believed the trademarks on Darvocet

26  and Darvon were "an important factor in marketing those products," and that it relied on "brand

27  reputation and awareness among physicians and patients to generate ongoing market demand for and

28  sale of" Darvocet and Darvon without promotional efforts from Xanodyne.

E.     **Xanodyne was Obligated to Pay Royalties to Eli Lilly for Its Sales of Darvocet.**

258.   Xanodyne's 2008 Form In S-1 Registration Statement contained the following assertion:

> As a result of our acquisition of all of AAIPharma's rights to Darvon and Darvocet, including the related trademarks and NDAs that AAIPharma had originally acquired from Eli Lilly in February 2002, we have agreed to pay Eli Lilly a royalty based on net sales in the United States above specified sales thresholds of all forms of Darvon and Darvocet covered by the acquired NDAs and, with specified exceptions, any new pharmaceutical product containing the active pharmaceutical ingredient propoxyphene or the name "Darvon" or "Darvocet." We do not currently expect to pay this royalty prior to FDA approval and the initiation of commercial sale of XP20B, which we expect to market as a line extension of our Darvocet brand. We do not anticipate this to occur earlier than 2011.

259.   That same form contained the following statement:

> We have agreed to pay AAIPharma a royalty through December 2011 based on quarterly net sales of Zipsor, XP20B and any orally administered follow on products. If we decide to develop any pain products containing the active pharmaceutical ingredient propoxyphene or diclofenac, or opioid products in combination with acetaminophen or an NSAID, or if we elect to continue to develop any pain products offered to us by AAIPharma, we are obligated to pay AAIPharma a royalty based on net sales of such pain products for ten years following commercial launch.

260.   XP20B was a time-release combination propoxyphene and acetaminophen modified release oral tablet being developed by Xanodyne.

F.     **Xanodyne Relied on Third Parties to Manufacture and Perform Other Services Related to Its Product Line of Propoxyphene Products.**

261.   Xanodyne has stated in its S-1/A filing of January 11, 2008 that it does not own or operate, and has no plans to establish, any manufacturing facilities for its products, which would include Darvocet and other branded propoxyphene products.

- 49 -

262.    Xanodyne further stated in this filing that it relies, and continues to rely, upon third parties for the supply of the active pharmaceutical ingredients in its products, which would include Darvocet and other branded propoxyphene products.

263.    Xanodyne further stated in this filing that it has entered into manufacturing agreements with various entities, including but not limited to, the aaiPharma Entities.

264.    Xanodyne further stated in this filing that it relies on third parties, such as the aaiPharma Entities, to conduct clinical trials of propoxyphene-containing medications.

265.    As discovery is on-going, Plaintiff is still in the process of discovering the extent of the various relationships by and among Xanodyne and other Defendants in this case, except to the extent set forth elsewhere in this Complaint.

### G.    The Innovator and Brand Defendants Were Inter-Related.

266.    Even after selling the intellectual property rights associated with propoxyphene-containing drugs such as Darvocet and Darvon, the Innovator and Brand Defendants retained significant rights and control with respect to the manufacturing, labeling, and distribution of the drugs and continued to reap royalties based on net sales of the drugs in the United States, and as a result, they had an ongoing interest in maintaining sales of Propoxyphene Products such as Darvocet and Darvon.

267.    In particular, the Assignment, Transfer, and Assumption Agreement between Eli Lilly and NeoSan referenced above, required Eli Lilly to share its experience and other know-how related to Propoxyphene Products such as Darvocet and Darvon with NeoSan.

268.    As a result of the foregoing, the Innovator and Brand Defendants are liable to Plaintiff, jointly and severally, due to the foregoing contractual and other relationships by, between and among the Innovator and Brand Name Defendants, at all relevant times, under the legal doctrine(s) of agency, vicarious liability, and/or respondeat superior.

### IV.    NDC NUMBERS AND PLAINTIFFS' INGESTION OF PROPOXYPHENE PRODUCTS

1    269.   Upon information and belief, as alleged above, Plaintiffs ingested propoxyphene

2    containing prescription drugs manufactured by Defendants.

3    270.   Ingestion of a prescription drug may be demonstrated by various means.  One such

4    method is through the use of a National Drug Code ("NDC") identifier.

5    271.   The NDC number may be, but is not always, helpful in identifying the particular

6    medication taken by a particular patient.

7    272.   For instance, 21 CFR 201.2 states that "[t]he National Drug Code (NDC) number is

8    requested but not required to appear on all drug labels and in all drug labeling, including the label of

9    any prescription drug container furnished to a consumer."

10   273.   At other times, the pharmacy or other entity dispensing the medication may no longer

11   possess the documents that would provide an otherwise valid NDC number, or some pharmacies do

12   not include NDC numbers in their records.

13   274.   In other instances, it can take six months or longer to obtain records, even from

14   established retail pharmacies.  Other, unique problems can arise in obtaining such records for a

15   plaintiff who obtained his or her prescription by mail.

16   275.   Additionally, in a preamble to the NDC directory, the FDA states, among other things,

17   that "The NDC Directory contains ONLY information submitted to FDA in SPL electronic listing

18   files by labelers.  (A labeler may be either a manufacturer, including a repackager or relabeler, or, for

19   drugs subject to private labeling arrangements, the entity under whose own label or trade name the

20   product will be distributed.)."

21   276.   In sum, the NDC number is not always available, and there are other methods to

22   establish proof of ingestion of a particular Propoxyphene Product.

23

24                    **FIRST CAUSE OF ACTION**
25          **STRICT PRODUCTS LIABILITY – DESIGN DEFECT**
                       **(Against All Defendants)**

26   277.   Plaintiffs incorporate and adopt by reference each paragraph set forth in this

27   Complaint.

28

278.   At all relevant times, the Innovator and Brand Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling, supplying, marketing and/or promoting Darvocet/Darvon, brand-name Propoxyphene Products.

279.   At all relevant times, the Generic Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling, supplying, marketing and/or promoting generic Propoxyphene Products.

280.   At all relevant times, all Propoxyphene Products were associated with a greatly increased risk of developing severe adverse cardiovascular effects that could result in death, and that risk outweighed their benefit for pain relief.

281.   At all relevant times, practical and medically-feasible alternate pain management medications that did not contain propoxyphene or involve an increased risk of serious adverse cardiovascular effects that could result in death were available.

282.   At all relevant times, the risks associated with Propoxyphene Products, and the ability to avoid them by using other available, practical and medically-feasible pain management medications, were beyond that which would be contemplated by the ordinary physician who prescribed Propoxyphene Products and the ordinary consumer who purchased Propoxyphene Products.

283.   At all relevant times, Plaintiffs and their prescribing physicians were unaware of the risks associated with Propoxyphene Products, or of the availability of practical and medically-feasible alternate pain management medications.

284.   For these reasons, at all relevant times, all of Defendants' Propoxyphene Products were in an unreasonably dangerous and defective condition.

285.   For these reasons, all of Defendants' Propoxyphene Products that Plaintiffs purchased and ingested were in an unreasonably dangerous and defective condition at the time of purchase.

286.   All of Defendants' Propoxyphene Products that Plaintiffs purchased and ingested was expected to and did reach Plaintiffs without substantial change in the unreasonably dangerous and in a defective condition in which they were when they left the hands of Defendants.

- 52 -

287.   Plaintiffs took their Propoxyphene Products in the intended and prescribed manner, and as a direct and proximate result, suffered the injuries described above.

288.   At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

289.   As a direct and proximate result of the defective and inappropriate design and the unreasonably dangerous and defective characteristics of the Propoxyphene Products and the Defendants' failure to comply with federal standards and requirements, the Plaintiffs suffered severe and permanent injuries. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the Defendants as alleged herein. The injuries and damages alleged herein are permanent and will continue into the future.

290.   The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including Plaintiffs herein, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish the Defendants and deter them from similar conduct in the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
### STRICT PRODUCTS LIABILITY – FAILURE TO WARN
### (Against All Defendants)

291.   Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

292.   At all relevant times, the Innovator and Brand Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging,

- 53 -

1    distributing, selling, supplying, marketing and/or promoting Darvocet/Darvon, brand-name

2    Propoxyphene Products.

3         293.    At all relevant times, the Generic Defendants were engaged in the business of

4    researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling,

5    supplying, marketing and/or promoting generic Propoxyphene Products.

6         294.    At all relevant times:

7              a.    propoxyphene had not been adequately tested;

8              b.    Propoxyphene Products were associated with a greatly increased risk of serious
                     adverse cardiovascular events that could result in death, which outweighed

9                    their benefit for pain relief;

10             c.    the risks, and the nature, scope, severity and duration of any serious side
                     effects, were greater with Propoxyphene Products than with other practical,

11                   medically feasible and available pain management medications;

12             d.    Propoxyphene Products were unreasonably dangerous to the health of patients

13                   suffering from pain; and

14             e.    Propoxyphene Products were no more effective for pain management than
                     other available, practical, and medically-feasible alternate pain management

15                   medications, such as over-the-counter acetaminophen (brand name Tylenol),

16                   which posed less risk.

17        295.    At all relevant times, the risks associated with Propoxyphene Products, and the ability

18   to avoid them by using other available, practical and medically-feasible pain management

19   medications, were beyond that which would be contemplated by the ordinary physician who

20   prescribed Propoxyphene Products and the ordinary consumer who purchased Propoxyphene

21   Products.

22        296.    At all relevant times, Plaintiffs and their prescribing physicians were unaware of the

23   risks associated with Propoxyphene Products, or of the availability of practical and medically-feasible

24   alternate pain management medications.

25        297.    At all relevant times, Defendants failed to adequately warn the general public or the

26   medical community – including Plaintiffs and their treating physicians – about any of the risks

27   outlined above, or about the availability of practical and medically-feasible alternatives.

28

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

298.   More specifically, Defendants failed to adequately warn the general public or the medical community – including Plaintiffs and their treating physicians – that:

a.   In 1971, six out of seven trials demonstrated that while propoxyphene alone was not significantly superior to placebo in managing pain, acetaminophen alone was;

b.   In 1978, the Health Research Group filed a petition with the FDA requesting the recall of Darvon based on its claim that it was a dangerous drug of questionable effectiveness, and subsequently submitted studies supporting that propoxyphene could be toxic to the cardiovascular system;

c.   In January 2005, health officials in Great Britain called for a phased withdrawal of propoxyphene-containing products because they were concerned about the cardiac effects associated with their use and were unable to identify any patient group in whom the risk benefit ratio may be positive;

d.   In June 2009, the European Medicines Agency recommended withdrawal across the European Union of marketing authorizations for propoxyphene-containing medications because available evidence suggested that acetaminophen alone was as effective as an acetaminophen-propoxyphene combination, and that the benefits of medicines containing propoxyphene, either alone or in combination, did not outweigh their risks.

e.   In 2009, the FDA ordered Xanodyne to include a Black Box warning concerning the risk of fatal overdose, and to add warnings to its label about propoxyphene's dangers overall, for elderly patients, and in terms of its potential for abuse and dependence.

f.   In 2009, the FDA also ordered Xanodyne to conduct clinical studies to assess the potential for cardiotoxicity associated with propoxyphene use, to prepare a MedGuide to highlight important safeguards for use of the drug, and to issue a Public Health Advisory to underscore safety issues.

g.   In July 2009, Xanodyne's study confirmed that propoxyphene can cause significant changes to the heart, even when taken at recommended doses.

299.   Upon information and belief, the Innovator and Brand Defendants did not comply with the FDA's mandate to prepare the MedGuide or issue the Public Health Advisory.

300.   Upon information and belief, the Innovator and Brand Defendants also did not timely implement the Black Box warning or revise the labels for Darvocet or Darvon, or publish the information in the PDR, or communicate the information to prescribing physicians in Dear Health Care Professional letters or by other means.

- 55 -

301.   The FDA mandate likewise effectively required the Generic Defendants to issue the Black Box warning and label changes, but upon information and belief, the Generic Defendants likewise did not timely implement the Black Box warning or revise the labels for their Propoxyphene Products, or publish the information in the PDR, or communicate the information to prescribing physicians in Dear Health Care Professional letters or by other means.

302.   It would have been technologically feasible, and would not have been cost-prohibitive, for Defendants to include adequate warnings and instructions in their marketing and labeling materials, and in their communications to the general public and the health care community.

303.   Defendants instead used their resources to downplay the risks associated with propoxyphene and Propoxyphene Products in their instructional materials, labeling for, and communications about Propoxyphene Products, which was especially misleading given their past and continued efforts to promote the safety and effectiveness of the drugs.

304.   At all relevant times, all of Defendants' Propoxyphene Products were in an unreasonably dangerous and defective condition, because they were distributed without the warnings outlined above.

305.   For these reasons, all of Defendants' Propoxyphene Products that Plaintiffs purchased and ingested were in an unreasonably dangerous and defective condition at the time of purchase.

306.   All of Defendants' Propoxyphene Products that Plaintiffs purchased and ingested were expected to and did reach Plaintiffs without substantial change in the unreasonably dangerous and defective condition in which they were when they left the hands of Defendants.

307.   Plaintiffs took their Propoxyphene Products in the intended and prescribed manner, and as a direct and proximate result, suffered the injuries described above.

308.   At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

309.   As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as

- 56 -

1  herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and

2  emotional in nature.  Plaintiffs incurred significant expenses for medical care and treatment, suffered

3  lost wages and earnings, and were otherwise physically, emotionally, and economically

4  injured.  Plaintiffs suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from

5  the Defendants as alleged herein.  The injuries and damages alleged herein are permanent and will

6  continue into the future.

7         WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory,

8  and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as

9  the Court deems proper.

10                          **THIRD CAUSE OF ACTION**
                           **STRICT LIABILITY IN TORT**
11                            **(Against All Defendants)**

12

13     310.   Plaintiffs incorporate and adopt by reference each paragraph set forth in this
   Complaint.

14

15     311.   Defendants used and controlled toxic propoxyphene for use in humans.

16     312.   Propoxyphene is highly toxic, inherently dangerous, and ultra-hazardous to humans.

17     313.   Defendants allowed and directed that toxic propoxyphene be used and directed in
   humans.

18

19     314.   At all relevant times herein, Defendants had full knowledge of the true cardiac risks

20  associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to

21  withdraw these products from the market or to stop selling the products.

22     315.   As a direct and proximate result of the defective and inappropriate warnings and the

23  unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to

   comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as

24  herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and

25  emotional in nature.  Plaintiffs incurred significant expenses for medical care and treatment, suffered

26  lost wages and earnings, and were otherwise physically, emotionally, and economically injured.

27  Plaintiffs suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from the

28

                                         - 57 -

1  Defendants as alleged herein. The injuries and damages alleged herein are permanent and will

2  continue into the future.

3       WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory,

4  and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as

5  the Court deems proper.

## FOURTH CAUSE OF ACTION
### NEGLIGENT DESIGN
### (Against All Defendants)

316.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this
Complaint.

317.    At all relevant times, the Innovator and Brand Defendants were engaged in the
business of designing Darvocet/Darvon, brand-name Propoxyphene Products.

318.    At all relevant times, the Generic Defendants were engaged in the business of
designing generic Propoxyphene Products.

319.    At all relevant times, Defendants had a duty to exercise reasonable care to carefully
and properly design their Propoxyphene Products to be reasonably safe prescription pain
management medications.

320.    Defendants breached that duty because all of the Propoxyphene Products that they
designed were in an unreasonably dangerous and defective condition, for the reasons described
above.

321.    Because of Defendants' failure to properly design their Propoxyphene Products, those
products were placed on the market and sold to Plaintiffs while they were in an unreasonably
dangerous and defective condition.

322.    Plaintiffs purchased and ingested Defendants' Propoxyphene Products, which were in
an unreasonably dangerous and defective condition at the time of purchase, in a reasonably
foreseeable manner and substantially as intended by Defendants.

323.    As a direct and proximate result, Plaintiffs suffered the injuries described above.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

324.    It was foreseeable that persons like Plaintiffs who ingested Defendants' Propoxyphene Products would, as a direct and proximate result, suffer those injuries.

325.    In light of what they knew or should have known, Defendants should have anticipated that these injuries were a likely result of the actions and failures to act described above.

326.    Through these actions and inactions, Defendants knowingly risked the lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was extreme and outrageous, and warrants an award of punitive damages.

327.    At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

328.    As a direct and proximate result of the negligent design and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the Defendants as alleged herein. The injuries and damages alleged herein are permanent and will continue into the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### FIFTH CAUSE OF ACTION
### NEGLIGENCE
### (Against All Defendants)

329.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

330.    At all relevant times, the Innovator and Brand Defendants were engaged in the business of researching, testing, studying, distributing, selling, supplying, marketing and/or promoting Darvocet/Darvon, brand-name Propoxyphene Products.

331.    At all relevant times, the Generic Defendants were engaged in the business of researching, testing, studying, distributing, selling, supplying, marketing and/or promoting generic Propoxyphene Products.

332.    At all relevant times, Defendants had a duty to:

    a.    exercise reasonable care to conduct adequate studies, tests, surveillance and analyses to assess the risks and adverse effects associated with their Propoxyphene Products; and

    b.    stop distributing, selling and/or supplying them if they discovered that the drugs were unreasonably dangerous and defective.

333.    Defendants breached those duties, because:

    a.    they failed to timely conduct adequate studies, tests, surveillance and analysis, which would have confirmed that their Propoxyphene Products were unreasonably dangerous and defective, for the reasons described above, and that other practical, medically-feasible and safer alternatives were available; and

    b.    they failed to timely stop distributing, selling and/or supplying their Propoxyphene Products once they discovered or should have discovered that those drugs were unreasonably dangerous and defective, and that other practical and medically-feasible alternatives that were safer were available.

334.    If Defendants had not breached those duties, their unreasonably dangerous and defective Propoxyphene Products would not have been on the market for Plaintiffs to purchase and ingest, and Plaintiffs would not have suffered the injuries described above.

335.    Because of these breaches, however, Defendants' unreasonably dangerous and defective Propoxyphene Products were on the market, and Plaintiffs purchased and ingested them in a reasonably foreseeable manner and substantially as intended by Defendants.

336.    As a direct and proximate result, Plaintiffs suffered the injuries described above.

337.    It was foreseeable that persons like Plaintiffs who ingested Defendants' Propoxyphene Products would, as a direct and proximate result, suffer those injuries.

338.    In light of what they knew or should have known, Defendants should have anticipated that these injuries were a likely result of the actions and failures to act described above.

339.    Through these actions and inactions, Defendants knowingly risked the lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was extreme and outrageous, and warrants an award of punitive damages.

340.    At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

341.    As a direct and proximate result of the defective manufacturing and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature.  Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured.  Plaintiffs suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from the Defendants as alleged herein.  The injuries and damages alleged herein are permanent and will continue into the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTH CAUSE OF ACTION
### NEGLIGENT FAILURE TO WARN
#### (Against All Defendants)

342.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

343.    At all relevant times, the Innovator and Brand Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging,

- 61 -

1  distributing, selling, supplying, marketing and/or promoting Darvocet/Darvon, brand-name

2  Propoxyphene Products.

3       344.   At all relevant times, the Generic Defendants were engaged in the business of

4  researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling,

5  supplying, marketing and/or promoting generic Propoxyphene Products.

6       345.   The following were the duties of the Innovator and Brand Defendants at all relevant

7  times, and the duties of the Generic Defendants following implementation of the Food and Drug

8  Administration Amendments Act of 2007, and possibly before:

9

10       a.   to assess, manage and communicate the risks, dangers and adverse effects
             associated with Propoxyphene Products to the health care community and the
11           general public, including Plaintiffs and their prescribing physicians; and

12       b.   to distribute their Propoxyphene Products with adequate information about the
             appropriate use of the products and their associated risks provided to the
13           general public and the health care community, including Plaintiffs and their
             prescribing physicians.
14

15       346.   Before Plaintiffs were injured by ingesting Defendants' Propoxyphene Products,

16  Defendants knew or should have known that:

17

18       a.   propoxyphene had not been adequately tested;

19       b.   Propoxyphene Products were associated with a greatly increased risk of serious
             adverse cardiovascular events that could result in death, which outweighed
20           their benefit for pain relief;

21       c.   the risks, and the nature, scope, severity and duration of any serious side
             effects, were greater with Propoxyphene Products than with other practical,
22           medically feasible and available pain management medications;

23       d.   Propoxyphene Products were unreasonably dangerous to the health of patients
24           suffering from pain; and

25       e.   Propoxyphene Products were no more effective for pain management than
             other available, practical, and medically-feasible alternate pain management
26           medications, such as over-the-counter acetaminophen (brand name Tylenol),
27           which posed less risk.

28

- 62 -

1       347.   At all relevant times, Defendants knew or should have known that the risks associated

2  with Propoxyphene Products, and the ability to avoid them by using other available, practical and

3  medically-feasible pain management medications, were beyond that which would be contemplated by

4  the ordinary physician who prescribed Propoxyphene Products and the ordinary consumer who

5  purchased Propoxyphene Products.

6       348.   More specifically, Defendants knew or should have known that the general public and

7  the health care community – including Plaintiffs and their prescribing physicians – would not have

8  been aware of the information outlined above, absent disclosures from Defendants, because:

9

10            a.     the general public and the health care community did not have access to the same resources, analysis and knowledge as Defendants; and

11

12            b.     Defendants manufactured, sold and distributed Propoxyphene Products, and would therefore be assumed to have superior knowledge about them.

13       349.   At all relevant times, Plaintiffs and their prescribing physicians were unaware of the

14  risks associated with Propoxyphene Products, or of the availability of practical and medically-feasible

15  alternate pain management medications.

16       350.   At all relevant times, Defendants failed to adequately disclose to the general public or

17  the medical community – including Plaintiffs and their treating physicians – about any of the risks

18  outlined above, or about the availability of practical and medically-feasible alternatives.

19       351.   More specifically, Defendants failed to adequately disclose to the general public or the

20  medical community – including Plaintiffs and their treating physicians, about the following facts that

21  it knew or should have known:

22

23            a.     In 1971, six out of seven trials demonstrated that while propoxyphene alone was not significantly superior to placebo in managing pain, acetaminophen alone was;

24

25            b.     In 1978, the Health Research Group filed a petition with the FDA requesting

26                the recall of Darvon based on its claim that it was a dangerous drug of questionable effectiveness, and subsequently submitted studies supporting that

27                propoxyphene could be toxic to the cardiovascular system;

28            c.     In January 2005, health officials in Great Britain called for a phased withdrawal of propoxyphene-containing products because they were concerned

- 63 -

about the cardiac effects associated with their use and were unable to identify any patient group in whom the risk benefit ratio may be positive;

    d.    In June 2009, the European Medicines Agency recommended withdrawal across the European Union of marketing authorizations for propoxyphene-containing medications because available evidence suggested that acetaminophen alone was as effective as an acetaminophen-propoxyphene combination, and that the benefits of medicines containing propoxyphene, either alone or in combination, did not outweigh their risks.

    e.    In 2009, the FDA ordered Xanodyne to include a Black Box warning concerning the risk of fatal overdose, and to add warnings to its label about propoxyphene's dangers overall, for elderly patients, and in terms of its potential for abuse and dependence.

    f.    In 2009, the FDA also ordered Xanodyne to conduct clinical studies to assess the potential for cardiotoxicity associated with propoxyphene use, to prepare a MedGuide to highlight important safeguards for use of the drug, and to issue a Public Health Advisory to underscore safety issues.

    g.    In July 2009, Xanodyne's study confirmed that propoxyphene can cause significant changes to the heart, even when taken at recommended doses.

352.    Upon information and belief, the Innovator and Brand Defendants did not comply with the FDA's mandate to prepare the MedGuide or issue the Public Health Advisory.  The failure to take these actions resulted in inadequate labeling of all Propoxyphene based pharmaceuticals.

353.    Upon information and belief, the Innovator and Brand Defendants also did not timely implement the Black Box warning or revise the labels for Darvocet or Darvon, or publish the information in the PDR, or communicate the information to prescribing physicians in Dear Health Care Professional letters or by other means.  The failure to take these actions resulted in inadequate labeling of all Propoxyphene based pharmaceuticals.

354.    The FDA mandate likewise effectively required the Generic Defendants to issue the Black Box warning and label changes, but upon information and belief, the Generic Defendants likewise did not timely implement the Black Box warning or revise the labels for their Propoxyphene Products, or publish the information in the PDR, or communicate the information to prescribing physicians in Dear Health Care Professional letters or by other means.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

355.   It would have been technologically feasible, and would not have been cost-prohibitive, for Defendants to include adequate disclosures in their marketing and labeling materials, and in their communications to the general public and the health care community.

356.   Defendants instead used their resources to downplay the risks associated with propoxyphene and Propoxyphene Products in their instructional materials, labeling for, and communications about Propoxyphene Products, which was especially misleading given their past and continued efforts to promote the safety and effectiveness of the drugs.

357.   Plaintiffs and their prescribing physicians justifiably relied on the lack of information about the risks associated with Propoxyphene Products and/or about other available, practical and medically-feasible pain management medications, and acted upon it, by Plaintiffs' physicians prescribing Propoxyphene Products, and Plaintiffs purchasing and ingesting Defendants' Propoxyphene Products.

358.   Had Defendants provided adequate disclosures:

   a.   Plaintiffs physicians would not have prescribed Propoxyphene Products, and would have instead prescribed another pain management medication that neither contained propoxyphene nor involved an increased risk of serious adverse cardiovascular events that could result in death, or recommended that Plaintiffs instead take over-the-counter acetaminophen;

   b.   Plaintiffs would not have purchased or ingested Defendants' Propoxyphene Products; and

   c.   Plaintiffs would not have suffered the injuries described above.

359.   In light of what Defendants knew or should have known, they should have anticipated that their failure to disclose the dangers of propoxyphene and Propoxyphene Products, and of the availability of practical and medically-feasible alternate pain management medications that posed less risk, would likely result in physicians prescribing Propoxyphene Products, and consumers purchasing and ingesting their Propoxyphene Products, and, as a direct and proximate result, suffering serious adverse cardiovascular effects that could result in death.

- 65 -

360.    Plaintiffs prescription for and purchase and ingestion of Defendants' Propoxyphene Products, and the injuries described above that followed, were the direct and proximate result of Defendants' failure to disclose.

361.    By failing to provide adequate disclosures, Defendants knowingly risked the lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was extreme and outrageous, and warrants an award of punitive damages.

362.    At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

363.    As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the Defendants as alleged herein. The injuries and damages alleged herein are permanent and will continue into the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SEVENTH CAUSE OF ACTION
### FRAUDULENT NONDISCLOSURE
### (Against All Defendants)

364.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

365.    At all relevant times, the Innovator and Brand Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging,

- 66 -

distributing, selling, supplying, marketing and/or promoting Darvocet/Darvon, brand-name Propoxyphene Products.

366.   At all relevant times, the Generic Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling, supplying, marketing and/or promoting generic Propoxyphene Products.

367.   The following were the duties of the Innovator and Brand Defendants at all relevant times, and the duties of the Generic Defendants following implementation of the Food and Drug Administration Amendments Act of 2007, and possibly before:

    a.    to assess, manage and communicate the risks, dangers and adverse effects associated with Propoxyphene Products to the health care community and the general public, including Plaintiffs and their prescribing physicians; and

    b.    to distribute their Propoxyphene Products with adequate information about the appropriate use of the products and their associated risks provided to the general public and the health care community, including Plaintiffs and their prescribing physicians.

368.   Before Plaintiffs were injured by ingesting Defendants' Propoxyphene Products, Defendants knew that:

    a.    propoxyphene had not been adequately tested;

    b.    Propoxyphene Products were associated with a greatly increased risk of serious adverse cardiovascular events that could result in death, which outweighed their benefit for pain relief;

    c.    the risks, and the nature, scope, severity and duration of any serious side effects, were greater with Propoxyphene Products than with other practical, medically feasible and available pain management medications;

    d.    Propoxyphene Products were unreasonably dangerous to the health of patients suffering from pain; and

    e.    Propoxyphene Products were no more effective for pain management than other available, practical, and medically-feasible alternate pain management medications, such as over-the-counter acetaminophen (brand name Tylenol), which posed less risk.

- 67 -

369.    At all relevant times, Defendants knew that the risks associated with Propoxyphene Products, and the ability to avoid them by using other available, practical and medically-feasible pain management medications, were beyond that which would be contemplated by the ordinary physician who prescribed Propoxyphene Products and the ordinary consumer who purchased Propoxyphene Products.

370.    More specifically, Defendants knew that the general public and the health care community – including Plaintiffs and their prescribing physicians – would not have been aware of the information outlined above, absent disclosures from Defendants, because:

    a.    the general public and the health care community did not have access to the same resources, analysis and knowledge as Defendants; and

    b.    Defendants manufactured, sold and distributed Propoxyphene Products, and would therefore be assumed to have superior knowledge about them.

371.    At all relevant times, Plaintiffs and their prescribing physicians were unaware of the risks associated with Propoxyphene Products, or of the availability of practical and medically-feasible alternate pain management medications.

372.    At all relevant times, Defendants failed to adequately disclose to the general public or the medical community – including Plaintiffs and their treating physicians – about any of the risks outlined above, or about the availability of practical and medically-feasible alternatives.

373.    More specifically, Defendants failed to adequately disclose to the general public or the medical community – including Plaintiffs and their treating physicians, about the following facts that it knew:

    a.    In 1971, six out of seven trials demonstrated that while propoxyphene alone was not significantly superior to placebo in managing pain, acetaminophen alone was;

    b.    In 1978, the Health Research Group filed a petition with the FDA requesting the recall of Darvon based on its claim that it was a dangerous drug of questionable effectiveness, and subsequently submitted studies supporting that propoxyphene could be toxic to the cardiovascular system;

    c.    In January 2005, health officials in Great Britain called for a phased withdrawal of propoxyphene-containing products because they were concerned

- 68 -

about the cardiac effects associated with their use and were unable to identify any patient group in whom the risk benefit ratio may be positive;

d.   In June 2009, the European Medicines Agency recommended withdrawal across the European Union of marketing authorizations for propoxyphene-containing medications because available evidence suggested that acetaminophen alone was as effective as an acetaminophen-propoxyphene combination, and that the benefits of medicines containing propoxyphene, either alone or in combination, did not outweigh their risks.

e.   In 2009, the FDA ordered Xanodyne to include a Black Box warning concerning the risk of fatal overdose, and to add warnings to its label about propoxyphene's dangers overall, for elderly patients, and in terms of its potential for abuse and dependence.

f.   In 2009, the FDA also ordered Xanodyne to conduct clinical studies to assess the potential for cardiotoxicity associated with propoxyphene use, to prepare a MedGuide to highlight important safeguards for use of the drug, and to issue a Public Health Advisory to underscore safety issues.

g.   In July 2009, Xanodyne's study confirmed that propoxyphene can cause significant changes to the heart, even when taken at recommended doses.

374.   Upon information and belief, the Innovator and Brand Defendants did not comply with the FDA's mandate to prepare the MedGuide or issue the Public Health Advisory. The failure to take these actions resulted in inadequate labeling of all Propoxyphene based pharmaceuticals.

375.   Upon information and belief, the Innovator and Brand Defendants also did not timely implement the Black Box warning or revise the labels for Darvocet or Darvon, or publish the information in the PDR, or communicate the information to prescribing physicians in Dear Health Care Professional letters or by other means. The failure to take these actions resulted in inadequate labeling of all Propoxyphene based pharmaceuticals.

376.   The FDA mandate likewise effectively required the Generic Defendants to issue the Black Box warning and label changes, but upon information and belief, the Generic Defendants likewise did not timely implement the Black Box warning or revise the labels for their Propoxyphene Products, or publish the information in the PDR, or communicate the information to prescribing physicians in Dear Health Care Professional letters or by other means.

- 69 -

377. It would have been technologically feasible, and would not have been cost-prohibitive, for the Defendants to include adequate disclosures in their marketing and labeling materials, and in their communications to the general public and the health care community.

378. Defendants instead used their resources to conceal and downplay the risks associated with Propoxyphene Products in their promotional materials, instructional materials, labeling for, and communications about Propoxyphene Products, which was especially misleading given their past and continued efforts to promote the safety and effectiveness of the drugs. Defendants failed to disclose the material information outlined above because they wanted the general public and the health care community – including Plaintiffs and their prescribing physicians – to believe that Propoxyphene Products were safe and effective, and wanted to induce medical providers – including Plaintiffs prescribing physicians – to prescribe Propoxyphene Products, and consumers – including Plaintiffs – to purchase and ingest their Propoxyphene Products.

379. Plaintiffs and their prescribing physicians justifiably relied on the lack of information about the risks associated with Propoxyphene Products and/or about other available, practical and medically-feasible pain management medications, and acted upon it, by Plaintiffs physicians prescribing Propoxyphene Products, and Plaintiffs purchasing and ingesting Defendants' Propoxyphene Products.

380. Had Defendants provided adequate disclosures:

a. Plaintiffs physicians would not have prescribed Propoxyphene Products, and would have instead prescribed another pain management medication that neither contained propoxyphene nor involved an increased risk of serious adverse cardiovascular events that could result in death, or recommended that Plaintiffs instead take over-the-counter acetaminophen;

b. Plaintiffs would not have purchased or ingested Defendants' Propoxyphene Products; and

c. Plaintiffs would not have suffered the injuries described above.

381. In light of what Defendants knew, they had to have known or anticipated that their failure to disclose the dangers of propoxyphene and Propoxyphene Products, and of the availability of

- 70 -

1    practical and medically-feasible alternate pain management medications that posed less risk, would

2    likely result in physicians prescribing Propoxyphene Products, and consumers purchasing and

3    ingesting their Propoxyphene Products, and, as a direct and proximate result, suffering serious

4    adverse cardiovascular effects that could result in death.

5         382.  Plaintiffs prescription for and purchase and ingestion of Defendants' Propoxyphene

6    Products, and the injuries described above that followed, were the direct and proximate result of

7    Defendants' knowing failure to disclose.

8         383.  By failing to make the disclosures outlined above, Defendants knowingly risked the

9    lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was

10   extreme and outrageous, and warrants an award of punitive damages.

11        384.  Upon information and belief, Plaintiffs allege that Defendants actively and

12   fraudulently concealed information in Defendants' exclusive possession regarding the hazards

13   associated with the Propoxyphene Products with the purpose of preventing consumers, such as

14   Plaintiffs, from discovery these hazards.

15        385.   At all relevant times herein, Defendants had full knowledge of the true cardiac risks

16   associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to

17   withdraw these products from the market or to stop selling the products.

18        386.  As a direct and proximate result of the defective manufacturing and the unreasonably

19   dangerous and defective characteristics of the Propoxyphene Products and the Defendants' failure to

20   comply with federal standards and requirements, the Plaintiffs suffered severe and permanent

21   injuries.  Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in

22   nature.  Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages

23   and earnings, and was otherwise physically, emotionally, and economically injured.  Plaintiffs

24   suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from the Defendants as

25   alleged herein.  The injuries and damages alleged herein are permanent and will continue into the

26   future.

27        387.  Defendants acted willfully or with gross negligence indicating a wanton disregard for

28   the rights of Plaintiffs and others, rendering Defendants liable to Plaintiffs for punitive damages.  The

- 71 -

1   aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate

2   disregard for the rights and safety of consumers, including Plaintiffs herein, thereby entitled Plaintiffs

3   to punitive damages in an amount appropriate to punish the Defendants and deter them from similar

4   conduct in the future.

5       388.   The aforesaid conduct of the Defendants was committed with knowing, conscious, and

6   deliberate disregard for the rights and safety of consumers, including Plaintiffs herein, thereby

7   entitling Plaintiffs to punitive damages in an amount appropriate to punish the Defendants and deter

8   them from similar conduct in the future.

9       WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory,

10  and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as

11  the Court deems proper.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

14      389.   Plaintiffs incorporate and adopt by reference each paragraph set forth in this

15  Complaint.

16      390.   At all relevant times, the Innovator and Brand Defendants were engaged in the

17  business of researching, designing, manufacturing, testing, studying, labeling, packaging,

18  distributing, selling, supplying, marketing and/or promoting Darvocet/Darvon, brand-name

19  Propoxyphene Products.

20      391.   At all relevant times, the Generic Defendants were engaged in the business of

21  researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling,

22  supplying, marketing and/or promoting generic Propoxyphene Products.

23      392.   The following were the duties of the Innovator and Brand Defendants at all relevant

24  times, and the duties of the Generic Defendants following implementation of the Food and Drug

25  Administration Amendments Act of 2007, and possibly before:

       a.      to assess, manage and communicate the risks, dangers and adverse effects
               associated with Propoxyphene Products to the health care community and the
               general public, including Plaintiff and their prescribing physicians; and

- 72 -

b.    to distribute their Propoxyphene Products with adequate information about the appropriate use of the products and their associated risks provided to the general public and the health care community, including Plaintiffs and their prescribing physicians.

393.    Before Plaintiffs were injured by ingesting Defendants' Propoxyphene Products, Defendants knew or should have known that:

a.    propoxyphene had not been adequately tested;

b.    Propoxyphene Products were associated with a greatly increased risk of serious adverse cardiovascular events that could result in death, which outweighed their benefit for pain relief;

c.    the risks, and the nature, scope, severity and duration of any serious side effects, were greater with Propoxyphene Products than with other practical, medically feasible and available pain management medications;

d.    Propoxyphene Products were unreasonably dangerous to the health of patients suffering from pain; and

e.    Propoxyphene Products were no more effective for pain management than other available, practical, and medically-feasible alternate pain management medications, such as over-the-counter acetaminophen (brand name Tylenol), which posed less risk.

394.    More specifically, Defendants knew or should have known that:

a.    In 1971, six out of seven trials demonstrated that while propoxyphene alone was not significantly superior to placebo in managing pain, acetaminophen alone was;

b.    In 1978, the Health Research Group filed a petition with the FDA requesting the recall of Darvon based on its claim that it was a dangerous drug of questionable effectiveness, and subsequently submitted studies supporting that propoxyphene could be toxic to the cardiovascular system;

c.    In January 2005, health officials in Great Britain called for a phased withdrawal of propoxyphene-containing products because they were concerned about the cardiac effects associated with their use and were unable to identify any patient group in whom the risk benefit ratio may be positive;

d.    In June 2009, the European Medicines Agency recommended withdrawal across the European Union of marketing authorizations for propoxyphene-

- 73 -

containing medications because available evidence suggested that acetaminophen alone was as effective as an acetaminophen-propoxyphene combination, and that the benefits of medicines containing propoxyphene, either alone or in combination, did not outweigh their risks.

e.   In 2009, the FDA ordered Xanodyne to include a Black Box warning concerning the risk of fatal overdose, and to add warnings to its label about propoxyphene's dangers overall, for elderly patients, and in terms of its potential for abuse and dependence.

f.   In 2009, the FDA also ordered Xanodyne to conduct clinical studies to assess the potential for cardiotoxicity associated with propoxyphene use, to prepare a MedGuide to highlight important safeguards for use of the drug, and to issue a Public Health Advisory to underscore safety issues.

g.   In July 2009, Xanodyne's study confirmed that propoxyphene can cause significant changes to the heart, even when taken at recommended doses.

395.   Despite what the Innovator and Brand Defendants knew or should have known, upon information and belief, they represented to the general public and the health care community in reports, press releases, advertising campaigns, television commercials, print advertisements, billboards, other commercial media, promotional materials, instructional materials and labeling that:

a.   propoxyphene had been adequately tested;

b.   Propoxyphene Products were safe and effective for pain management; and

c.   Propoxyphene Products were more effective for pain management than other pain management medications.

396.   Similarly, despite what the Generic Defendants knew or should have known, upon information and belief, they represented to the general public and the health care community in their instructional materials and labeling that:

a.   propoxyphene had been adequately tested;

b.   Propoxyphene Products were safe and effective for pain management; and

c.   Propoxyphene Products were more effective for pain management than other pain management medications.

- 74 -
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    397.   These representations made by Defendants were false at the time that they were made,

2    and Defendants knew or should have known that they were false.

3    398.   Defendants knew or should have known that the general public and the health care

4    community – including Plaintiffs and their prescribing physicians – would not have been aware that

5    their statements about the testing, safety and effectiveness associated with Propoxyphene Products

6    were false, and would have instead justifiably relied on them, because:

7

8        a.   the general public and the health care community did not have access to the
      same resources, analysis and knowledge as Defendants; and

9

10       b.   Defendants manufactured, sold and distributed Propoxyphene Products, and
      would therefore be assumed to have superior knowledge about them.

11   399.   At all relevant times, Plaintiffs and their prescribing physicians did not, in fact, know

12   that Defendants' misrepresentations were false.

13   400.   Because of what Defendants knew or should have known, as described above, they

14   failed to exercise reasonable care or competence in making these misrepresentations.

15   401.   Plaintiffs and their prescribing physicians justifiably relied and acted upon

16   Defendants' misrepresentations, by Plaintiffs physicians prescribing Propoxyphene Products, and

17   Plaintiffs purchasing and ingesting Defendants' Propoxyphene Products.

18   402.   Had Defendants not made these misrepresentations:

19

20       a.   Plaintiffs physicians would not have prescribed Propoxyphene Products, and
      would have instead prescribed another pain management medication that

21         neither contained propoxyphene nor involved an increased risk of serious
      adverse cardiovascular events that could result in death, or recommended that

22         Plaintiffs instead take over-the-counter acetaminophen;

23

24       b.   Plaintiffs would not have purchased or ingested Defendants' Propoxyphene
      Products; and

25       c.   Plaintiffs would not have suffered the injuries described above.

26

27   403.   In light of what Defendants knew or should have known, they should have anticipated

28   that their misrepresentations would likely result in physicians prescribing Propoxyphene Products,

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    and consumers purchasing and ingesting their Propoxyphene Products, and, as a direct and

2    proximate result, suffering serious adverse cardiovascular effects that could result in death.

3         404.    Plaintiffs prescription for and purchase and ingestion of Propoxyphene Products, and

4    the injuries described above that followed, were the direct and proximate result of Defendants'

5    misrepresentations.

6         405.    By making the misrepresentations described above, Defendants knowingly risked the

7    lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was

8    extreme and outrageous, and warrants an award of punitive damages.

9         406.    At all relevant times herein, Defendants had full knowledge of the true cardiac risks

10   associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to

11   withdraw these products from the market or to stop selling the products.

12        407.    As a direct and proximate result of the defective and inappropriate warnings and the

13   unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to

14   comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as

15   herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and

16   emotional in nature.  Plaintiffs incurred significant expenses for medical care and treatment, suffered

17   lost wages and earnings, and were otherwise physically, emotionally, and economically injured.

18   Plaintiffs suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from the

19   Defendants as alleged herein.  The injuries and damages alleged herein are permanent and will

20   continue into the future.

21        WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory,

22   and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as

23   the Court deems proper.

24

25                          ### NINTH CAUSE OF ACTION
                **FRAUDULENT MISREPRESENTATION AND CONCEALMENT**
26                            **(Against All Defendants)**

27        408.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this

28   Complaint.

409.    At all relevant times, the Innovator and Brand Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling, supplying, marketing and/or promoting Darvocet/Darvon, brand-name Propoxyphene Products.

410.    At all relevant times, the Generic Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling, supplying, marketing and/or promoting generic Propoxyphene Products.

411.    The following were the duties of the Innovator and Brand Defendants at all relevant times, and the duties of the Generic Defendants following implementation of the Food and Drug Administration Amendments Act of 2007, and possibly before:

  a. to assess, manage and communicate the risks, dangers and adverse effects associated with Propoxyphene Products to the health care community and the general public, including Plaintiffs and their prescribing physicians; and

  b. to distribute their Propoxyphene Products with adequate information about the appropriate use of the products and their associated risks provided to the general public and the health care community, including Plaintiffs and their prescribing physicians.

412.    Before Plaintiffs was injured by ingesting Defendants' Propoxyphene Products, Defendants knew that:

  a. propoxyphene had not been adequately tested;

  b. Propoxyphene Products were associated with a greatly increased risk of serious adverse cardiovascular events that could result in death, which outweighed their benefit for pain relief;

  c. the risks, and the nature, scope, severity and duration of any serious side effects, were greater with Propoxyphene Products than with other practical, medically feasible and available pain management medications;

  d. Propoxyphene Products were unreasonably dangerous to the health of patients suffering from pain; and

  e. Propoxyphene Products were no more effective for pain management than other available, practical, and medically-feasible alternate pain management

- 77 -

medications, such as over-the-counter acetaminophen (brand name Tylenol), which posed less risk.

413.    More specifically, Defendants knew that:

a.      In 1971, six out of seven trials demonstrated that while propoxyphene alone was not significantly superior to placebo in managing pain, acetaminophen alone was;

b.      In 1978, the Health Research Group filed a petition with the FDA requesting the recall of Darvon based on its claim that it was a dangerous drug of questionable effectiveness, and subsequently submitted studies supporting that propoxyphene could be toxic to the cardiovascular system;

c.      In January 2005, health officials in Great Britain called for a phased withdrawal of propoxyphene-containing products because they were concerned about the cardiac effects associated with their use and were unable to identify any patient group in whom the risk benefit ratio may be positive;

d.      In June 2009, the European Medicines Agency recommended withdrawal across the European Union of marketing authorizations for propoxyphene-containing medications because available evidence suggested that acetaminophen alone was as effective as an acetaminophen-propoxyphene combination, and that the benefits of medicines containing propoxyphene, either alone or in combination, did not outweigh their risks.

e.      In 2009, the FDA ordered Xanodyne to include a Black Box warning concerning the risk of fatal overdose, and to add warnings to its label about propoxyphene's dangers overall, for elderly patients, and in terms of its potential for abuse and dependence.

f.      In 2009, the FDA also ordered Xanodyne to conduct clinical studies to assess the potential for cardiotoxicity associated with propoxyphene use, to prepare a MedGuide to highlight important safeguards for use of the drug, and to issue a Public Health Advisory to underscore safety issues.

g.      In July 2009, Xanodyne's study confirmed that propoxyphene can cause significant changes to the heart, even when taken at recommended doses.

414.    Despite what the Innovator and Brand Defendants knew, upon information and belief, they falsely represented to the general public and the health care community in reports, press releases, advertising campaigns, television commercials, print advertisements, billboards, other commercial media, promotional materials, instructional material and labeling that:

- 78 -

a.      propoxyphene had been adequately tested;

b.      Propoxyphene Products were safe and effective for pain management; and

c.      Propoxyphene Products were more effective for pain management than other pain management medications.

415.    Similarly, despite what the Generic Defendants knew, upon information and belief, they falsely represented to the general public and the health care community in their instructional materials and labeling that:

a.      propoxyphene had been adequately tested;

b.      Propoxyphene Products were safe and effective for pain management; and

c.      Propoxyphene Products were more effective for pain management than other pain management medications.

416.    These representations were all intentionally false and misleading at the time that they were made, and Defendants knew that they were false and misleading, and willfully, wantonly and recklessly disregarded that they were false.

417.    Defendants knew that the general public and the health care community – including Plaintiffs and their prescribing physicians – would not have been aware that their statements about the testing, safety and effectiveness associated with Propoxyphene Products were false, and would have instead justifiably relied on them, because:

a.      the general public and the health care community did not have access to the same resources, analysis and knowledge as Defendants; and

b.      Defendants manufactured, sold and distributed Propoxyphene Products, and would therefore be assumed to have superior knowledge about them.

418.    At all relevant times, Plaintiffs and their prescribing physicians did not, in fact, know that Defendants' misrepresentations were false.

419.    Defendants made these material misrepresentations because they wanted the general public and the health care community to rely on them, and wanted to induce medical providers –

- 79 -

1    including Plaintiffs prescribing physicians – to prescribe Propoxyphene Products, and consumers –

2    including Plaintiffs – to purchase and ingest their Propoxyphene Products.

3        420.   Plaintiffs and their prescribing physicians justifiably relied and acted upon

4    Defendants' misrepresentations, by Plaintiffs physicians prescribing Propoxyphene Products, and

5    Plaintiffs purchasing and ingesting Defendants' Propoxyphene Products.

6        421.   Had Defendants not made these misrepresentations:

7

8        a.   Plaintiffs physicians would not have prescribed Propoxyphene Products, and
             would have instead prescribed another pain management medication that
9             neither contained propoxyphene nor involved an increased risk of serious
             adverse cardiovascular events that could result in death, or recommended that
10            Plaintiffs instead take over-the-counter acetaminophen;

11       b.   Plaintiffs would not have purchased or ingested Defendants' Propoxyphene
             Products, and
12

13       c.   Plaintiffs would not have suffered the injuries described above.

14

15       422.   In light of what Defendants knew, they had to have known that their

16   misrepresentations would likely result in physicians prescribing Propoxyphene Products, and

17   consumers purchasing and ingesting their Propoxyphene Products, and, as a direct and proximate

     result, suffering serious adverse cardiovascular effects that could result in death.
18

19       423.   Plaintiffs prescription for and purchase and ingestion of Propoxyphene Products, and

20   the injuries described above that followed, were the direct and proximate result of Defendants'

     knowing misrepresentations.
21

22       424.   By making the misrepresentations described above, Defendants knowingly risked the

23   lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was

     extreme and outrageous, and warrants an award of punitive damages.
24

25       425.   Upon information and belief, Plaintiffs allege that Defendants actively and

26   fraudulently concealed information in Defendants' exclusive possession regarding the hazards

27   associated with the Propoxyphene Products with the purpose of preventing consumers, such as

28   Plaintiffs, from discovery these hazards.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

426.   At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

427.   As a direct and proximate result of the defective manufacturing and the unreasonably dangerous and defective characteristics of the Propoxyphene Products and the Defendants' failure to comply with federal standards and requirements, the Plaintiffs suffered severe and permanent injuries. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and was otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the Defendants as alleged herein. The injuries and damages alleged herein are permanent and will continue into the future.

428.   Defendants acted willfully or with gross negligence indicating a wanton disregard for the rights of Plaintiffs and others, rendering Defendants liable to Plaintiffs for punitive damages. The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including Plaintiffs herein, thereby entitled Plaintiffs to punitive damages in an amount appropriate to punish the Defendants and deter them from similar conduct in the future.

429.   The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including Plaintiffs herein, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish the Defendants and deter them from similar conduct in the future.

WHEREFORE Plaintiffs demand judgment against Defendants for compensatory, statutory, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### TENTH CAUSE OF ACTION
### NEGLIGENCE PER SE
### (Against All Defendants)

- 81 -

430.   Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

431.   At all relevant times, the Innovator and Brand Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling, supplying, marketing and/or promoting Darvocet/Darvon, brand-name Propoxyphene Products.

432.   At all relevant times, the Generic Defendants were engaged in the business of researching, designing, manufacturing, testing, studying, labeling, packaging, distributing, selling, supplying, marketing and/or promoting generic Propoxyphene Products.

433.   Under the doctrine of negligence per se, otherwise known as statutory negligence, the duty of Defendants to exercise reasonable care included the obligation to conform their products and activities related to those products to safety standards imposed by applicable statutes or regulations.

434.   At all relevant times, Defendants violated federal standards for the sale of prescription drugs set forth in the Federal Food, Drug and Cosmetic Act, at 21 C.F.R. § 310.303, because their Propoxyphene Products were not safe and effective for their intended use.

435.   Additionally, there were violations of federal standards for the sale of prescription drugs set forth in the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, et seq., by the Innovator and Brand Defendants at all relevant times, and by the Generic Defendants following implementation of the Food and Drug Administration Amendments Act of 2007, and possibly before, as follows:

a.   Their Propoxyphene Products were adulterated pursuant to 21 U.S.C. § 351 because, among other things, their quality fell below the standard set forth in the official compendium for their Propoxyphene Products and such deviations were not plainly stated in their labels.

b.   Their Propoxyphene Products were misbranded pursuant to 21 U.S.C. § 352 because, among other things, their labeling was false or misleading.

c.   Their Propoxyphene Products were misbranded pursuant to 21 U.S.C. § 352 because words, statements or other information required by or under authority of that section were not prominently placed thereon with such conspicuousness and in such terms as to render them likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

- 82 -

d.  Their Propoxyphene Products were misbranded pursuant to 21 U.S.C. § 352 because the labeling did not bear adequate directions for use, and/or the labeling did not bear adequate warnings against use where their use may have been dangerous to health or against unsafe dosage or methods or duration of administration or application, in such manner and form as were necessary for the protection of users.

e.  Their Propoxyphene Products were misbranded pursuant to 21 U.S.C. § 352 because they were dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof.

f.  Their Propoxyphene Products' labeling was not informative and accurate as required by 21 C.F.R. § 201.56.

g.  Their Propoxyphene Products were misbranded pursuant to 21 C.F.R. § 201.56 because the labeling was not updated as new information became available that caused the labeling to become inaccurate, false or misleading.

h.  Their Propoxyphene Products were mislabeled pursuant to 21 C.F.R. § 201.57 because the labeling failed to describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur.

i.  Their Propoxyphene Products were mislabeled pursuant to 21 C.F.R. § 201.57 because the labeling was not revised to include a warning as soon as there was reasonable evidence of an association of a serious hazard with the drugs.

j.  Defendants failed to list the adverse reactions that occurred with their Propoxyphene Products and other drugs in the same pharmacologically active and chemically related class, as required by 21 C.F.R. § 201.57.

k.  Defendants violated 21 C.F.R. § 310.303 by failing to establish and maintain records and make reports related to clinical experience or other data or information necessary to make or facilitate a determination of whether there were or might have been grounds for suspending or withdrawing approval of the application for their Propoxyphene Products to the FDA.

436.  Such violations constitute a breach of duty of reasonable care toward Plaintiffs that would subject Defendants to civil liability for personal injuries proximately caused by the violations.

437.  As a lawful consumer of Defendants' Propoxyphene Products, Plaintiffs was within the class of persons the statutes and regulations described above was designed to protect, and their injuries were the type of harm they were intended to prevent.

- 83 -

438.   At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

439.   As a direct and proximate cause of the violations of these statutes and regulations by Defendants, which therefore constitute negligent per se acts and/or omissions, Plaintiffs suffered the injuries set forth in this Complaint.

440.   By violating these statutes and regulations, Defendants knowingly risked the lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was extreme and outrageous, and warrants an award of punitive damages.

441.   As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the Defendants as alleged herein. The injuries and damages alleged herein are permanent and will continue into the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### ELEVENTH CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
#### (Against All Defendants)

442.   Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

443.   At all relevant times, the Innovator and Brand Defendants were engaged in the business of selling goods, which were Darvocet/Darvon.

- 84 -

444.   At all relevant times, the Generic Defendants were engaged in the business of selling goods, which were generic Propoxyphene Products.

445.   Upon information and belief, at all relevant times, Defendants expressly warranted that:

    a.    propoxyphene, such as that contained in their Propoxyphene Products, had been adequately tested;

    b.    propoxyphene, such as that contained in their Propoxyphene Products, was safe and effective for pain management; and

    c.    Propoxyphene Products, such as their Propoxyphene Products, were more effective for pain management than other pain management medications.

446.   Upon information and belief, Defendants made these express warranties for the benefit of Plaintiffs.

447.   These express warranties were relied upon, and were part of the basis of the bargain for, Plaintiffs and their prescribing physicians.

448.   Defendants' Propoxyphene Products did not conform to these express warranties, because:

    a.    Propoxyphene, such as that contained in Defendants' Propoxyphene Products, had not been adequately tested;

    b.    Propoxyphene Products, such as Defendants' Propoxyphene Products, were associated with a greatly increased risk of serious adverse cardiovascular events that could result in death, which outweighed their benefit for pain relief;

    c.    the risks, and the nature, scope, severity and duration of any serious side effects were greater with Propoxyphene Products, such as Defendants' Propoxyphene Products, than with other practical, medically-feasible and available pain management medications;

    d.    Propoxyphene Products, such as Defendants' Propoxyphene Products, were unreasonably dangerous to the health of patients suffering from pain; and

    e.    Propoxyphene Products, such as Defendants' Propoxyphene Products, were no more effective for pain management than other practical, medically-feasible and available alternate pain management medications, such as over-the-counter acetaminophen (brand name Tylenol), which posed less risk.

449.   Had Defendants not made these express warranties:

- 85 -

a.  Plaintiffs physicians would not have prescribed Propoxyphene Products, and would have instead prescribed another pain management medication that neither contained propoxyphene nor involved an increased risk of serious adverse cardiovascular events that could result in death, or recommended that Plaintiffs instead take over-the-counter acetaminophen;

b.  Plaintiffs would not have purchased or ingested Defendants' Propoxyphene Products; and

c.  Plaintiffs would not have suffered the injuries described above.

450.  Upon information and belief, Defendants did, however, make these express warranties, and as a result, Plaintiffs' physicians prescribed Propoxyphene Products, and Plaintiffs purchased and ingested Defendants' Propoxyphene Products, and suffered the injuries described above.

451.  Plaintiffs' injuries that are described above were the direct and proximate result of Defendants' breach of their express warranties.

452.  At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

453.  As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the Defendants as alleged herein. The injuries and damages alleged herein are permanent and will continue into the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

- 86 -

**TWELFTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**
**(Against All Defendants)**

454. Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

455. At all relevant times, the Innovator and Brand Defendants were engaged in the business of selling goods, which were Darvocet/Darvon and owed a duty to consumers regarding all Propoxyphene Products.

456. At all relevant times, the Generic Defendants were engaged in the business of selling goods, which were generic Propoxyphene Products.

457. Defendants sold their Propoxyphene Products to Plaintiffs.

458. The ordinary purpose for which Propoxyphene Products are used is for safe and effective management of pain.

459. The Propoxyphene Products that Defendants sold to Plaintiffs were not fit for their ordinary purpose of providing safe and effective management of pain because:

a. Propoxyphene, such as that contained in Defendants' Propoxyphene Products, had not been adequately tested;

b. Propoxyphene Products, such as Defendants' Propoxyphene Products, were associated with a greatly increased risk of serious adverse cardiovascular events that could result in death, which outweighed their benefit for pain relief;

c. the risks, and the nature, scope, severity and duration of any serious side effects were greater with Propoxyphene Products, such as Defendants'. Propoxyphene Products, than with other practical, medically-feasible and available pain management medications;

d. Propoxyphene Products, such as Defendants' Propoxyphene Products, were unreasonably dangerous to the health of patients suffering from pain; and

e. Propoxyphene Products, such as Defendants' Propoxyphene Products, were no more effective for pain management than other practical, medically-feasible and available alternate pain management medications, such as over-the-counter acetaminophen (brand name Tylenol), which posed less risk.

- 87 -

1    460.    Plaintiffs' injuries that are described above were the direct and proximate result of the

2    failure of Defendants' Propoxyphene Products to be fit for their ordinary purpose of providing safe

3    and effective management of pain.

4    461.    At all relevant times herein, Defendants had full knowledge of the true cardiac risks

5    associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to

6    withdraw these products from the market or to stop selling the products.

7    462.    As a direct and proximate result of the defective and inappropriate warnings and the

8    unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to

9    comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as

10   herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and

11   emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered

12   lost wages and earnings, and were otherwise physically, emotionally, and economically injured.

13   Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the

14   Defendants as alleged herein. The injuries and damages alleged herein are permanent and will

15   continue into the future.

16   WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory,

17   and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as

18   the Court deems proper.

19

20   **THIRTEENTH CAUSE OF ACTION**
     **DECEIT BY CONCEALMENT – VIOLATION OF**
21   **CALIFORNIA CIVIL CODE §§ 1709, 1710**
     **(Against All Defendants)**
22

23   463.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this

     Complaint.

24   464.    The Defendants had actual knowledge based upon studies, published reports, and

25   clinical experience, that products containing propoxyphene created an unreasonable risk of serious

26   bodily injury or should have known such information.

27   465.    The Defendants intentionally omitted, concealed and suppressed this information from

28

- 88 -

1   the product labeling, promoting, and advertising of products containing propoxyphene and instead

2   labeled, promoted, and advertised products containing propoxyphene as safe in order to avoid losses

3   and sustain profits in its sale to consumers, as Defendants knew that Plaintiffs' healthcare providers

4   would not have exposed Plaintiffs to products containing propoxyphene had Plaintiffs' healthcare

5   providers known or otherwise been aware of the true facts concerning propoxyphene administration.

6          466.    Plaintiffs and Plaintiffs' healthcare providers reasonably relied, to their detriment,

7   upon the Defendants' fraudulent actions and omissions in their representations concerning the risks of

8   propoxyphene in the labeling, advertising, and promoting of said product.

9          467.    Plaintiffs and Plaintiffs' healthcare providers reasonably relied upon the Defendants'

10   representations to them that propoxyphene was safe for human consumption and/or use and that the

11   Defendants' labeling, advertising, and promotions fully described all known risks of propoxyphene.

12          468.    The Defendants' actions, concealment and omissions as described herein demonstrate

13   a flagrant disregard for human life, so as to warrant the imposition of punitive damages.

14          469.    At all relevant times herein, Defendants had full knowledge of the true cardiac risks

15   associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to

16   withdraw these products from the market or to stop selling the products.

17          470.    As a direct and proximate result of the defective and inappropriate warnings and the

18   unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to

19   comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as

20   herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and

21   emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered

22   lost wages and earnings, and were otherwise physically, emotionally, and economically injured.

23   Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the

24   Defendants as alleged herein. The injuries and damages alleged herein are permanent and will

25   continue into the future.

26          WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory,

27   and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as

28   the Court deems proper.

## FOURTEENTH CAUSE OF ACTION
### VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200
#### (Against All Defendants)

471.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

472.    Plaintiffs bring this cause of action pursuant to California Business & Professions Code § 17204, in Plaintiffs' individual capacities, and not on behalf of the general public.

473.    California Business & Professions Code § 17200 provides that unfair competition shall mean and include "all unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

474.    The acts and practices described above were and are likely to mislead the general public and therefore constitute unfair business practices within the meaning of California Business & Professions Code § 17200. The acts of untrue and misleading advertising are, by definition, violations of California Business & Professions Code § 17200. This conduct includes, but is not limited to:

    a.    Representing to Plaintiffs, Plaintiffs' physicians, and the general public that propoxyphene was safe, fit, and effective for human use, knowing that said representations were false, and concealing from Plaintiffs, Plaintiffs' physicians, and the general public that propoxyphene had a serious propensity to cause injuries to users;

    b.    Engaging in advertising programs designed to create the image, impression and belief by consumers and physicians that propoxyphene was safe for human use, even though the Defendants knew this to be false, and even though the Defendants had no reasonable grounds to believe them to be true; and

    c.    Purposely downplaying and understating the health hazards and risks associated with propoxyphene.

475.    These practices constitute unlawful, unfair and fraudulent business acts or practices, within the meaning of California Business & Professions Code § 17200, as well as unfair, deceptive, untrue and misleading advertising as prohibited by California Business & Professions Code § 17500.

476.    As a result of their conduct described above, Defendants have been and will be unjustly enriched. Specifically, Defendants have been unjustly enriched by receipt of ill-gotten gains

- 90 -

1  from the sale of propoxyphene in California, sold in large part as a result of the acts and omissions

2  described herein.

3       477.    Because of fraudulent misrepresentations made by Defendants as detailed above, and

4  the inherently unfair practice of committing a fraud against the public by intentionally

5  misrepresenting and concealing material information, the acts of Defendants described herein

6  constitute unfair or fraudulent business practices.

7       478.    Plaintiffs, pursuant to California Business & Professions Code § 17203, seek an order

8  of this court compelling the Defendants to provide restitution and injunctive relief calling for

9  Defendants, and each of them, to cease unfair business practices in the future.

10      479.    At all relevant times herein, Defendants had full knowledge of the true cardiac risks

11  associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to

12  withdraw these products from the market or to stop selling the products.

13      480.    As a direct and proximate result of the defective and inappropriate warnings and the

14  unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to

15  comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as

16  herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and

17  emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered

18  lost wages and earnings, and were otherwise physically, emotionally, and economically injured.

19  Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the

20  Defendants as alleged herein. The injuries and damages alleged herein are permanent and will

21  continue into the future.

22      WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory,

23  and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as

24  the Court deems proper.

25

26                              **FIFTEENTH CAUSE OF ACTION**
27           **VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17500**
                                **(Against All Defendants)**

28

481.   Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

482.   Plaintiffs bring this cause of action pursuant to California Business & Professions Code § 17500, in Plaintiffs' individual capacities and not on behalf of the general public.

483.   California Business & Professions Code § 17500 provides that it is unlawful for any person, firm, corporation or association to dispose of property or perform services, or to induce the public to enter into any obligation relating thereto, through the use of untrue or misleading statements.

484.   At all times herein alleged Defendants have committed acts of disseminating untrue and misleading statements as defined by California Business & Professions Code § 17500 by engaging in the following acts and practices with intent to induce members of the public, including healthcare professionals, to purchase and use products containing propoxyphene:

   a.   Representing to Plaintiffs, Plaintiffs' physicians, and the general public that propoxyphene was safe, fit, and effective for human use, knowing that said representations were false, and concealing from Plaintiffs, Plaintiffs' physicians, and the general public that propoxyphene had a serious propensity to cause injuries to users;

   b.   Engaging in advertising programs designed to create the image, impression and belief by consumers and physicians that propoxyphene was safe for human use, even though the Defendants knew this to be false, and even though the Defendants had no reasonable grounds to believe them to be true; and

   c.   Purposely downplaying and understating the health hazards and risks associated with propoxyphene.

485.   The foregoing practices constitute false and misleading advertising within the meaning of California Business & Professions Code § 17500.

486.   As a result of their conduct described above, Defendants have been and will be unjustly enriched. Specifically, Defendants have been unjustly enriched by receipt of ill-gotten gains from the sale and prescription of products containing propoxyphene in California, sold in large part as a result of the acts and omissions described herein.

- 92 -

487.    Pursuant to California Business & Professions Code § 17535, Plaintiffs seek an order of this court compelling the Defendants to provide restitution and injunctive relief calling for Defendants, and each of them, to cease unfair business practices in the future.

488.    Plaintiffs seek restitution of the monies collected by Defendants, and each of them, and other injunctive relief to cease such false and misleading advertising in the future.

489.    At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

490.    As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature.  Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from the Defendants as alleged herein.  The injuries and damages alleged herein are permanent and will continue into the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTEENTH CAUSE OF ACTION
### VIOLATION OF CIVIL CODE § 1750 ET. SEQ.
#### (Against All Defendants)

491.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

492.    Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, by the acts and misconduct alleged herein, violated the Consumers Legal Remedies Act, California Civil Code  §§ 1750 et. seq. ("CLRA").

493.    Plaintiffs hereby seek injunctive relief as appropriate against Defendants, and each of them, for their violations of California Civil Code §§ 1750 et. seq. The CLRA applies to Defendants' actions and conduct described herein because it extends to transactions which are intended to result, or which have resulted, in the sale of goods to consumers.

494.    Plaintiffs are a "consumer" within the meaning of California Civil Code § 1761(d).

495.    Defendants have violated, and continue to violate, the CLRA in representing that goods have characteristics and benefits which they do not have in violation of California Civil Code § 1770(a)(5).

496.    At all times herein alleged Defendants have committed acts of disseminating untrue and misleading statements as defined by California Civil Code § 1770 by engaging in the following acts and practices with intent to induce members of the public, including healthcare providers, to purchase and use products containing propoxyphene, but is not limited to:

a.    Representing to Plaintiffs, Plaintiffs' physicians, and the general public that propoxyphene was safe, fit, and effective for human use, knowing that said representations were false, and concealing from Plaintiffs, Plaintiffs' physicians, and the general public that propoxyphene had a serious propensity to cause injuries to users;

b.    Engaging in advertising programs designed to create the image, impression and belief by consumers and physicians that propoxyphene was safe for human use, even though the Defendants knew this to be false, and even though the Defendants had no reasonable grounds to believe them to be true; and

c.    Purposely downplaying and understating the health hazards and risks associated with propoxyphene.

497.    The foregoing practices constitute false and misleading advertising and representations within the meaning of California Civil Code § 1770.

498.    Pursuant to California Civil Code § 1780, Plaintiffs seek an order of this court for injunctive relief calling for Defendants, and each of them, to cease such deceptive business practices in the future.

- 94 -

499.    At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

500.    As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature.  Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from the Defendants as alleged herein.  The injuries and damages alleged herein are permanent and will continue into the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTEENTH CAUSE OF ACTION
### NEGLIGENCE
### (Against Innovator and Brand Defendants)

501.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

502.    At all relevant times, the Innovator and Brand Defendants were engaged in the business of researching, testing, studying, distributing, selling, supplying, marketing and/or promoting Darvocet and Darvon, brand-name Propoxyphene Products.

503.    At all relevant times, the Innovator and Brand Defendants had a duty to:

a.    exercise reasonable care to conduct adequate studies, tests, surveillance and analyses to assess the risks and adverse effects associated with their Propoxyphene Products; and

b.    stop distributing, selling and/or supplying them if they discovered that the drugs were unreasonably dangerous and defective.

- 95 -

1   504.   At all relevant times, the Innovator and Brand Defendants knew or should have known

2   that physicians who prescribe drugs to their patients, in making their decisions on what to prescribe,

3   often rely on the statements made about the brand formulations of a drug, and thus that the physicians

4   who prescribed either brand or generic Propoxyphene Products to their patients were relying on the

5   statements that the Innovator and Brand Defendants made about Darvocet and/or Darvon.

6   505.   At all relevant times, the Innovator and Brand Defendants knew or should have known

7   that patients who are prescribed a brand formulation of a drug are more likely to purchase the generic

8   than the brand formulation, and thus that patients who were prescribed Darvocet and/or Darvon likely

9   would have instead purchased a generic formulation of Darvocet and/or Darvon.

10   506.   Because of this knowledge, the duties of the Innovator and Brand Defendants that are

11   outlined above applied at all relevant times not only to the purchasers of the brand products and their

12   prescribing physicians, but also to the purchasers of generic formulations of those drugs and their

13   prescribing physicians, including Plaintiffs and their prescribing physicians.

14   507.   This count applies to the Innovator and Brand Defendants in relation to Plaintiffs'

15   ingestion of generic Propoxyphene Products.

16   508.   The Innovator and Brand Defendants breached the duties outlined above, because:

17

18       a.   they failed to timely conduct adequate studies, tests, surveillance and analysis,
which would have confirmed that their Propoxyphene Products were

19          unreasonably dangerous and defective, for the reasons described above, and
that other practical, medically-feasible and safer alternatives were available;

20          and

21       b.   they failed to timely stop distributing, selling and/or supplying their
Propoxyphene Products once they discovered or should have discovered that

22          those drugs were unreasonably dangerous and defective, and that other
practical and medically-feasible alternatives that were safer were available.

23

24   509.   If the Innovator and Brand Defendants had not breached those duties, and had more

25   timely withdrawn their Propoxyphene Products from the market for reasons of safety and efficacy,

26   the FDA would have also required the withdrawal of all generic Propoxyphene Products.

27

28

- 96 -

510.   If this had occurred, the Generic Defendants' unreasonably dangerous and defective Propoxyphene Products would not have been on the market for Plaintiffs to purchase and ingest, and Plaintiffs would not have suffered the injuries described above.

511.   Because of these breaches, however, the Generic Defendants' unreasonably dangerous and defective Propoxyphene Products were on the market, and Plaintiffs purchased and ingested them in a reasonably foreseeable manner and substantially as intended by the Innovator and Brand Defendants.

512.   As a direct and proximate result, Plaintiffs suffered the injuries described above.

513.   It was foreseeable that if the Innovator and Brand Defendants did not timely withdraw their brand Propoxyphene Products from the market for reasons of safety and efficacy, that the FDA would allow the generic Propoxyphene Products to also remain on the market, and that persons like Plaintiffs would be prescribed Propoxyphene Products, and would purchase and ingest the Generic Defendants' Propoxyphene Products, and, as a direct and proximate result, suffer the injuries that Plaintiffs suffered.

514.   Through the actions and inactions described above, the Innovator and Brand Defendants knowingly risked the lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was extreme and outrageous, and warrants an award of punitive damages.

515.   At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

516.   As a direct and proximate result of the defective manufacturing and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the Defendants as

- 97 -

1  alleged herein. The injuries and damages alleged herein are permanent and will continue into the

2  future.

3        WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory,

4  and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as

5  the Court deems proper.

### EIGHTEENTH CAUSE OF ACTION
### FRAUDULENT NONDISCLOSURE
### (Against Innovator and Brand Defendants)

8      517.   Plaintiffs incorporate and adopt by reference each paragraph set forth in this

9  Complaint.

10      518.   At all relevant times, the Innovator and Brand Defendants were engaged in the

11  business of researching, designing, manufacturing, testing, studying, labeling, packaging,

12  distributing, selling, supplying, marketing and/or promoting Darvocet and/or Darvon, brand-name

13  Propoxyphene Products.

14      519.   At all relevant times, the Innovator and Brand Defendants had a duty to:

16         a.    assess, manage and communicate the risks, dangers and adverse effects associated with their Propoxyphene Products to the health care community and the general public, including Plaintiffs and their prescribing physicians; and

18         b.    distribute their Propoxyphene Products with adequate information about the appropriate use of the products and their associated risks provided to the general public and the health care community, including Plaintiffs and their prescribing physicians.

21      520.   At all relevant times, the Innovator and Brand Defendants knew that physicians who

22  prescribe drugs to their patients, in making their decisions on what to prescribe, often rely on the

23  statements made about the brand formulations of a drug, and thus that the physicians who prescribed

24  either brand or generic Propoxyphene Products to their patients were relying on the statements that

25  the Innovator and Brand Defendants made about Darvocet and/or Darvon.

26      521.   At all relevant times, the Innovator and Brand Defendants knew that patients who are

27  prescribed a brand formulation of a drug are more likely to purchase the generic than the brand

- 98 -

1   formulation, and thus that patients who were prescribed Darvocet and/or Darvon likely would have

2   instead purchased a generic formulation of Darvocet and/or Darvon.

3       522.   Because of this knowledge, the duties of the Innovator and Brand Defendants that are

4   outlined above applied at all relevant times not only to the purchasers of the brand products and their

5   prescribing physicians, but also to the purchasers of generic formulations of those drugs and their

6   prescribing physicians, including Plaintiffs and their prescribing physicians.

7       523.   This count applies to the Innovator and Brand Defendants in relation to Plaintiffs'

8   ingestion of generic Propoxyphene Products.

9       524.   Before Plaintiffs was injured by ingesting the Generic Defendants' Propoxyphene

10   Products, the Innovator and Brand Defendants knew that:

        a.    propoxyphene had not been adequately tested;

        b.   Propoxyphene Products were associated with a greatly increased risk of serious adverse cardiovascular events that could result in death, which outweighed their benefit for pain relief;

        c.   the risks, and the nature, scope, severity and duration of any serious side effects, were greater with Propoxyphene Products than with other practical, medically feasible and available pain management medications;

        d.   Propoxyphene Products were unreasonably dangerous to the health of patients suffering from pain; and

        e.   Propoxyphene Products were no more effective for pain management than other available, practical, and medically-feasible alternate pain management medications, such as over-the-counter acetaminophen (brand name Tylenol), which posed less risk.

      525.   At all relevant times, the Innovator and Brand Defendants knew that the risks associated with Propoxyphene Products, and the ability to avoid them by using other available, practical and medically-feasible pain management medications, were beyond that which would be contemplated by the ordinary physician who prescribed Propoxyphene Products and the ordinary consumer who purchased Propoxyphene Products.

526.  More specifically, the Innovator and Brand Defendants knew that the general public and the health care community – including Plaintiffs and their prescribing physicians – would not have been aware of the information outlined above, absent disclosures from the Innovator and Brand Defendants, because:

a.  the general public and the health care community did not have access to the same resources, analysis and knowledge as the Innovator and Brand Defendants; and

b.  the Innovator and Brand Defendants manufactured, sold and distributed Propoxyphene Products, and would therefore be assumed to have superior knowledge about them.

527.  At all relevant times, Plaintiffs and their prescribing physicians were unaware of the risks associated with Propoxyphene Products, or of the availability of practical and medically-feasible alternate pain management medications.

528.  At all relevant times, the Innovator and Brand Defendants failed to adequately disclose to the general public or the medical community – including Plaintiffs and their treating physicians – about any of the risks outlined above, or about the availability of practical and medically-feasible alternatives.

529.  More specifically, the Innovator and Brand Defendants failed to adequately disclose to the general public or the medical community – including Plaintiffs and their treating physicians, about the following facts that it knew:

a.  In 1971, six out of seven trials demonstrated that while propoxyphene alone was not significantly superior to placebo in managing pain, acetaminophen alone was;

b.  In 1978, the Health Research Group filed a petition with the FDA requesting the recall of Darvon based on its claim that it was a dangerous drug of questionable effectiveness, and subsequently submitted studies supporting that propoxyphene could be toxic to the cardiovascular system;

c.  In January 2005, health officials in Great Britain called for a phased withdrawal of propoxyphene-containing products because they were concerned

about the cardiac effects associated with their use and were unable to identify any patient group in whom the risk benefit ratio may be positive;

d. In June 2009, the European Medicines Agency recommended withdrawal across the European Union of marketing authorizations for propoxyphene-containing medications because available evidence suggested that acetaminophen alone was as effective as an acetaminophen-propoxyphene combination, and that the benefits of medicines containing propoxyphene, either alone or in combination, did not outweigh their risks.

e. In 2009, the FDA ordered Xanodyne to include a Black Box warning concerning the risk of fatal overdose, and to add warnings to its label about propoxyphene's dangers overall, for elderly patients, and in terms of its potential for abuse and dependence.

f. In 2009, the FDA also ordered Xanodyne to conduct clinical studies to assess the potential for cardiotoxicity associated with propoxyphene use, to prepare a MedGuide to highlight important safeguards for use of the drug, and to issue a Public Health Advisory to underscore safety issues.

g. In July 2009, Xanodyne's study confirmed that propoxyphene can cause significant changes to the heart, even when taken at recommended doses.

530. Upon information and belief, the Innovator and Brand Defendants did not comply with the FDA's mandate to prepare the MedGuide or issue the Public Health Advisory. The failure to take these actions resulted in inadequate labeling of all Propoxyphene based pharmaceuticals.

531. Upon information and belief, the Innovator and Brand Defendants also did not timely implement the Black Box warning or revise the labels for Darvocet or Darvon, or publish the information in the PDR, or communicate the information to prescribing physicians in Dear Health Care Professional letters or by other means. The failure to take these actions resulted in inadequate labeling of all Propoxyphene based pharmaceuticals.

532. It would have been technologically feasible, and would not have been cost-prohibitive, for the Innovator and Brand Defendants to include adequate disclosures in their marketing and labeling materials, and in their communications to the general public and the health care community.

533. The Innovator and Brand Defendants instead used their resources to conceal and downplay the risks associated with Propoxyphene Products in their promotional materials, instructional materials, labeling for, and communications about Propoxyphene Products, which was

- 101 -

1   especially misleading given their past and continued efforts to promote the safety and effectiveness of

2   the drugs.

3       534.   The Innovator and Brand Defendants failed to disclose the material information

4   outlined above because they wanted the general public and the health care community – including

5   Plaintiffs and their prescribing physicians – to believe that Propoxyphene Products were safe and

6   effective, and wanted to induce medical providers – including Plaintiffs' prescribing physicians – to

7   prescribe Propoxyphene Products, and consumers – including Plaintiffs – to request or not resist

8   those prescriptions.

9       535.   Plaintiffs and their prescribing physicians justifiably relied on the lack of information

10  about the risks associated with Propoxyphene Products and/or about other available, practical and

11  medically-feasible pain management medications, and acted upon it, by Plaintiffs' physicians

12  prescribing Propoxyphene Products, and Plaintiffs requesting or not resisting those prescriptions.

13      536.   Had the Innovator and Brand Defendants provided adequate disclosures:

14

15      a.   Plaintiffs' physicians would not have prescribed Propoxyphene Products, and
            would have instead prescribed another pain management medication that
16          neither contained propoxyphene nor involved an increased risk of serious
            adverse cardiovascular events that could result in death, or recommended that
17          Plaintiffs instead take over-the-counter acetaminophen;

18      b.   Plaintiffs would not have purchased or ingested the Generic Defendants'
            Propoxyphene Products; and
19

20      c.   Plaintiffs would not have suffered the injuries described above.

21

22      537.   In light of what the Innovator and Brand Defendants knew, they had to have known or

23  anticipated that their failure to adequately disclose the dangers of propoxyphene and Propoxyphene

    Products, and the availability of practical and medically-feasible alternate pain management
24
    medications that posed less risk, would likely result in physicians prescribing Propoxyphene
25
    Products, and consumers purchasing and ingesting generic Propoxyphene Products, and, as a direct
26
    and proximate result, suffering serious adverse cardiovascular effects that could result in death.
27

28

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

538.    Plaintiffs' prescription for and purchase and ingestion of the Generic Defendants' Propoxyphene Products, and the injuries described above that followed, were the direct and proximate result of the Innovator and Brand Defendants' knowing failure to disclose.

539.    By failing to make the disclosures outlined above, the Innovator and Brand Defendants knowingly risked the lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was extreme and outrageous, and warrants an award of punitive damages.

540.    Upon information and belief, Plaintiffs allege that Defendants actively and fraudulently concealed information in Defendants' exclusive possession regarding the hazards associated with the Propoxyphene Products with the purpose of preventing consumers, such as Plaintiffs, from discovery these hazards.

541.    At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

542.    As a direct and proximate result of the defective manufacturing and the unreasonably dangerous and defective characteristics of the Propoxyphene Products and the Defendants' failure to comply with federal standards and requirements, the Plaintiffs suffered severe and permanent injuries. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and was otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the Defendants as alleged herein. The injuries and damages alleged herein are permanent and will continue into the future.

543.    Defendants acted willfully or with gross negligence indicating a wanton disregard for the rights of Plaintiffs and others, rendering Defendants liable to Plaintiffs for punitive damages. The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including Plaintiffs herein, thereby entitled Plaintiffs

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    to punitive damages in an amount appropriate to punish the Defendants and deter them from similar

2    conduct in the future.

3        544.    The aforesaid conduct of the Defendants was committed with knowing, conscious, and

4    deliberate disregard for the rights and safety of consumers, including Plaintiffs herein, thereby

5    entitling Plaintiffs to punitive damages in an amount appropriate to punish the Defendants and deter

6    them from similar conduct in the future.

7        WHEREFORE Plaintiffs demand judgment against Defendants for compensatory, statutory,

8    and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as

9    the Court deems proper.

### NINETEENTH CAUSE OF ACTION
#### NEGLIGENT MISREPRESENTATION
#### (Against Innovator and Brand Defendants)

12        545.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this

13    Complaint.

14        546.    At all relevant times, the Innovator and Brand Defendants were engaged in the

15    business of researching, designing, manufacturing, testing, studying, labeling, packaging,

16    distributing, selling, supplying, marketing and/or promoting Darvocet and Darvon, brand-name

17    Propoxyphene Products.

18        547.    At all relevant times, the Innovator and Brand Defendants had a duty to:

20          a.      assess, manage and communicate the risks, dangers and adverse effects associated with their Propoxyphene Products to the health care community and the general public, including Plaintiffs and their prescribing physicians; and

22          b.      distribute their Propoxyphene Products with adequate information about the appropriate use of the products and their associated risks provided to the general public and the health care community, including Plaintiffs and their prescribing physicians.

25        548.    At all relevant times, the Innovator and Brand Defendants knew or should have known

26    that physicians who prescribe drugs to their patients, in making their decisions on what to prescribe,

27    often rely on the statements made about the brand formulations of a drug, and thus that the physicians

- 104 -

1  who prescribed either brand or generic Propoxyphene Products to their patients were relying on the

2  statements that the Innovator and Brand Defendants made about Darvocet and/or Darvon.

3      549.   At all relevant times, the Innovator and Brand Defendants knew or should have known

4  that patients who are prescribed a brand formulation of a drug are more likely to purchase the generic

5  than the brand formulation, and thus that patients who were prescribed Darvocet and/or Darvon likely

6  would have instead purchased a generic formulation of Darvocet and/or Darvon.

7      550.   Because of this knowledge, the duties of the Innovator and Brand Defendants that are

8  outlined above applied at all relevant times not only to the purchasers of the brand products and their

9  prescribing physicians, but also to the purchasers of generic formulations of those drugs and their

10  prescribing physicians, including Plaintiffs and their prescribing physicians.

11      551.   This count applies to the Innovator and Brand Defendants in relation to Plaintiffs'

12  ingestion of generic Propoxyphene Products.

13      552.   Before Plaintiffs were injured by ingesting the Generic Defendants' Propoxyphene

14  Products, the Innovator and Brand Defendants knew or should have known that:

16      a.    propoxyphene had not been adequately tested;

17      b.    Propoxyphene Products were associated with a greatly increased risk of serious
adverse cardiovascular events that could result in death, which outweighed
18      their benefit for pain relief;

19      c.    the risks, and the nature, scope, severity and duration of any serious side
effects, were greater with Propoxyphene Products than with other practical,
20      medically feasible and available pain management medications;

21      d.    Propoxyphene Products were unreasonably dangerous to the health of patients
22      suffering from pain; and

23      e.    Propoxyphene Products were no more effective for pain management than
other available, practical, and medically-feasible alternate pain management
24      medications, such as over-the-counter acetaminophen (brand name Tylenol),
25      which posed less risk.

26      553.   More specifically, the Innovator and Brand Defendants knew or should have known

27  that:

28

- 105 -

a.      In 1971, six out of seven trials demonstrated that while propoxyphene alone was not significantly superior to placebo in managing pain, acetaminophen alone was;

b.      In 1978, the Health Research Group filed a petition with the FDA requesting the recall of Darvon based on its claim that it was a dangerous drug of questionable effectiveness, and subsequently submitted studies supporting that propoxyphene could be toxic to the cardiovascular system;

c.      In January 2005, health officials in Great Britain called for a phased withdrawal of propoxyphene-containing products because they were concerned about the cardiac effects associated with their use and were unable to identify any patient group in whom the risk benefit ratio may be positive;

d.      In June 2009, the European Medicines Agency recommended withdrawal across the European Union of marketing authorizations for propoxyphene-containing medications because available evidence suggested that acetaminophen alone was as effective as an acetaminophen-propoxyphene combination, and that the benefits of medicines containing propoxyphene, either alone or in combination, did not outweigh their risks.

e.      In 2009, the FDA ordered Xanodyne to include a Black Box warning concerning the risk of fatal overdose, and to add warnings to its label about propoxyphene's dangers overall, for elderly patients, and in terms of its potential for abuse and dependence.

f.      In 2009, the FDA also ordered Xanodyne to conduct clinical studies to assess the potential for cardiotoxicity associated with propoxyphene use, to prepare a MedGuide to highlight important safeguards for use of the drug, and to issue a Public Health Advisory to underscore safety issues.

g.      In July 2009, Xanodyne's study confirmed that propoxyphene can cause significant changes to the heart, even when taken at recommended doses.

554.    Despite what the Innovator and Brand Defendants knew or should have known, upon information and belief, the Innovator and Brand Defendants represented to the general public and the health care community in reports, press releases, advertising campaigns, television commercials, print advertisements, billboards, other commercial media, promotional materials, instructional material and labeling that:

a.      propoxyphene had been adequately tested;

b.      Propoxyphene Products were safe and effective for pain management; and

c.      Propoxyphene Products were more effective for pain management than other pain management medications.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

555.   Upon information and belief, these representations made by the Innovator and Brand Defendants were false at the time that they were made, and the Innovator and Brand Defendants knew or should have known that they were false.

556.   Because of what the Innovator and Brand Defendants knew or should have known, as described above, they failed to exercise reasonable care or competence in making these misrepresentations.

557.   The Innovator and Brand Defendants knew or should have known that the general public and the health care community – including Plaintiffs and their prescribing physicians – would not have been aware that their statements about the testing, safety and effectiveness associated with Propoxyphene Products were false, and would have instead justifiably relied on them, because:

      a.    the general public and the health care community did not have access to the same resources, analysis and knowledge as the Innovator and Brand Defendants; and

      b.    the Innovator and Brand Defendants manufactured, sold and distributed Propoxyphene Products, and would therefore be assumed to have superior knowledge about them.

558.   At all relevant times, Plaintiffs and their prescribing physicians did not, in fact, know that the Innovator and Brand Defendants' misrepresentations were false.

559.   Because of what the Innovator and Brand Defendants knew or should have known, as described above, they failed to exercise reasonable care or competence in making these misrepresentations.

560.   Plaintiffs and their prescribing physicians justifiably relied and acted upon the Innovator and Brand Defendants' misrepresentations, by Plaintiffs' physicians prescribing Propoxyphene Products, and Plaintiffs purchasing and ingesting Propoxyphene Products.

561.   Had the Innovator and Brand Defendants not made these misrepresentations:

      a.    Plaintiffs' physicians would not have prescribed Propoxyphene Products, and would have instead prescribed another pain management medication that neither contained propoxyphene nor involved an increased risk of serious

- 107 -

adverse cardiovascular events that could result in death, or recommended that Plaintiffs instead take over-the-counter acetaminophen;

b.   Plaintiffs would not have purchased or ingested the Generic Defendants' Propoxyphene Products; and

c.   Plaintiffs would not have suffered the injuries described above.

562.   In light of what the Innovator and Brand Defendants knew or should have known, they should have anticipated that their misrepresentations would likely result in physicians prescribing Propoxyphene Products, and consumers purchasing and ingesting generic Propoxyphene Products, and, as a direct and proximate result, suffering serious adverse cardiovascular effects that could result in death.

563.   Plaintiffs' prescription for and purchase and ingestion of Propoxyphene Products, and the injuries described above that followed, were the direct and proximate result of the Innovator and Brand Defendants' misrepresentations.

564.   By making the misrepresentations described above, the Innovator and Brand Defendants knowingly risked the lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was extreme and outrageous, and warrants an award of punitive damages.

565.   At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

566.   As a direct and proximate result of the defective and inappropriate warnings and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent injuries as herein alleged. Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature. Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the Defendants as alleged herein. The injuries and damages alleged herein are permanent and will

- 108 -

1   continue into the future.

2      WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory,

3   and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as

4   the Court deems proper.

5

6                      **TWENTIETH CAUSE OF ACTION**
                  **FRAUDULENT MISREPRESENTATION AND CONCEALMENT**
7                      **(Against Innovator and Brand Defendants)**

8      567.   Plaintiffs incorporate and adopt by reference each paragraph set forth in this

9   Complaint.

10     568.   At all relevant times, the Innovator and Brand Defendants were engaged in the

11  business of researching, designing, manufacturing, testing, studying, labeling, packaging,

12  distributing, selling, supplying, marketing and/or promoting Darvocet and Darvon, brand-name

13  Propoxyphene Products.

14     569.   At all relevant times, the Innovator and Brand Defendants had a duty to:

15           a.    assess, manage and communicate the risks, dangers and adverse effects
                   associated with their Propoxyphene Products to the health care
16                 community and the general public, including Plaintiffs and their
                   prescribing physicians; and
17

18           b.    distribute their Propoxyphene Products with adequate information
                   about the appropriate use of the products and their associated risks
19                 provided to the general public and the health care community,
                   including Plaintiffs and their prescribing physicians.
20

21     570.   At all relevant times, the Innovator and Brand Defendants knew or should have known

22  that physicians who prescribe drugs to their patients, in making their decisions on what to prescribe,

23  often rely on the statements made about the brand formulations of a drug, and thus that the physicians

24  who prescribed either brand or generic Propoxyphene Products to their patients were relying on the

25  statements that the Innovator and Brand Defendants made about Darvocet and/or Darvon.

26     571.   At all relevant times, the Innovator and Brand Defendants knew or should have known

27  that patients who are prescribed a brand formulation of a drug are more likely to purchase the generic

28

- 109 -

1    than the brand formulation, and thus that patients who were prescribed Darvocet and/or Darvon likely

2    would have instead purchased a generic formulation of Darvocet and/or Darvon.

3        572.    Because of this knowledge, the duties of the Innovator and Brand Defendants that are

4    outlined above applied at all relevant times not only to the purchasers of the brand products and their

5    prescribing physicians, but also to the purchasers of generic formulations of those drugs and their

6    prescribing physicians, including Plaintiffs and their prescribing physicians.

7        573.    This count applies to the Innovator and Brand Defendants in relation to Plaintiffs'

8    ingestion of generic Propoxyphene Products.

9        574.    Before Plaintiffs were injured by ingesting the Generic Defendants' Propoxyphene

10   Products, the Innovator and Brand Defendants knew that:

11

12        a.    propoxyphene had not been adequately tested;

13        b.    Propoxyphene Products were associated with a greatly increased risk of
              serious adverse cardiovascular events that could result in death, which
14            outweighed their benefit for pain relief;

15        c.    the risks, and the nature, scope, severity and duration of any serious
16            side effects, were greater with Propoxyphene Products than with other
              practical, medically feasible and available pain management
17            medications;

18        d.    Propoxyphene Products were unreasonably dangerous to the health of
19            patients suffering from pain; and

20        e.    Propoxyphene Products were no more effective for pain management
              than other available, practical, and medically-feasible alternate pain
21            management medications, such as over-the-counter acetaminophen
              (brand name Tylenol), which posed less risk.
22

23        575.    More specifically, the Innovator and Brand Defendants knew that:

24        a.    In 1971, six out of seven trials demonstrated that while propoxyphene
              alone was not significantly superior to placebo in managing pain,
25            acetaminophen alone was;

26        b.    In 1978, the Health Research Group filed a petition with the FDA
              requesting the recall of Darvon based on its claim that it was a
27            dangerous drug of questionable effectiveness, and subsequently
              submitted studies supporting that propoxyphene could be toxic to the
28            cardiovascular system;

- 110 -

c.    In January 2005, health officials in Great Britain called for a phased withdrawal of propoxyphene-containing products because they were concerned about the cardiac effects associated with their use and were unable to identify any patient group in whom the risk benefit ratio may be positive;

d.    In June 2009, the European Medicines Agency recommended withdrawal across the European Union of marketing authorizations for propoxyphene-containing medications because available evidence suggested that acetaminophen alone was as effective as an acetaminophen-propoxyphene combination, and that the benefits of medicines containing propoxyphene, either alone or in combination, did not outweigh their risks.

e.    In 2009, the FDA ordered Xanodyne to include a Black Box warning concerning the risk of fatal overdose, and to add warnings to its label about propoxyphene's dangers overall, for elderly patients, and in terms of its potential for abuse and dependence.

f.    In 2009, the FDA also ordered Xanodyne to conduct clinical studies to assess the potential for cardiotoxicity associated with propoxyphene use, to prepare a MedGuide to highlight important safeguards for use of the drug, and to issue a Public Health Advisory to underscore safety issues.

g.    In July 2009, Xanodyne's study confirmed that propoxyphene can cause significant changes to the heart, even when taken at recommended doses.

576.    Despite what the Innovator and Brand Defendants knew, upon information and belief, the Innovator and Brand Defendants falsely represented to the general public and the health care community in reports, press releases, advertising campaigns, television commercials, print advertisements, billboards, other commercial media, promotional materials, instructional material and labeling that:

a.    propoxyphene had been adequately tested;

b.    Propoxyphene Products were safe and effective for pain management; and

c.    Propoxyphene Products were more effective for pain management than other pain management medications.

- 111 -

577.  Upon information and belief, these representations were all intentionally false and misleading at the time they were made, and the Innovator and Brand Defendants knew that they were false and misleading, and willfully, wantonly and recklessly disregarded that they were false.

578.  The Innovator and Brand Defendants knew that the general public and the health care community – including Plaintiffs and their prescribing physicians – would not have been aware that their statements about the testing, safety and effectiveness associated with Propoxyphene Products were false, and would have instead justifiably relied on them, because:

        a.    the general public and the health care community did not have access to the same resources, analysis and knowledge as the Innovator and Brand Defendants; and

        b.    the Innovator and Brand Defendants manufactured, sold and distributed Propoxyphene Products, and would therefore be assumed to have superior knowledge about them.

579.  At all relevant times, Plaintiffs and their prescribing physicians did not, in fact, know that the Innovator and Brand Defendants' misrepresentations were false.

580.  .The Innovator and Brand Defendants made these material misrepresentations because they wanted the general public and the health care community to rely on them, and wanted to induce medical providers – including Plaintiffs' treating physicians – to prescribe Propoxyphene Products, and consumers – including Plaintiffs – to request or not resist those prescription.

581.  Plaintiffs and their prescribing physicians justifiably relied and acted upon the Innovator and Brand Defendants' misrepresentations, by Plaintiffs' physicians prescribing Propoxyphene Products, and Plaintiffs requesting or not resisting that prescription.

582.  Had the Innovator and Brand Defendants not made these misrepresentations:

        a.    Plaintiffs' physicians would not have prescribed Propoxyphene Products, and would have instead prescribed another pain management medication that neither contained propoxyphene nor involved an increased risk of serious adverse cardiovascular events that could result in death, or recommended that Plaintiffs instead take over-the-counter acetaminophen; .

- 112 -

b.     Plaintiffs would not have purchased or ingested the Generic Defendants' Propoxyphene Products; and

c.     Plaintiffs would not have suffered the injuries described above.

583.    In light of what the Innovator and Brand Defendants knew, they had to have known that their misrepresentations would likely result in physicians prescribing Propoxyphene Products, and consumers purchasing and ingesting generic Propoxyphene Products, and, as a direct and proximate result, suffering serious adverse cardiovascular effects that could result in death.

584.    Plaintiffs' prescription for and purchase and ingestion of Propoxyphene Products, and the injuries described above that followed, were the direct and proximate result of the Innovator and Brand Defendants' knowing misrepresentations.

585.    By making the misrepresentations described above, the Innovator and Brand Defendants knowingly risked the lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was extreme and outrageous, and warrants an award of punitive damages.

586.    Upon information and belief, Plaintiffs allege that Defendants actively and fraudulently concealed information in Defendants' exclusive possession regarding the hazards associated with the Propoxyphene Products with the purpose of preventing consumers, such as Plaintiffs, from discovery these hazards.

587.    At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

588.    As a direct and proximate result of the defective manufacturing and the unreasonably dangerous and defective characteristics of the Propoxyphene Products and the Defendants' failure to comply with federal standards and requirements, the Plaintiffs suffered severe and permanent injuries.  Plaintiffs endured substantial conscious pain and suffering, both physical and emotional in nature.  Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages

- 113 -

and earnings, and was otherwise physically, emotionally, and economically injured. Plaintiffs suffered severe pecuniary loss. Plaintiffs seek actual and punitive damages from the Defendants as alleged herein. The injuries and damages alleged herein are permanent and will continue into the future.

589.    Defendants acted willfully or with gross negligence indicating a wanton disregard for the rights of Plaintiffs and others, rendering Defendants liable to Plaintiffs for punitive damages. The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including Plaintiffs herein, thereby entitled Plaintiffs to punitive damages in an amount appropriate to punish the Defendants and deter them from similar conduct in the future.

590.    The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including Plaintiffs herein, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish the Defendants and deter them from similar conduct in the future.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWENTY-FIRST CAUSE OF ACTION
### STRICT LIABILITY: STATE OF ALABAMA
Code of Alabama §§ 6-5-500 through 6-5-504 and 6-5-520 through 6-5-525
(Against All Defendants)
(Applies to Plaintiffs whose Cause of Action Arose in the State of Alabama)

591.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this complaint.

592.    Pursuant to the Alabama Code as well as the Alabama Extended Manufacturer Liability Doctrine, as adopted by the Alabama Supreme Court in 1976, Alabama plaintiffs claim damages and personal injury as a result of ingestion of unreasonably dangerous propoxyphene

- 114 -

1    containing products. Further, Defendants' actions and omissions as identified in this Complaint
2    constitute a flagrant disregard for human life, so as to warrant the imposition of punitive damages
3    pursuant to the common law and/or Title 6, Article, 2, inclusive, of the Code of Alabama 1975.
4        593.    Defendants were engaged in the business of manufacturing, distributing, selling and
5    promoting defective propoxyphene containing medications in the state of Alabama.
6        594.    The propoxyphene containing pain medication was in a defective condition
7    unreasonably dangerous to the consumer user in that it had a defective warning, and a defective
8    design.
9        595.    The defective propoxyphene containing product caused the plaintiff's injuries.
10       596.    The defective design of the propoxyphene containing product existed at the time of the
11   sale and the defective propoxyphene containing product had a defective warning at the time of the
12   sale.
13       597.    The product was expected to and did reach the plaintiff without substantial change in
14   its condition.
15       598.    At all relevant times herein, Defendants had full knowledge of the true cardiac risks
16   associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to
17   withdraw these products from the market or to stop selling the products.
18       WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory,
19   and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as
20   the Court deems proper.

21                        TWENTY-SECOND CAUSE OF ACTION
22                        STRICT LIABILITY: STATE OF ARKANSAS
                                 Ark. Code Ann. § 16-116-102
23                                  (Against All Defendants)
         (Applies to Plaintiffs whose Cause of Action Arose in the State of Arkansas)
24
25       599.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this
26   complaint.
27       600.    Plaintiff is making a "product liability action" as defined by Ark. Code Ann. § 16-116-
28   102(5), for damages caused by Plaintiff's use of propoxyphene containing pain medications, a

                                           - 115 -

"product" as defined by Ark. Code Ann. § 16-116-102(4), manufactured, designed, sold, distributed, supplied and/or placed this product in the stream of commerce by Defendants who are "manufacturer[s]" as defined by Ark. Code Ann. § 16-116-102(3) and/or "seller[s]" as defined by Ark. Code Ann. § 16-116-102(6).

601.    Propoxyphene containing pain medications are "unreasonably dangerous" as defined by Ark. Code Ann. § 16-116-102(7)(A) in that propoxyphene containing pain medications are more dangerous than what would be contemplated by an ordinary and reasonable consumer who uses propoxyphene containing pain medications.

602.    The propoxyphene containing pain medications manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce by Defendants, was defective in its design and had a deficient warning when it left the hands of Defendants in that it was unreasonably dangerous posing a serious risk of injury.

603.    At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

604.    As a direct and proximate result of Plaintiff's use of propoxyphene containing pain medications as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendants, Plaintiff suffered harm, damages and economic loss and will continue to suffer such harm.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### TWENTY-THIRD CAUSE OF ACTION
### STRICT LIABILITY: STATE OF COLORADO
C.R.S.A. § 13-21-401 to § 13-21-406 and Restatement (Second) Torts, Section 402A
(Against All Defendants)
(Applies to Plaintiffs whose Cause of Action Arose in the State of Colorado)

- 116 -

605.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this complaint.

606.    In addition to the traditional common law causes of action pled elsewhere in this complaint, Plaintiffs whose injuries occurred in the State of Colorado also state that Defendants violated section 402A of the Restatement (Second) of Torts.  Specifically, these plaintiffs state that the Propoxyphene ingested by them and manufactured and sold by defendants was in a defective condition; that the defective condition made it unreasonably dangerous to its users; that the defect existed at the time it left the control of the defendants; that the Propoxyphene was expected to and did reach the Plaintiffs without any substantial unforeseeable change in its condition; and that the defective condition was a legal cause of each of the Plaintiffs injuries.

607.    Plaintiffs are making a "product liability action," as defined by C.R.S.A. § 13-21-401(2) for damages caused by his/her use of propoxyphene containing pain medications, a product manufactured, designed, sold, distributed, supplied and/or placed this product in the stream of commerce by Defendants who are "manufacturer[s]" as defined by C.R.S.A. § 13-21-401(1) and/or "seller[s]" as defined by C.R.S.A. § 13-21-401(3).

608.    Defendants are the manufacturers, designers, distributors, sellers, and/or suppliers of the propoxyphene containing pain medications.

609.    The propoxyphene containing pain medications manufactured and supplied by Defendants was defective in design or formulation in that, when it left the hands of the Defendants, the foreseeable risks of the product exceeded the benefits associated with its design or formulation, or it was more dangerous than an ordinary consumer would expect.

610.    The propoxyphene containing pain medications that the Plaintiff used had not been materially altered or modified prior to their use.

611.    The foreseeable risks associated with the design or formulation of propoxyphene containing pain medications, include, but are not limited to, the fact that the design or formulation of propoxyphene containing pain medications is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner.

- 117 -

612.   At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

613.   As a direct and proximate result of Plaintiff's use of propoxyphene containing pain medications as manufactured, designed, sold, supplied, marketed and introduced into the stream of commerce by Defendants, Plaintiff suffered harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

614.   Additionally, to the extent any claims are made under the laws of the State of Colorado, including but not necessarily the claims of Plaintiff, and to the extent this Court finds that Colorado statutory law found at C.R.S.A. § 13-21-401 to § 13-21-406 is applicable to this case, Plaintiff asserts and alleges that the presumptions found at C.R.S.A. § 13-21-403 are inapplicable.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### TWENTY-FOURTH CAUSE OF ACTION
### STRICT LIABILITY: STATE OF FLORIDA
#### Restatement (Second) Torts, Section 402A
#### (Against All Defendants)
#### (Applies to Plaintiffs whose Cause of Action Arose in the State of Florida)

615.   Plaintiffs incorporate and adopt by reference each paragraph set forth in this complaint.

616.   In addition to the traditional common law causes of action pled elsewhere in this complaint, Plaintiffs whose injuries occurred in the State of Florida also state that Defendants violated section 402A of the Restatement (Second) of Torts.  Specifically, these plaintiffs state that the Propoxyphene ingested by them and manufactured and sold by defendants was in a defective condition; that the defective condition made it unreasonably dangerous to its users; that the defect existed at the time it left the control of the defendants; that the Propoxyphene was expected to and did

reach the Plaintiffs without any substantial unforeseeable change in its condition; and that the defective condition was a legal cause of each of the Plaintiffs injuries.

617. At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### TWENTY-FIFTH CAUSE OF ACTION
### LIABILITY: STATE OF GEORGIA
### § 51-1-11 OF THE GEORGIA CODE
#### (Against All Defendants)
#### (Applies to Plaintiffs whose Cause of Action Arose in the State of Georgia)

618. Plaintiffs incorporate and adopt by reference each paragraph set forth in this complaint.

619. For the reasons set forth above, Plaintiffs assert and allege that Defendants are liable to Plaintiffs under Section 51-1-11 of the Georgia Code because Defendants' Propoxyphene containing medications were not merchantable or reasonably suited for their intended use at the time of sale to Plaintiffs, and this condition is the proximate cause of Plaintiffs' injuries.

620. At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

621. As a direct and proximate result of Plaintiffs' use of the Propoxyphene medication, Plaintiffs suffered harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

622. As a direct and proximate result of the foregoing, Plaintiff is entitled to damages pursuant to the common law and applicable state statutes.

- 119 -

1  WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory,

2  and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as

3  the Court deems proper.

### TWENTY-SIXTH CAUSE OF ACTION
#### STRICT LIABILITY: STATE OF ILLINOIS
Restatement (Second) Torts, Section 402A
**(Against All Defendants)**
**(Applies to Plaintiffs whose Cause of Action Arose in the State of Illinois)**

623.  Plaintiffs incorporate and adopt by reference each paragraph set forth in this complaint.

624.  In addition to the traditional common law causes of action pled elsewhere in this complaint, Plaintiffs whose injuries occurred in the State of Illinois also state that Defendants violated section 402A of the Restatement (Second) of Torts.  Specifically, these plaintiffs state that the Propoxyphene ingested by them and manufactured and sold by defendants was in a defective condition; that the defective condition made it unreasonably dangerous to its users; that the defect existed at the time it left the control of the defendants; that the Propoxyphene was expected to and did reach the Plaintiffs without any substantial unforeseeable change in its condition; and that the defective condition was a legal cause of each of the Plaintiffs injuries.

625.  At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### TWENTY-SEVENTH CAUSE OF ACTION
#### STRICT LIABILITY: STATE OF INDIANA
CLAIMS UNDER THE IPLA: Ind. Code. Ann. §24-20 et seq.
**(Against All Defendants)**
**(Applies to Plaintiffs whose Cause of Action Arose in the State of Indiana)**

- 120 -

626.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this complaint.

627.    Defendants placed into the stream of commerce propoxyphene containing pain medication that was in a defective condition unreasonably dangerous to plaintiffs in that it was defectively designed and had a defective warning.

628.    The plaintiffs are in a class of people that defendants should reasonably foresee as being subject to the harm caused by the defective condition; the defendants are engaged in the business of manufacturing, marketing, and selling Propoxyphene containing pain medication; and the Propoxyphene containing pain medication reached the plaintiffs without substantial alteration in condition.

629.    At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

630.    Defendants defective product caused the plaintiffs to suffer injury and damages as described in this complaint.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### TWENTY-EIGHTH CAUSE OF ACTION
### LIABILITY: STATE OF KANSAS
K.S.A. § 60-3302 et seq.
(Against All Defendants)
**(Applies to Plaintiffs whose Cause of Action Arose in the State of Kansas)**

631.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this complaint.

632.    Plaintiffs are making a "product liability claim" as defined by K.S.A. § 60-3302(c) because she suffered "harm" as defined by K.S.A. § 60-3302(d) caused by Plaintiffs' use of

- 121 -

1  Propoxyphene containing medication, manufactured, designed, sold, distributed, supplied and/or

2  placed this product in the stream of commerce by Defendants who are "manufacturer[s]" as defined

3  by K.S.A. § 60-3302(b) and/or "product seller[s]" as defined by K.S.A. § 60-3302(a).

4      633.   The Propoxyphene containing medications manufactured, designed, sold, distributed,

5  supplied and/or placed in the stream of commerce by Defendants, was defective in its design and

6  deficient in its warnings when it left the hands of Defendants in that it was unreasonably dangerous.

7      634.   At all relevant times herein, Defendants had full knowledge of the true cardiac risks

8  associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to

9

10 withdraw these products from the market or to stop selling the products.

11     635.   As a direct and proximate result of Plaintiff's use of the defendants' Propoxyphene

12 containing medication Plaintiffs suffered harm, damages and economic loss and will continue to

13 suffer such harm.

14     636.   Additionally, Plaintiffs asserts and alleges that there is no applicable defense found at

15 K.S.A. § 60-3304.

16

17     WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory,

18 and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as

19 the Court deems proper.

20          **TWENTY-NINTH CAUSE OF ACTION**
            **STRICT LIABILITY: STATE OF MAINE**
21     Strict Liability Pursuant to Me. Rev. Stat. Ann. tit 14, § 221 (2008)
                    **(Against All Defendants)**
22     **(Applies to Plaintiffs whose Cause of Action Arose in the State of Maine)**

23     637.   Plaintiffs incorporate and adopt by reference each paragraph set forth in this

24

25 complaint.

26     638.   Plaintiffs whose injuries occurred in the State of Maine allege strict liability as set out

27 under Me. Rev. Stat. Ann. tit 14, 221 (2008). Plaintiffs allege that the propoxyphene containing

28 medication was defectively designed and unreasonably dangerous and carried a defective warning.

- 122 -

The defective propoxyphene containing product caused the plaintiff's injuries. The product was expected to and did reach the plaintiff without substantial change in its condition.

639. At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRTIETH CAUSE OF ACTION
## VIOLATION OF CONSUMER PROTECTION ACTS AND DECEPTIVE TRADE PRACTICES ACTS

640. Plaintiffs incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

641. Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of propoxyphene containing medications.

642. Had the Defendants not engaged in the deceptive conduct described herein, Plaintiffs would not have purchased and/or paid for propoxyphene containing medications and would not have incurred related medical costs.

643. Specifically, Plaintiffs were misled by the deceptive conduct described herein.

644. Defendants' deceptive, unconscionable, or fraudulent representations and material omissions to consumers, including Plaintiffs, constituted unfair and deceptive acts and trade practices in violation of the state consumer protection statutes listed below.

645. Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, substantial sums of money from Plaintiffs for propoxyphene containing medications that they would not have paid had Defendants not engaged in unfair and deceptive conduct.

- 123 -

646.    Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or trade practices in violation of:

a.    Alabama Ala. Code §§8-19-1 through 8-19-15 (Deceptive Trade Practices Act);

b.    Arizona Ariz. Rev. Stat. Ann. §§44-1521 through 44-1534 (Consumer Fraud Act);

c.    Arkansas Ark. Code Ann. §§4-88-101 through 4-88-207 (Deceptive Trade Practices Act);

d.    California Cal. Civ. Code §§1750 through 1784 (Consumer Legal Remedies Act); Cal Bus. & Prof. Code §§17200 through 17594 (Unfair Competition Law);

e.    Colorado Colo. Rev. Stat. §§6-1-101 through 6-1-115 (Consumer Protection Act);

f.    Florida Fla. Stat. Ann. §§501.201 through 501.213 (Deceptive and Unfair Trade Practices Act);

g.    Georgia Ga. Code Ann. §§10-1-370 through 10-1-375 (Uniform Deceptive Trade Practices Act); Ga. Code Ann. §§10-1-390 through 10-1-407 (Fair Business Practices Act);

h.    Hawaii Haw. Rev. Stat. §§480-1 through 480-24; Haw. Rev. Stat. §§481A-1 through 481A-5 (Uniform Deceptive Trade Practices Act):

i.    Illinois 815 Ill. Comp. Stat. Ann. 505/1 through 505/12 (Consumer Fraud and Deceptive Business Practices Act); 815 Ill. Comp. Stat. Ann. 510/1 through 510/7 (Uniform Deceptive Trade Practices Act);

j.    Indiana Ind. Code Ann. §§24-5-0.5-1 through 25-5-0.5-12 (Deceptive Consumer Sales Act);

k.    Kansas Kan. Stat. Ann. §§50-623 through 50-640 and 50-676 through 50-679a (Consumer Protection Act);

l.    Maine Me. Rev. Stat. Ann. tit. 5, §§205-A through 214 (Unfair Trade Practices Act); Me. Rev. Stat. Ann. tit. 10, §§1211 through 1216 (Uniform Deceptive Trade Practices Act);

m.    Massachusetts Mass. Gen. Laws Ann. ch. 93A, §§1 through 11 (Regulation of Business Practice and Consumer Protection Act);

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

647.    Plaintiffs were injured by the cumulative and indivisible nature of Defendants' conduct. The cumulative effect of Defendants' conduct directed at consumers including Plaintiffs was to create a demand for and sell propoxyphene containing medications. Each aspect of Defendants' conduct combined to artificially create sales of propoxyphene containing medications.

648.    Consumers relied upon Defendants' misrepresentations and omissions in determining which propoxyphene containing medications to purchase.

649.    By reason of the unlawful acts engaged in by Defendants, Plaintiffs have suffered ascertainable loss and damages.

650.    At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

651.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs were damaged by paying in whole or in part for Defendants' propoxyphene containing medications.

652.    As a direct and proximate result of Defendants' violations of the above states' consumer protection statutes, Plaintiffs have sustained economic losses and other damages for which they are entitled to statutory and compensatory damages, and declaratory relief, in an amount to be proven at trial.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRTY-FIRST CAUSE OF ACTION
### PUNITIVE DAMAGES

653.    At all times material hereto, the Defendants knew or should have known that the administration of propoxyphene could result in the development of including, but not limited to, an increased risk of serious adverse cardiovascular events that could result in death.

- 125 -

654.   At all times material hereto, the Defendants attempted to misrepresent and did misrepresent facts concerning the safety and efficacy of propoxyphene and products containing propoxyphene.

655.   Defendants' misrepresentations included knowingly withholding material information from the medical community and the public, including Plaintiffs herein, concerning the safety of propoxyphene.

656.   At all times material hereto, the Defendants knew and recklessly disregarded the fact that propoxyphene and products containing propoxyphene could result in the development of including, but not limited to, an increased risk of serious adverse cardiovascular events that could result in death.

657.   Notwithstanding the foregoing, the Defendants continued to aggressively market products containing propoxyphene to consumers, including Plaintiffs herein, without disclosing the fact that administration of propoxyphene could result in the development of including, but not limited to, an increased risk of serious adverse cardiovascular events that could result in death.

658.   The Defendants knew of the defective and unreasonably dangerous nature of products containing propoxyphene as set forth herein, but continued to design, develop, manufacture, promote, market, distribute, and sell it so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiffs herein, in conscious and/or negligent disregard of the foreseeable risks including, adverse cardiovascular events that could result in death.

659.   Defendants intentionally concealed and/or recklessly failed to disclose to the public, including Plaintiffs herein, the potentially life threatening side effects of the administration of propoxyphene in order to ensure continued and increased sales.

660.   The Defendants' intentional and/or reckless failure to disclose information deprived Plaintiffs of necessary information to enable Plaintiffs and their healthcare providers to weigh the true risks of using propoxyphene against its benefits.

- 126 -

661.    As a direct and proximate result of the Defendants' conscious and deliberate disregard for the rights and safety of consumers such as the Plaintiffs, and the unreasonably dangerous and defective characteristics of propoxyphene, and the Defendants' failure to comply with federal standards and requirements, Plaintiffs suffered severe and permanent cardiovascular injuries, including death.

662.    Plaintiffs incurred significant expenses for medical care and treatment, suffered lost wages and earnings, and were otherwise economically injured.  Plaintiffs suffered severe pecuniary loss.  Plaintiffs seek actual and punitive damages from the Defendants as alleged herein.

663.    At all relevant times herein, Defendants had full knowledge of the true cardiac risks associated with propoxyphene products, and despite this knowledge and the ability to do so, failed to withdraw these products from the market or to stop selling the products.

664.    The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including Plaintiffs herein, thereby entitling Plaintiffs to punitive damages, as allowed by law and by state statute in an amount appropriate to punish the Defendants and deter them from similar conduct in the future.

## THIRTY-SECOND CAUSE OF ACTION
### WRONGFUL DEATH
### (Against All Defendants)

665.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

666.    Plaintiffs who are representatives of decedents bring this action as the representatives of Decedents' estates.

667.    As a direct and proximate result of Defendants' conduct described above, Decedent suffered bodily injury resulting in reasonably necessary medical and hospital services, pain and suffering, death and funeral expenses.

668.    As a direct and proximate result of Defendants' conduct described above, Decedents' beneficiaries have suffered and will continue indefinitely to suffer mental and physical anguish, and a loss of consortium.

669.    Through the conduct alleged above, Defendants knowingly risked the lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was extreme and outrageous, and warrants an award of punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory, punitive damages, and damages for wrongful death, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRTY-THIRD CAUSE OF ACTION
SURVIVAL
(Against All Defendants)

670.    Plaintiffs incorporate and adopt by reference each paragraph set forth in this Complaint.

671.    All Plaintiffs who are representatives of a decedent bring this action as the representatives of Decedents' estates.

672. .   As a direct and proximate result of Defendants' conduct described above, Decedents suffered bodily injury resulting in reasonably necessary medical and hospital services, pain and suffering, death and funeral expenses.

673.    As a direct and proximate result of Defendants' conduct described above, Decedents' beneficiaries have suffered and will continue indefinitely to suffer mental and physical anguish, and a loss of consortium.

674.    Through the conduct alleged above, Defendants knowingly risked the lives of unsuspecting consumers in order to continue making a profit, and their conduct thus was extreme and outrageous, and warrants an award of punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, statutory, punitive damages, and damages for wrongful death, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### Affirmative Defense of
### Comment k. to §402A of the Second Restatement of Torts
### Is not applicable to any Plaintiff's Claim

675.   In States that recognize Comment k. to the Restatement of Torts (Second), Comment K does not apply to provide any defendants an affirmative defense to strict liability or other cause of action.

676.   Multiple alternative pain medications were available to Plaintiffs, that were safer than and just as effective as propoxyphene in managing pain. None the defendants chose to offer such safer alternatives in lieu of propoxyphene medications. Further, Defendants could have chosen to voluntarily withdraw the propoxyphene medications from the market prior to FDA action.

### MARKET SHARE LIABILITY

677.   Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

678.   In this action, there may be certain plaintiffs in which the manufacturer of propoxyphene ingested before his or her injury cannot be identified due to no fault of their own. These situations may arise for example where the pharmacy or drug store has not maintained records of which manufacturer they bought the propoxyphene from. In other cases the pharmacy records may simply not be available for any number of reasons. In these cases, each Generic Defendant should bear a share of liability to the effected Plaintiff in an amount equal to its percentage of general market share at the time of the injury.

### PRESERVATION CLAIMS

679.   Many States have recently enacted tort reform statutes with "exclusive remedy" provisions. Courts have yet to determine whether these exclusive remedy provisions eliminate or supersede, to any extent, state common law claims. If during the pendency of this action this court makes any such determination, Plaintiffs hereby specifically makes claim to and preserves any State

- 129 -

1   claim based upon any exclusive remedy provision, under any state law this court may apply, to the

2   extent not already alleged above.

3      To the extent that Defendant(s) may claim that one or more of Plaintiffs' claims are barred by

4   the applicable statute of limitations, Plaintiff and each of them asserts that the statute of limitations is

5   and has been tolled by Plaintiff's discovery that his or her injury(ies) was/were caused by

6   Defendants' defective product and failure to properly and adequately warn of the products' risks, all

7   as more fully set forth in this Complaint, after the injuries sustained by each Plaintiff.

8   **PRAYER FOR RELIEF**

9      WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, as

10  follows:

11

12    1. For an award of compensatory damages against Defendants for medical and hospital

13      expenses, funeral expenses, pain and suffering, loss of income or earning capacity, and other

14      damages according to proof at trial in excess of the jurisdictional minimum of this Court;

15    2. For an award of punitive or exemplary damages against Defendants in an amount sufficient

16      to punish and deter future similar conduct, according to statute and as allowed by law;

17    3. For reasonable attorneys' fees and costs;

18    4. For pre-judgment interest;

19    5. For leave to amend as additional facts are gathered; and

20    6. For such further and other relief the Court deems just, equitable, and proper.

21

22              Respectfully submitted,

23  DATED: November 15, 2012     KHORRAMI, LLP

24

25              By _____

26              ELISE R. SANGUINETTI

27              Attorneys for Plaintiffs

28

- 130 -

1

## DEMAND FOR JURY TRIAL

2

3       Plaintiffs respectfully demand a trial by jury on all claims.

4

5                                   Respectfully submitted,

6       DATED:   November 15, 2012          KHORRAMI, LLP

7

8                                   By _Elise R Sanguinetti_

9                                   ELISE R. SANGUINETTI
                                    Attorneys for Plaintiffs
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CM-010

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*<br>Elise R. Sanguinetti SBN 191389; Amanda J. Greenburg, SBN 255767<br>KHORRAMI LLP<br>360 22nd Street, Suite 640<br>Oakland, CA 94612<br>TELEPHONE NO.: 510-867-2000   FAX NO.: 510-867-2010<br>ATTORNEY FOR *(Name):* | **FOR COURT USE ONLY**<br>**FILED**<br>Los Angeles Superior Court<br>**NOV 15 2012**<br>John A. Clarke, Executive Officer/Clerk<br>By _____, Deputy<br>SHAUNYA WESLEY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **LOS ANGELES**
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse--Central

CASE NAME:
Corber, et al. v. McKesson, et al.

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: **BC495753** |
|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402). | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[✓] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[✓] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [✓] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. [✓] Large number of separately represented parties
b. [✓] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [✓] Substantial amount of documentary evidence
d. [✓] Large number of witnesses
e. [✓] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a.[✓] monetary b.[ ] nonmonetary; declaratory or injunctive relief c.[✓] punitive
4. Number of causes of action *(specify):*
5. This case [ ] is [✓] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: November 15, 2012
Elise R. Sanguinetti
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

FILED
Los Angeles Superior Court

NOV 16 2012

John A. Clarke, Executive Officer/Clerk
BY _____ Deputy
SHAURYA WESLEY

INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) (*if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto*)

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability (*not asbestos or toxic/environmental*) (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) (*not civil harassment*) (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    (*not medical or legal*)
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract (*not unlawful detainer or wrongful eviction*)
  Contract/Warranty Breach–Seller
    Plaintiff (*not fraud or negligence*)
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage (*not provisionally complex*) (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property (*not eminent domain, landlord/tenant, or foreclosure*)

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential*)

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  (*arising from provisionally complex case type listed above*) (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment (*non-domestic relations*)
  Sister State Judgment
  Administrative Agency Award
    (*not unpaid taxes*)
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified above*) (42)
  Declaratory Relief Only
  Injunctive Relief Only (*non-harassment*)
  Mechanics Lien
  Other Commercial Complaint
    Case (*non-tort/non-complex*)
  Other Civil Complaint
    (*non-tort/non-complex*)

**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition (*not specified above*) (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
    Claim
  Other Civil Petition

CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

| SHORT TITLE: Corber, et al. v. McKesson, et al. | CASE NUMBER |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

Item I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES   CLASS ACTION? ☐ YES  LIMITED CASE? ☐ YES   TIME ESTIMATED FOR TRIAL 5 ☐ HOURS/ ☑ DAYS

Item II. Indicate the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column A, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check one Superior Court type of action in Column B below which best describes the nature of this case.

**Step 3:** In Column C, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.0.



| Applicable Reasons for Choosing Courthouse Location (see Column C below) |
|---|

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>See Step 3 Above |
|---|---|---|---|
| Auto Tort | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| Other Personal Injury/ Property Damage/ Wrongful Death Tort | Asbestos (04) | ☐ A6070  Asbestos Property Damage<br>☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2.<br>2. |
| | Product Liability (24) | ☑ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons<br>☐ A7240  Other Professional Health Care Malpractice | 1., 4.<br>1., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall)<br>☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270  Intentional Infliction of Emotional Distress<br>☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 4.<br>1., 4.<br>1., 3.<br>1., 4. |

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 1 of 4

| SHORT TITLE: Corber, et al. v. McKesson, et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice<br>☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3.<br>1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2.,3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case<br>☐ A6109  Labor Commissioner Appeals | 1., 2., 3.<br>10. |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction)<br>☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence)<br>☐ A6019  Negligent Breach of Contract/Warranty (no fraud)<br>☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 2., 5.<br>2., 5.<br>1., 2., 5.<br>1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff<br>☐ A6012  Other Promissory Note/Collections Case | 2., 5., 6.<br>2., 5. |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud<br>☐ A6031  Tortious Interference<br>☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 5.<br>1., 2., 3., 5.<br>1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation          Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure<br>☐ A6032  Quiet Title<br>☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6.<br>2., 6.<br>2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

| SHORT TITLE: Corber, et al. v. McKesson, et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☑ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment | 2., 9. |
| | | ☐ A6160  Abstract of Judgment | 2., 6. |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment | 2., 3., 9. |
| | | ☐ A6123  Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190  Election Contest | 2. |
| | | ☐ A6110  Petition for Change of Name | 2., 7. |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100  Other Civil Petition | 2., 9. |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

| SHORT TITLE: Corber, et al. v. McKesson, et al. | CASE NUMBER |
|---|---|

**Item III.** Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., Step 3 on Page 1, as the proper reason for filing in the court location you selected.

| REASON: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case.<br><br>☐1. ☑2. ☑3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | ADDRESS:<br>Margalit Corber<br>5818 Lindley Ave.<br>Encino, CA 91316 |
|---|---|
| CITY: | STATE: | ZIP CODE: |

**Item IV.** *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the Stanley Mosk _____ courthouse in the Central _____ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.0, subds. (b), (c) and (d)].

Dated: November 15, 2012 _____

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/11).

5. Payment in full of the filing fee, unless fees have been waived.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 4 of 4

# EXHIBIT B

1  ELISE R. SANGUINETTI (CA SBN: 191389)
   AMANDA J. GREENBURG (CA SBN: 255767)
2  KHORRAMI, LLP
3  360 22nd Street, Suite 640
   Oakland, California 94612
4  Telephone: (510) 867-2000
   Facsimile: (866) 546-7377
5  Email: ESanguinetti@khorrami.com

6  TREVOR B. ROCKSTAD (CA SBN: 277274)
7  DAVIS & CRUMP PC
   1712 15th Street, Suite 300
8  Gulfport, MS 39501
   Telephone: (228) 863-6000
9  Facsimile: (228) 864-0907
   Email: Trevor.Rockstad@daviscrump.com
10

11 TARA TABATABAIE (OK Bar No. 21838)
   THE SILL LAW GROUP PLLC
12 14005 N. Eastern Avenue
   Edmond, OK 73103
13 Tel: (405) 509-6300
   Fax: (405) 509-6268
14 Email: tara@sill-law.com

15 STEPHEN J. RANDALL (CA SBN:
16 PEARSON RANDALL & SCHUMACHER, PA
   100 S. Fifth Street
17 Suite 1025
   Minneapolis, MN 55402
18 612-767-7500
   Fax: 612-767-7501
19 Email: srandall@prslegal.com
20 Attorneys for JCCP Petitioners

**JUDICIAL COUNCIL OF CALIFORNIA**

**CHAIR OF THE JUDICIAL COUNCIL**

| | |
|---|---|
| 23  RACHEL RENTZ, et al., | ) LOS ANGELES SUPERIOR COURT |
| 24 | ) CASE NO.: BC 483765 |
|         Plaintiffs, | ) |
| 25     vs. | ) **PETITION FOR COORDINATION** |
| | ) |
| 26  MCKESSON CORPORATION, et al., | ) *[Filed concurrently with Declaration of* |
| | ) *Elise Sanguinetti; Memorandum of* |
| 27         Defendants. | ) *Points and Authorities ISO Petition for* |
| | ) *Coordination]* |
| 28 | ) |

1

PETITION FOR COORDINATION

1    TO THE HONORABLE TANI G. CANTIL-SAKAUYE, CHAIRPERSON OF THE

2    CALIFORNIA JUDICIAL COUNCIL, CHIEF JUSTICE OF CALIFORNIA:

3            Pursuant to the California Code of Civil Procedure Section 404, et seq., and

4    California Rules of Court 3.500, et seq., plaintiffs and petitioners *RACHEL RENTZ; GEORGIA*

5    *METCALFE; VIVIAN PONCE; JERRY HALL; CLAUDETTA MCCLAIN; ERIC CANTRELL*

6    through counsel, Khorrami, LLP, respectfully submit this request to the Chairperson of the

7    Judicial Council for assignment of a judge to determine whether the above-titled actions and

8    included joined actions are complex actions and, if so, whether coordination of the actions is

9    appropriate.

10        The petitioners and plaintiffs in the included actions all allege use of the prescription

11    medication containing the active ingredient propoxyphene sold under various generic and brand

12    names including Darvon and Darvocet and consequent injuries including, but not limited to,

13    heart arrhythmias, atrial fibrillations, tachycardias, bradycardias, myocardial infarctions, and/or

14    sudden death.

15        This petition for coordination is based upon the criteria codified in *California Code of*

16    *Civil Procedure* § 404.1.  That is, in the Darvocet cases sought to be coordinated herein:

17        One judge hearing all of the actions for all purposes in a selected site or sites will
         promote the ends of justice taking into account whether common questions of fact or law

18        are predominating and significant to the litigation; the convenience of parties, witnesses,
         and counsel; the relative development of the actions and the work product of counsel; the

19        efficient utilization of judicial facilities and manpower; the calendar of the courts; the
         disadvantages of the duplicative and inconsistent rulings, orders or judgments; and, the

20        likelihood of settlement of the actions without further litigation should coordination be
         denied. (*California Code of Civil Procedure* § 404.1).

21

22        All of the cases sought to be coordinated herein involve use of the pharmaceutical

23    medication containing the active ingredient propoxyphene and consequent injuries including, but

24    not limited to heart arrhythmias, atrial fibrillations, tachycardias, bradycardias, myocardial

25    infarctions, and/or sudden death (hereinafter "Darvocet related injury cases").  Such cases are

26    more particularly described in the accompanying Declaration of Elise Sanguinetti, the

27    accompanying memorandum of points and authorities, exhibits attached thereto including

28

PETITION FOR COORDINATION

1   conformed copies of complaints filed in said actions, and other supporting documents submitted

2   herewith.

3        The actions sought to be coordinated fall within the definition of "complex litigation"

4   under Section 19 of the Standards of Judicial Administration and Rule 3.400 et seq., of the

5   California Rules of Court. (See the Declaration of Elise Sanguinetti filed herewith.) Petitioners

6   are currently seeking to coordinate the seven (7) actions listed below. However, Petitioners'

7   counsel is informed and believes that scores of additional propoxyphene related injury cases will

8   be filed within the next weeks.  Petitioners will seek to join these additional cases via "Add-On

9   Petitions."

10       1.     *Terry Freitas and Lori Freitas, husband and wife; Oleta Burney and Harold*

11   *Burney, wife and husband; Donald Green, individually and as husband and next of kin to Mary*

12   *Green, Deceased; Charles Hearn, a single man; John Jenkins, a single man, Linda Miller and*

13   *Anthony Miller, wife and husband; Barbara Reed, individually and as wife and next of kin to*

14   *Raymond Reed, deceased; Martha Poole, a single woman, vs. McKesson Corporation; Eli Lilly*

15   *& Company;  AAI Pharma, Inc; AAI Pharma LLC; AAI Development Services, Inc.; Neosan*

16   *Pharmaceuticals Inc.; Xanodyne Pharmaceuticals, Inc.;  Qualitest Pharmaceuticals, Inc.;*

17   *Vintage Pharmaceuticals, Inc.; Propst Distribution, Inc.; Brenn Distribution, Inc.; Vintage*

18   *Pharmaceuticals, LLC; Generics International (US), Inc.; Generics Bidco I, LLC; Generics*

19   *Bidco II, LLC; Generics International (US Parent), Inc.; Endo Pharmaceuticals, Inc.; Endo*

20   *Pharmaceuticals Holdings, Inc.; and DOES 1 thru 50, inclusive;* filed in San Francisco County

21   Superior Court on 10/31/2011, Case No. CGC-11-515537;

22       2.     *Mary Keene and George Keene, wife and husband; Judy Humphrey, a single*

23   *woman; Marty Armstrong, a single man; Diane Bane, a single woman; Linda Brown, a single*

24   *woman; Doris Dowdy, a single woman; Darlene Hibler, a single woman; Tiffany Hughes, a*

25   *single woman; Imogene Mealer, a single woman; Jessie Miller, a single woman; Deidra Minor,*

26   *a single woman; Lettie Perkins, a single woman;  William Sherrill and Becky Sherrill, husband*

27   *and wife; Brenda Shields, a single woman; Thomas Strzyz and Trixy Strzyz, husband and wife;*

28   *Linzo Taylor and Nadine Taylor, husband and wife; Sharon Waller, a single woman; Vanissa*

1  White, a single woman; Mary Bearden, a single woman; Michael Brooks, a single man; Jerry

2  Gibson and Katherine Gibson, husband and wife; Jackie Jackson, a single woman; Mosetta

3  Wortham, a single woman; Virgie Hopper, individually and as daughter and next of kin to Lola

4  Hopper, deceased; Avensky Clayborn, individually and as son and next of kin to Belinda

5  Clayborn, deceased; Bobbie Osborn, individually and as daughter and next of kin to Joann

6  Spears, deceased; vs. McKesson Corporation; Eli Lilly & Company;  AAI Pharma, Inc; AAI

7  Pharma LLC; AAI Development Services, Inc.; Neosan Pharmaceuticals Inc.; AAI Pharma

8  Services, Inc.; Xanodyne Pharmaceuticals, Inc.;  Qualitest Pharmaceuticals, Inc.; Vintage

9  Pharmaceuticals, Inc.; Propst Distribution, Inc.; Brenn Distribution, Inc.; Brenn

10  Manufacturing, Inc.; Vintage Pharmaceuticals, LLC;  Generics International (US), Inc.;

11  Generics Bidco I, LLC; Generics Bidco II, LLC; Generics International (US Parent), Inc.; Endo

12  Pharmaceuticals, Inc.; Endo Pharmaceuticals Holdings, Inc.; Cornerstone Pharmaceuticals,

13  Inc.; Cornerstone Biopharma, Inc.; Cornerstone Biopharma Holdings, Inc.; Teva

14  Biopharmaceuticals, Inc.; Teva Pharmaceuticals USA, Inc.; Mylan Pharmaceuticals, Inc.;

15  Mylan, Inc.; Covidien PLC; Covidien Inc.; Mallinckrodt Inc.; Watson Pharmaceuticals, Inc.;

16  and DOES 1 through 50, inclusive, filed in San Francisco County Superior on 11/18/2011, Case

17  No. CGC-11-516031;

18       3.     Tenessia Posey, Megan Stinson, Barbara J. Olson, Mary A. Alsop, Clifford

19  August, Charlie Bell, Wrildia A. Blackburn, Dorothy Bonds, Terrence Brown, Delores

20  Christopher, Dorothy A. Cowan, Christine W. Graham, Mary L. Gremillion, Martha R. Grooms,

21  Margaret R. Harmon, Kay F. Jones, Anthony B. Kenner, Suzanne Manuel,  John H. Moore, Paul

22  M. Nelson, Carilee Pemberton, Kenneth J.  Tambaugh, Sheila G. Sulljvan, Casa Thomas vs.

23  McKesson Corporation; Eli Lilly & Company;  AAI Pharma, Inc; AAI Pharma LLC; AAI

24  Development Services, Inc.; Neosan Pharmaceuticals Inc.; AAI Pharma Services, Inc.;

25  Xanodyne Pharmaceuticals, Inc.; Qualitest Pharmaceuticals, Inc.; Vintage Pharmaceuticals,

26  Inc.; Propst Distribution, Inc.; Brenn Distribution, Inc.; Brenn Manufacturing, Inc.; Vintage

27  Pharmaceuticals, LLC; Generics International (US), Inc.; Generics Bidco I, LLC; Generics

28  Bidco II, LLC; Generics International (US Parent), Inc: Endo Pharmaceuticals, Inc.; Endo

1  *Pharmaceuticals Holdings Inc.; Cornerstone Pharmaceuticals. Inc.; Cornerstone Biopharma,*

2  *Inc.; Cornerstone Biopharma Holdings, Inc.; Teva Biopharmaceuticals, Inc.; Teva*

3  *Pharmaceuticals USA, Inc.; Mylan Pharmaceuticals, Inc.; Mylan, Inc.; Covidien PLC; Covidien*

4  *Inc.; Mallinckrodt Inc.; Watson Pharmaceuticals, Inc.; and DOES 1 through 50, inclusive,* filed

5  in San Francisco County Superior Court on 11/18/2011, Case No. CGC-11-515995;

6         4.      *Wendell Rice and Patricia Rice, husband and wife; Roy Bell and Laurel Bell,*

7  *husband and wife; Linda Mahorney and David Mahorney, wife and husband; Jay Mason and*

8  *Sharon Mason, husband and wife; William Barker and Ann Barker, husband and wife; Teddy*

9  *Teasley And Joyce Teasley, husband and wife; Ilmaid Khalil and Roxanne Khalil, husband and*

10  *wife; Beverly Rodriguez, a single woman; Mary Dries and Andrew Dries, wife and husband;*

11  *Joseph Roy, a single man: Wanda Thomas and Bernard Thomas, wife and husband; Harry*

12  *Stepp, a single man; Mitchell Ashley and Geraldine Ashley, husband and wife; Ethel Newberry,*

13  *a single woman; Mary Price-Thomas, a single woman; and Fannie Smith, a single woman, vs.*

14  *McKesson Corporation; Eli Lilly & Company; AAI Pharma, Inc; AAI Pharma LLC; AAI*

15  *Development Services, Inc; Neosan Pharmaceuticals Inc.; AAI Pharma Services, Inc.; Xanodyne*

16  *Pharmaceuticals, Inc.; Qualitest Pharmaceuticals, Inc.; Vintage Pharmaceuticals, Inc.; Propst*

17  *Distribution, Inc.; Brenn Distribution, Inc.; Brenn Manufacturing, Inc.; Vintage*

18  *Pharmaceuticals, LLC; Generics International (US), Inc.; Generics Bidco 1, LLC: Generics*

19  *Bidco II, LLC; Generics International (US Parent), Inc.; Endo Pharmaceuticals. Inc.; Endo*

20  *Pharmaceuticals Holdings Inc.; Cornerstone Pharmaceuticals, Inc.; Cornerstone Biopharma,*

21  *Inc.; Cornerstone Biopharma Holdings, Inc.; Teva Biopharmaceuticals, Inc.; Teva*

22  *Pharmaceuticals USA, Inc.; Mylan Pharmaceuticals, Inc.; Mylan, Inc.; Covidien PLC; Covidien*

23  *Inc.; Mallinckrodt Inc.; Watson Pharmaceuticals, Inc.; and DOES 1 through 100, inclusive,*

24  filed in San Francisco County Superior Court on 11/15/2011, Case No. CGC-11-515897;

25         5.      *Harry D. Witthauer, a married man; Marina Damas, a married individual; Joyce*

26  *Auston, a married woman; Minnie Beasley, a married woman; Teresa Hash, a single individual;*

27  *Gary Hatfield, a married man; Billy Hoskins, a married man; Kenneth Delavergnie, Jr., a*

28  *married man; Edith Langlois, a single woman; Donna Quesinberry, a single woman; Kay*

1  *Romero, a single woman; Donna Romero, a single woman; Diane Saucier, a married woman;*

2  *Joyce Brown, a married woman; Gary Tackett, a married man; Ronald T. Miller, a married*

3  *man; Kim Ragan, a married woman; Helen Timmons, a single woman; Beverly Webb, a single*

4  *woman; Charles T. Hibbard, a married man; Frances Ziegler, a single man; Jeffie Mills, a*

5  *single individual; Jennifer Walker nka Jennifer Dunn and Janet Dunn, individually and as*

6  *daughters and next of kin to Drexel Dunn, deceased; Edward Murray, individually and as*

7  *husband and next of kin to Margaret Murray, deceased; Willam O'Banion and Leesa O'Banion,*

8  *individually and as son and daughter-in-law, respectively and as next of kin to Jackinell*

9  *O'Banion, deceased; Avis Ortego, individually and as son and next of kin to Margaret Ortego,*

10 *deceased; Patricia Jackson, individually and as mother and next of kin to Priscilla Pile,*

11 *deceased; Sarah Hinson, individually and as daughter and next of kin to Dorothy Smith,*

12 *deceased; and Thurman Stacy, individually and as husband and next of kin to Shelby Stacy,*

13 *deceased, vs. McKesson Corporation; Eli Lilly & Company; AAI Pharma, Inc; AAI Pharma*

14 *LLC; AAI Development Services, Inc.; Neosan Pharmaceuticals Inc.; AAI Pharma Services,*

15 *Inc.; Xanodyne Pharmaceuticals, Inc.; Qualitest Pharmaceuticals, Inc.; Vintage*

16 *Pharmaceuticals, Inc.; Propst Distribution, Inc.; Brenn Distribution, Inc.; Brenn*

17 *Manufacturing, Inc.; Vintage Pharmaceuticals, LLC; Generics International (US), Inc.;*

18 *Generics Bidco I, LLC; Generics Bidco II, LLC; Generics International (US Parent), Inc.; Endo*

19 *Pharmaceuticals, Inc.; Endo Pharmaceuticals Holdings Inc.; Cornerstone Pharmaceuticals,*

20 *Inc.; Cornerstone Biopharma, Inc.; Cornerstone Biopharma Holdings, Inc.; Teva*

21 *Biopharmaceuticals, Inc.; Teva Pharmaceuticals USA, Inc.; Ivax Pharmaceuticals, Inc.; Mylan*

22 *Pharmaceuticals, Inc.; Mylan, Inc.; Covidien PLC; Covidien, Inc.; Mallinckrodt Inc.; Watson*

23 *Pharmaceuticals, Inc.; and DOES 1 through 100, inclusive,* filed in San Francisco County

24 Superior Court on 11/18/2011, Case No. CGC-11-515994.

25       6.    *Lawrence B. Fields Robinson, by and through his Guardian ad Litem,*

26 *Diane Laws; Joseph Lee Laverine Fields, by and through his Guardian ad Litem, Diane Laws,*

27 *vs. Eli Lilly and Company; Watson Pharmaceuticals, Inc. and DOES 1-100 inclusive,* filed in

28 Los Angeles County Superior Court on 12/16/2011, Case No. KC 062737.

PETITION FOR COORDINATION

7.     *Rachel Rentz; Georgia Metcalfe; Vivian Ponce; Jerry Hall; Claudetta Mcclain; Eric Cantrell Vs. McKesson Corporation; Eli Lilly And Company; Xanodyne Pharmaceuticals, Inc.; Teva Biopharmaceuticals, Inc.; Teva Pharmaceuticals USA, Inc.; Qualitest Pharmaceuticals, Inc.; Vintage Pharmaceuticals, Inc.; Propst Distribution, Inc.; Brenn Distribution, Inc.; Brenn Manufacturing, Inc.; Vintage Pharmaceuticals, LLC; Generics International (US), Inc.; Generics Bidco I, LLC; Generics Bidco II, LLC; Generics International (US Parent), Inc.; Endo Pharmaceuticals, Inc.; Endo Pharmaceuticals Holdings Inc.; Cornerstone Pharmaceuticals, Inc.; Cornerstone Biopharma, Inc.;Cornerstone Biopharma Holdings, Inc.; And Does 1 thru 50, inclusive,* filed in Los Angeles County Superior Court on 5/3/2012, Case No. BC483765.

Proof of filing of a Notice of Submission of Petition for Coordination and a copy of this Petition in each included action will be submitted to the Chair of the Judicial Council pursuant to Rule 3.522 of the California Rules of Court.  Proof of filing of any further documents to be submitted pursuant to Rule 3.523 of the California Rules of Court will be submitted to the Chair of the Judicial Council within the time frames provided by Rules 3.522 and 3.523.

This Petition is based upon the accompanying Memorandum of Points and Authorities, and the Declaration of Elise Sanguinetti filed herewith and the exhibits attached thereto.

A hearing on this petition for coordination is requested.

DATED:  Oct. 23, 2012

Respectfully submitted,


By  *Elise R Sanguinetti*
ELISE R. SANGUINETTI (CA SBN: 191389)
AMANDA J. GREENBURG (CA SBN: 255767)
KHORRAMI, LLP
360 22nd Street, Suite 640
Oakland, California 94612
Telephone: (510) 867-2000
Facsimile: (866) 546-7377
Email: ESanguinetti@khorrami.com

*Attorneys for Plaintiffs/Petitioners*

7

# EXHIBIT C

1   ELISE R. SANGUINETTI (CA SBN: 191389)
    AMANDA J. GREENBURG (CA SBN: 255767)
2   KHORRAMI, LLP
    360 22nd Street, Suite 640
3   Oakland, California 94612
    Telephone: (510) 867-2000
4   Facsimile: (866) 546-7377
    Email: ESanguinetti@khorrami.com
5
6   TREVOR B. ROCKSTAD (CA SBN: 277274)
    DAVIS & CRUMP PC
7   1712 15th Street, Suite 300
    Gulfport, MS 39501
8   Telephone: (228) 863-6000
    Facsimile: (228) 864-0907
9   Email: Trevor.Rockstad@daviscrump.com
10
    TARA TABATABAIE (OK Bar No. 21838)
11  THE SILL LAW GROUP PLLC
    14005 N. Eastern Avenue
12  Edmond, OK 73103
    Telephone: (405) 509-6300
13  Facsimile: (405) 509-6268
    Email: tara@sill-law.com
14
15  STEPHEN J. RANDALL (CA SBN: 165025)
    PEARSON RANDALL & SCHUMACHER, PA
16  100 S. Fifth Street, Suite 1025
    Minneapolis, MN 55402
17  Telephone: (612) 767-7500
    Facsimile: (612) 767-7501
18  Email: srandall@prslegal.com
19
    Attorneys for JCCP Petitioners
20

JUDICIAL COUNCIL OF CALIFORNIA

CHAIR OF THE JUDICIAL COUNCIL

| | |
|---|---|
| RACHEL RENTZ, et al., | LOS ANGELES COUNTY SUPERIOR COURT CASE NO.: BC 483765 |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR COORDINATION** |
| vs. | |
| MCKESSON CORPORATION, et al., | *[Filed concurrently with Petition for Coordination; Declaration of Elise Sanguinetti]* |
| Defendants. | |

1

## I.    INTRODUCTION

Petitioner is aware of a total of seven (7) cases that have been filed in California Superior Courts on behalf of persons that have developed, among other injuries, cardiac injuries and/or sudden death (hereinafter "Darvocet related injuries") from ingesting Darvocet and other prescription medication containing the active ingredient propoxyphene (hereinafter the "Darvocet Product").  All of the actions at issue name the same group of defendants:  the distributor, MCKESSON CORPORATION;  the brand name manufacturer, ELI LILLY AND COMPANY; the generic manufacturers[1] of the Darvocet Product .; and DOES 1 through 50, inclusive.  Petitioners' counsel plans to file additional similar cases in California Superior Courts within the next several weeks. Further, counsel is informed that, aside from the additional cases that we will file shortly, scores of similar cases will be filed soon involving consumption of the Darvocet Product and consequent diagnosis of Darvocet related injuries.

Plaintiffs/petitioners seek coordination of the following seven (7) actions that are known to be filed in the State of California and involve the same defective Darvocet Product, the same or substantially similar causes of action, the same or substantially similar issues of law, the same or substantially similar issue of material fact:

1.    *Terry Freitas and Lori Freitas, husband and wife; Oleta Burney and Harold Burney, wife and husband; Donald Green, individually and as husband and next of kin to Mary Green, Deceased; Charles Hearn, a single man; John Jenkins, a single man, Linda Miller and Anthony Miller, wife and husband; Barbara Reed, individually and as wife and next of kin to Raymond Reed, deceased; Martha Poole, a single woman, vs. Mckesson Corporation; Eli Lilly & Company;  AAI*

[1] AAI PHARMA, INC; AAI PHARMA LLC; AAI DEVELOPMENT SERVICES, INC.; NEOSAN PHARMACEUTICALS INC.; AAI PHARMA SERVICES, INC.; XANODYNE PHARMACEUTICALS, INC.; QUALITEST PHARMACEUTICALS, INC.; VINTAGE PHARMACEUTICALS, INC.; PROPST DISTRIBUTION, INC.; BRENN DISTRIBUTION, INC.; BRENN MANUFACTURING, INC.; VINTAGE PHARMACEUTICALS, LLC; GENERICS INTERNATIONAL (US), INC.; GENERICS BIDCO I, LLC; GENERICS BIDCO II, LLC; GENERICS INTERNATIONAL (US PARENT), INC.; ENDO PHARMACEUTICALS, INC.; ENDO PHARMACEUTICALS HOLDINGS INC.; CORNERSTONE PHARMACEUTICALS, INC.; CORNERSTONE BIOPHARMA, INC.; CORNERSTONE BIOPHARMA HOLDINGS, INC.; TEVA BIOPHARMACEUTICALS, INC.; TEVA PHARMACEUTICALS USA, INC.; IVAX PHARMACEUTICALS, INC.; MYLAN PHARMACEUTICALS, INC.; MYLAN, INC.; COVIDIEN PLC; COVIDIEN, INC.; MALLINCKRODT INC.; WATSON PHARMACEUTICALS,INC.

2

1   *Pharma, Inc; AAI Pharma LLC; AAI Development Services, Inc.; Neosan Pharmaceuticals Inc.;*

2   *Xanodyne Pharmaceuticals, Inc.;  Qualitest Pharmaceuticals, Inc.; Vintage Pharmaceuticals, Inc.;*

3   *Propst Distribution, Inc.; Brenn Distribution, Inc.; Vintage Pharmaceuticals, LLC; Generics*

4   *International (US), Inc.; Generics Bidco I, LLC; Generics Bidco II, LLC; Generics International (US*

5   *Parent), Inc.; Endo Pharmaceuticals, Inc.; Endo Pharmaceuticals Holdings, Inc.; and DOES 1 thru*

6   *50, inclusive;* filed in San Francisco County Superior Court on 10/31/2011, Case No. CGC-11-

7   515537;

8         2.      *Mary Keene and George Keene, wife and husband; Judy Humphrey, a single woman;*

9   *Marty Armstrong, a single man; Diane Bane, a single woman; Linda Brown, a single woman; Doris*

10  *Dowdy, a single woman; Darlene Hibler, a single woman; Tiffany Hughes, a single woman; Imogene*

11  *Mealer, a single woman; Jessie Miller, a single woman; Deidra Minor, a single woman; Lettie*

12  *Perkins, a single woman; Martha Poole, a single woman; William Sherrill and Becky Sherrill,*

13  *husband and wife; Brenda Shields, a single woman; Thomas Strzyz and Trixy Strzyz, husband and*

14  *wife; Linzo Taylor and Nadine Taylor, husband and wife; Sharon Waller, a single woman; Vanissa*

15  *White, a single woman; Mary Bearden, a single woman; Michael Brooks, a single man; Jerry Gibson*

16  *and Katherine Gibson, husband and wife; Jackie Jackson, a single woman; Mosetta Wortham, a*

17  *single woman; Virgie Hopper, individually and as daughter and next of kin to Lola Hopper,*

18  *deceased; Avensky Clayborn, individually and as son and next of kin to Belinda Clayborn, deceased;*

19  *Bobbie Osborn, individually and as daughter and next of kin to Joann Spears, deceased; vs.*

20  *McKesson Corporation; Eli Lilly & Company;  AAI Pharma, Inc; AAI Pharma LLC; AAI*

21  *Development Services, Inc.; Neosan Pharmaceuticals Inc.; AAI Pharma Services, Inc.; Xanodyne*

22  *Pharmaceuticals, Inc.;  Qualitest Pharmaceuticals, Inc.; Vintage Pharmaceuticals, Inc.; Propst*

23  *Distribution, Inc.; Brenn Distribution, Inc.; Brenn Manufacturing, Inc.; Vintage Pharmaceuticals,*

24  *LLC;  Generics International (US), Inc.; Generics Bidco I, LLC; Generics Bidco II, LLC; Generics*

25  *International (US Parent), Inc.; Endo Pharmaceuticals, Inc.; Endo Pharmaceuticals Holdings, Inc.;*

26  *Cornerstone Pharmaceuticals, Inc.; Cornerstone Biopharma, Inc.; Cornerstone Biopharma*

27  *Holdings, Inc.; Teva Biopharmaceuticals, Inc.; Teva Pharmaceuticals USA, Inc.; Mylan*

28  *Pharmaceuticals, Inc.; Mylan, Inc.; Covidien PLC; Covidien Inc.; Mallinckrodt Inc.; Watson*

1   *Pharmaceuticals, Inc.; and DOES 1 through 50, inclusive*, filed in San Francisco County Superior on

2   11/18/2011, Case No. CGC-11-516031;

3        3.    *Tenessia Posey, Megan Stinson, Barbara J. Olson, Mary A. Alsop, Clifford August,*

4   *Charlie Bell, Wrildia A. Blackburn, Dorothy Bonds, Terrence Brown, Delores Christopher, Dorothy*

5   *A. Cowan, Christine W. Graham, Mary L. Gremillion, Martha R. Grooms, Margaret R. Harmon, Kay*

6   *F. Jones, Anthony B. Kenner, Suzanne Manuel,  John H. Moore, Paul M. Nelson, Carilee Pemberton,*

7   *Kenneth J. Tambaugh, Sheila G. Sullivan, Casa Thomas vs. McKesson Corporation; Eli Lilly &*

8   *Company;  AAI Pharma, Inc; AAI Pharma LLC; AAI Development Services, Inc.; Neosan*

9   *Pharmaceuticals Inc.; AAI Pharma Services, Inc.; Xanodyne Pharmaceuticals, Inc.; Qualitest*

10   *Pharmaceuticals, Inc.; Vintage Pharmaceuticals, Inc.; Propst Distribution, Inc.; Brenn Distribution,*

11   *Inc.; Brenn Manufacturing, Inc.; Vintage Pharmaceuticals, LLC; Generics International (US), Inc.;*

12   *Generics Bidco I, LLC; Generics Bidco II, LLC; Generics International (US Parent), Inc: Endo*

13   *Pharmaceuticals, Inc.; Endo Pharmaceuticals Holdings Inc.; Cornerstone Pharmaceuticals, Inc.;*

14   *Cornerstone Biopharma, Inc.; Cornerstone Biopharma Holdings, Inc.; Teva Biopharmaceuticals,*

15   *Inc.; Teva Pharmaceuticals USA, Inc.; Mylan Pharmaceuticals, Inc.; Mylan, Inc.; Covidien PLC;*

16   *Covidien Inc.; Mallinckrodt Inc.; Watson Pharmaceuticals, Inc.; and DOES 1 through 50, inclusive,*

17   filed in San Francisco County Superior Court on 11/18/2011, Case No. CGC-11-515995;

18        4.    *Wendell Rice and Patricia Rice, husband and wife; Roy Bell and Laurel Bell, husband*

19   *and wife; Linda Mahorney and David Mahorney, wife and husband; Jay Mason and Sharon Mason,*

20   *husband and wife; William Barker and Ann Barker, husband and wife; Teddy Teasley And Joyce*

21   *Teasley, husband and wife; Ilmaid Khalil and Roxanne Khalil, husband and wife; Beverly Rodriguez,*

22   *a single woman; Mary Dries and Andrew Dries, wife and husband; Joseph Roy, a single man:*

23   *Wanda Thomas and Bernard Thomas, wife and husband; Harry Stepp, a single man; Mitchell  Ashley*

24   *and Geraldine Ashley, husband and wife; Ethel Newberry, a single woman; Mary Price-Thomas, a*

25   *single woman; and Fannie Smith, a single woman, vs. McKesson Corporation; Eli Lilly & Company;*

26   *AAI Pharma, Inc; AAI Pharma LLC; AAI Development Services, Inc; Neosan Pharmaceuticals Inc.;*

27   *AAI Pharma Services, Inc.; Xanodyne Pharmaceuticals, Inc.;  Qualitest Pharmaceuticals, Inc.;*

28   *Vintage Pharmaceuticals, Inc.; Propst Distribution, Inc.; Brenn Distribution, Inc.; Brenn*

4

1 | *Manufacturing, Inc.; Vintage Pharmaceuticals, LLC; Generics International (US), Inc.; Generics*

2 | *Bidco I, LLC; Generics Bidco II, LLC; Generics International (US Parent), Inc.; Endo*

3 | *Pharmaceuticals. Inc.; Endo Pharmaceuticals Holdings Inc.; Cornerstone Pharmaceuticals, Inc.;*

4 | *Cornerstone Biopharma, Inc.; Cornerstone Biopharma Holdings, Inc.; Teva Biopharmaceuticals,*

5 | *Inc.; Teva Pharmaceuticals USA, Inc.; Mylan Pharmaceuticals, Inc.; Mylan, Inc.; Covidien PLC;*

6 | *Covidien Inc.; Mallinckrodt Inc.; Watson Pharmaceuticals, Inc.; and DOES 1 through 100, inclusive,*

7 | *filed in San Francisco County Superior Court on 11/15/2011, Case No. CGC-11-515897;*

8 |   5.   *Harry D. Witthauer, a married man; Marina Damas, a married individual; Joyce*

9 | *Auston, a married woman; Minnie Beasley, a married woman; Teresa Hash, a single individual;*

10 | *Gary Hatfield, a married man; Billy Hoskins, a married man; Kenneth Delavergnie, Jr., a married*

11 | *man; Edith Langlois, a single woman; Donna Quesinberry, a single woman; Kay Romero, a single*

12 | *woman; Donna Romero, a single woman; Diane Saucier, a married woman; Joyce Brown, a*

13 | *married woman; Gary Tackett, a married man; Ronald T. Miller, a married man; Kim Ragan, a*

14 | *married woman; Helen Timmons, a single woman; Beverly Webb, a single woman; Charles T.*

15 | *Hibbard, a married man; Frances Ziegler, a single man; Jeffie Mills, a single individual; Jennifer*

16 | *Walker nka Jennifer Dunn and Janet Dunn, individually and as daughters and next of kin to Drexel*

17 | *Dunn, deceased; Edward Murray, individually and as husband and next of kin to Margaret Murray,*

18 | *deceased; Willam O'Banion and Leesa O'Banion, individually and as son and daughter-in-law,*

19 | *respectively and as next of kin to Jackinell O'Banion, deceased; Avis Ortego, individually and as son*

20 | *and next of kin to Margaret Ortego, deceased; Patricia Jackson, individually and as mother and next*

21 | *of kin to Priscilla Pile, deceased; Sarah Hinson, individually and as daughter and next of kin to*

22 | *Dorothy Smith, deceased; and Thurman Stacy, individually and as husband and next of kin to Shelby*

23 | *Stacy, deceased, vs. McKesson Corporation; Eli Lilly & Company; AAI Pharma, Inc; AAI Pharma*

24 | *LLC; AAI Development Services, Inc.; Neosan Pharmaceuticals Inc.; AAI Pharma Services, Inc.;*

25 | *Xanodyne Pharmaceuticals, Inc.; Qualitest Pharmaceuticals, Inc.; Vintage Pharmaceuticals, Inc.;*

26 | *Propst Distribution, Inc.; Brenn Distribution, Inc.; Brenn Manufacturing, Inc.; Vintage*

27 | *Pharmaceuticals, LLC; Generics International (US), Inc.; Generics Bidco I, LLC; Generics Bidco II,*

28 | *LLC; Generics International (US Parent), Inc.; Endo Pharmaceuticals, Inc.; Endo Pharmaceuticals*

5

1  *Holdings Inc.; Cornerstone Pharmaceuticals, Inc.; Cornerstone Biopharma, Inc.; Cornerstone*

2  *Biopharma Holdings, Inc.; Teva Biopharmaceuticals, Inc.; Teva Pharmaceuticals USA, Inc.; Ivax*

3  *Pharmaceuticals, Inc.; Mylan Pharmaceuticals, Inc.; Mylan, Inc.; Covidien PLC; Covidien, Inc.;*

4  *Mallinckrodt Inc.; Watson Pharmaceuticals, Inc.; and DOES 1 through 100, inclusive,* filed in San

5  Francisco County Superior Court on 11/18/2011, Case No. CGC-11-515994.

6       6.    *Lawrence B. Fields Robinson, by and through his Guardian ad Litem, Diane Laws;*

7  *Joseph Lee Laverine Fields, by and through his Guardian ad Litem, Diane Laws, vs. Eli Lilly and*

8  *Company; Watson Pharmaceuticals, Inc. and DOES 1-100 inclusive,* filed in Los Angeles County

9  Superior Court on 12/16/2011, Case No. KC 062737.

10       7.    *Rachel Rentz; Georgia Metcalfe; Vivian Ponce; Jerry Hall; Claudetta Mcclain; Eric*

11  *Cantrell Vs. McKesson Corporation; Eli Lilly And Company; Xanodyne Pharmaceuticals, Inc.; Teva*

12  *Biopharmaceuticals, Inc.; Teva Pharmaceuticals USA, Inc.; Qualitest Pharmaceuticals, Inc.; Vintage*

13  *Pharmaceuticals, Inc.; Propst Distribution, Inc.; Brenn Distribution, Inc.; Brenn Manufacturing,*

14  *Inc.; Vintage Pharmaceuticals, LLC; Generics International (US), Inc.; Generics Bidco I, LLC;*

15  *Generics Bidco II, LLC; Generics International (US Parent), Inc.; Endo Pharmaceuticals, Inc.; Endo*

16  *Pharmaceuticals Holdings Inc.; Cornerstone Pharmaceuticals, Inc.; Cornerstone Biopharma,*

17  *Inc.;Cornerstone Biopharma Holdings, Inc.; And Does 1 thru 50, inclusive,* filed in Los Angeles

18  County Superior Court on 5/3/2012, Case No. BC483765.

19      In all seven matters, Plaintiffs allege, among other injuries, cardiac injuries and/or sudden

20  death along with loss of consortium claims caused by use of Darvocet/Propoxyphene.  Accordingly,

21  while each plaintiff's medical background and special damages may be unique, each case shares the

22  same general liability facts and issues against the defendants, the same scientific facts and issues

23  concerning the Darvocet Product and consequent injuries, and the same or similar treatment protocols

24  for the Darvocet related injuries.  Petitioners' counsel anticipates that the actions will, therefore,

25  involve duplicative requests for the same defendant witness depositions and the same documents

26  related to development, manufacturing, testing, marketing, and sale of the Darvocet Product.  Absent

27  coordination of these actions by a single judge, there is a significant likelihood of duplicative

28  discovery, waste of judicial resources and possible inconsistent judicial rulings on legal issues.

6

1    Plaintiffs and petitioners submit that Los Angeles County is the most appropriate choice as a

2    coordination venue for the Darvocet Product cases.  Los Angeles County has a complex litigation

3    panel at the Central Civil West Division and said panel has extensive experience in handling

4    coordinated actions similar to the cases at issue in this Petition.  These actions constitute complex

5    litigation under Section 19 of the Standards of Judicial Administration and Rule 3.400., et seq., of the

6    California Rules of Court, thus, coordination and assignment to a complex panel is appropriate.  The

7    cases were not originally filed as complex cases.  However, pursuant to California Rule of Court (c)

8    (5), the cases are complex as they are claim involving mass tort.  (See Declaration of Elise

9    Sanguinetti ¶ 6.)

10    Plaintiffs and petitioners respectfully request that the Judicial Council appoint a coordination

11    motion judge.  Petitioners further submit that the interests of justice and judicial economy support the

12    coordination of the seven (7) Darvocet Product cases as well as other such cases that may be filed

13    before this Petition is decided.  Finally, petitioners urge the Judicial Council to designate Los Angeles

14    County Central Civil West Division as the coordination venue.

15                                                    II.

16                                              ARGUMENT

17    A.    THE DARVOCET CASES AGAINST DEFENDANTS ARE APPROPRIATE

18            CASES FOR COORDINATION PURSUANT TO CODE OF CIVIL

19            PROCEDURE SECTION 404.1

20    Pursuant to *California Code of Civil Procedure* § 404, the petitioners currently seek

21    coordination of seven (7) actions involving more than 100 personal injury claimants that used

22    Darvocet and thereafter suffered injury and/or death and additional 20 plaintiffs that have suffered

23    resulting loss of consortium as a result.   These seven (7) actions are pending in San Francisco

24    County Superior Court and Los Angeles County Superior Court against the same group of

25    defendants.   Use of committees and standardized discovery in a coordinated setting will expedite

26    resolution of these cases, avoid inconsistent results, and assist in alleviating onerous burdens on the

27    courts as well as the parties.

28

1    The factors set forth in *California Code of Civil Procedure* § 404.1 must be weighed in

2  determining whether coordination under *California Code of Civil Procedure* § 404, in selecting the

3  site or sites for the coordinated proceedings and the coordination trial judge under Section 404.3, and

4  in selecting the reviewing court under Section 404.3. The following factors, catalogued in section

5  404.1 and discussed in more detail below, all demonstrate that coordination of these included actions

6  is appropriate:  One judge hearing all of the actions for all purposes in a selected site or sites will

7  promote the ends of justice; Common questions of fact or law are predominating and significant to

8  the litigation; Coordination may serve the convenience of parties, witnesses, and counsel the relative

9  development of the actions and the work product of counsel; Coordination may facilitate the efficient

10  utilization of judicial facilities and manpower; Coordination may enhance the orderly calendar of the

11  courts; Without coordination, the parties may suffer from disadvantages caused by duplicative and

12  inconsistent rulings, orders or judgments; and, without coordination, settlement of the actions without

13  further litigation is unlikely.

14    1.    COMMON QUESTIONS OF FACT OR LAW ARE PREDOMINATING

15    AND SIGNIFICANT

16    These included actions are more similar than dissimilar.  The actions share substantially the

17  same defendants, the same acts and omissions, the same product and the same general medical

18  consequences caused by the product.  Each action alleges the same general claims, including theories

19  of liability, causation and damages as allegedly caused by the Darvocet Product (See Exhibit 1 to

20  Declaration of Elise Sanguinetti).

21    The facts relied on to show that each included action meets the coordination standards

22  specific in CCP Section 404.1 are those as alleged in the complaints – specifically, those facts alleged

23  in the general factual allegation sections of the complaints.  The general allegations in each of these

24  complaints state that the plaintiffs suffered, among other injuries, cardiac injury and/or sudden death

25  following exposure to the product and that the defendants failed to warn patients and physicians

26  regarding all known and knowable risks associated with the product.

27    The actions involve common questions of law that predominate and are significant to the

28  litigation.  These common questions of law and fact include, but are not limited to:

8

1.      Whether there are design and/or manufacturing defects in the defendants' Darvocet Product;

2.      Whether the defendants failed to adequately warn physicians and consumers regarding all known and knowable risks associated with the Darvocet Product;

3.      Whether the defendants' conduct in designing, manufacturing, and marketing the Darvocet Product fell below the applicable duties of care owed by the defendants to the plaintiffs;

4.      Whether the defendants intentionally, deliberately, knowingly, carelessly, recklessly, or negligently misrepresented, omitted, concealed or suppressed material and important information regarding the true and known risks of the product from the plaintiffs and their physicians;

5.      Whether the defendants' misconduct constitutes negligence;

6.      Whether the defendants' conduct constitutes negligence;

7.      Whether the plaintiffs are entitled to compensatory damages and/or restitution, and if so, the method by which such relief should be determined; and

8.      Whether the defendants are liable for punitive or exemplary damages, a matter to be determined when appropriate, and if so, the amount necessary and appropriate to punish them for their conduct, to deter others, and to fulfill the other policies and purposes of punitive and exemplary damages.

Thus, the similarities of the parties and the issues of liability and scientific causation justify coordination of these actions.

      2.      THE RELATIVE DEVELOPMENT OF THE ACTIONS AND THE WORK PRODUCT OF COUNSEL WEIGH IN FAVOR OF COORDINATION PROCEEDINGS

*California Code of Civil Procedure* § 404.1 suggests that the Judicial Council and the coordination motion judge weigh the "relative development of the actions and the work product of counsel" in determining whether coordination is appropriate. However, in all cases sought to be coordinated, the complaints have only recently been filed. In all of the cases, no responsive pleadings have yet been filed. Therefore, this factor does not preclude coordination of these actions at this time, as coordination will not penalize any particular individual case.

9

1     Additionally, in light of the similarity of the actions, there will be duplicate discovery

2    obligations upon the common defendants unless coordination is ordered.  Coordination before

3    initiation of discovery in any of the cases will eliminate waste of resources and will facilitate

4    economy.  Thus, this factor weighs in favor of prompt coordination.

5         3.       **COORDINATION WOULD FOSTER EFFICIENT UTILIZATION OF**

6                    **JUDICIAL RESOURCES**

7     At present, these actions are pending in San Francisco County and Los Angeles County.

8    More actions will likely be filed in other counties across this State.  No one can seriously dispute that

9    coordination would foster judicial consistencies and result in efficient use of the court's resources as

10   well as the parties' resources.  Conversely, unless coordinated, these cases would likely be assigned

11   to different judges in different counties, thereby undermining judicial economy.

12        4.      **DUPLICATIVE AND INCONSISTENT RULINGS AND ORDERS**

13                  **WILL LIKELY OCCUR IF MULTIPLE COURTS ARE ADDRESSING**

14                  **THE SAME ISSUES**

15     Failure to coordinate these actions will result in the disadvantages of duplicate and

16   inconsistent rulings, orders, or judgments.  The inevitability of realizing the inconsistency and

17   duplication factor of California Code of Civil Procedure Section 404.1, weighs heavily in favor of

18   coordination.  Indeed, issues likely to be raised in this action include issues pertaining to liability,

19   allocation of fault and contribution, as well as the same wrongful conduct of defendants.  Such

20   difficult issues may ultimately be addressed by the California Court of Appeal.  Coordination is

21   required in order to avoid duplicative efforts and inconsistent rulings.

22        5.      **IF COORDINATION IS DENIED, IT IS NOT LIKELY THAT THESE**

23                  **CASES WILL SETTLE WITHOUT FURTHER LITIGATION**

24     The final factor to be considered under California Code of Civil Procedure 404.1 is "the

25   likelihood of settlement of the actions without further litigation should coordination be denied." It is

26   highly unlikely that denial of coordination would foster settlement.  The included actions are in

27   litigation on multiple claims and significant issues.  With multi-millions of dollars at stake, these

28   cases are sure to be seriously litigated.  Generally, coordination assists in the settlement process

10

1    because the parties, at the Court's urging, are forced to create organized plans for mediation or

2    settlement. If experience is a guide, coordination will not only lead to greater efficiencies in the

3    litigation process, it will also lead to coordinated settlement discussions.

4         **B. A STAY OF ALL DARVON CASES PENDING IN CALIFORNIA STATE**

5    **COURTS IS NECESSARY AND WARRANTED TO EFFECT THE PURPOSES OF**

6    **COORDINATION**

7         The ends of justice will be well-served by ordering a stay of the pending Darvon actions. A

8    brief stay pending determination of coordination will ensure the uniformity, consistency and

9    predictability of pre-trial discovery and other proceedings.

10        Currently, there is outstanding case activity which requires a stay in various cases. All the

11   cases have upcoming court requirements such as motion work and Case Management Conferences.

12        Petitioning Plaintiff will be requesting an order staying the California Darvon cases pending

13   resolution of the Petition for Coordination. This limited stay will prevent the wasteful expenditure of

14   resources to individual case motions while coordination is considered. Additionally, a stay will

15   prevent inconsistent rulings and a waste of judicial resources pending a decisions by the assigned

16   judge on the Petition for Coordination.

17                                        **III.**

18                            **CONCLUSION**

19        As set forth above, all factors to be considered demonstrate that coordination of these

20   included actions is appropriate as it is in the interest of judicial economy and the parties.

21   DATED: Oct. 23, 2012

22   Respectfully submitted,

23                               By _Elise R Sanguinetti_

24                                 ELISE R. SANGUINETTI (CA SBN: 191389)

25                                 AMANDA J. GREENBURG (CA SBN: 255767)
                                   KHORRAMI, LLP

26                                 360 22nd Street, Suite 640
                                   Oakland, California 94612

27                                 Telephone: (510) 867-2000
                                   Facsimile: (866) 546-7377

28                                 Email: ESanguinetti@khorrami.com

EXHIBIT D

1  ELISE R. SANGUINETTI (SBN 191389)
   AMANDA J. GREENBURG (SBN 255767)
2  KHORRAMI, LLP
   360 22nd Street, Suite 640
3  Oakland, California  94612
   Telephone:  (866) 546-7266
4  Facsimile:  (866) 546-7377

5
   RICHARD SALKOW (SBN 204572)
6  SALKOW LAW, APC
   1540 7th Street, Suite 206
7  Santa Monica, California 90401-3432
   Telephone:  (310) 451-8484
8  Facsimile:  (310) 451-8486

9
   Attorneys for Plaintiffs
10

11

12            IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

13              IN AND FOR THE COUNTY OF SAN FRANCISCO

14  TERRY FREITAS, et al.,                   )   CASE NO.: CGC-11-515537
                                             )
15              Plaintiffs,                  )   **MEMORANDUM OF POINTS AND**
                                             )   **AUTHORITIES IN SUPPORT OF**
16  vs.                                      )   **PLAINTIFFS' MOTION TO STAY**
                                             )   **PROCEEDINGS PENDING**
17  MCKESSON CORPORATION, et al.,            )   **RESOLUTION OF PLAINTFFS'**
                                             )   **PETITION FOR COORDINATION**
18              Defendants.                  )
                                             )   DATE: December 6, 2012
19                                           )   TIME: 9:00am  9/30am.
                                             )   DEPT: 302
20

21

22       Plaintiffs submit this Memorandum of Points and Authorities in Support of their Motion to

23  Stay Proceedings Pending Resolution of Plaintiffs' Petition For Coordination.  Plaintiffs have

24  brought the exact same motion in all Darvon cases filed in San Francisco.

25               I.      **STATEMENT OF FACTS**

26       This lawsuit concerns personal injuries related to Plaintiffs' ingestion of prescription

27  medication containing the active ingredient Propoxyphene for treatment of mild to moderate pain.

28                              - 1 -

1  The Propoxyphene medication was marketed and sold as generic and/or brand-name drugs under

2  various names including Darvon and Darvocet.  In addition to the Plaintiffs bringing this lawsuit,

3  there are additional cases before this Court and cases filed in Los Angeles Superior Court making

4  similar allegations regarding personal injuries related to prescription medications containing the

5  active ingredient Propoxyphene.

6       In the Propoxyphene cases before the Court, Defendants have brought numerous motions.

7  The following Motions are currently pending before this Court:

8      1.  *Terry Freitas and Lori Freitas, etc., et al., vs. McKesson Corporation, et al*. CGC-11-

9        515537:

10        a. Motion to Dismiss for Forum Non Conveniens brought by multiple by Vintage

11           Pharmaceuticals, LLC et al., and joined by multiple Defendants.

12        b. Demurrer on Ground of Improper Joinder brought by Vintage Pharmaceuticals,

13           LLC and joined by multiple Defendants.

14        c. Motion to Quash Service of Summons brought by Xanodyne Pharmaceuticals, Inc.

15     2.  *Mary Keene and George Keene, et al., vs. McKesson Corporation, et al*.  CGC-11-

16       510631:

17        a. Motion to Quash Service of Summons brought by Xanodyne Pharmaceuticals, Inc.

18        b. Motion to Dismiss for Forum Non Conveniens brought by Teva Pharmaceuticals

19           USA, Inc..

20        c. Motion to Sever Based on Improper Joinder brought by Teva Pharmaceuticals

21           USA, Inc..

22     3.  *Tenessia Posey, et al., vs. McKesson Corporation, et al*. CGC-11-515995:

23        a. Motion to Dismiss for Forum Non Conveniens brought by multiple by Xanodyne

24           Pharmaceuticals, Inc. and joined by multiple Defendants.

25        b. Demurrer on Ground of Improper Joinder brought by Xanodyne Pharmaceuticals,

26           Inc. and joined by multiple Defendants.

27        c. Motion to Quash Service of Summons brought by Xanodyne Pharmaceuticals, Inc.

28

- 2 -

1       4.    *Wendell Rice and Patricia Rice, et al., vs. McKesson Corporation et al.* CGC-11-

2       515897:

3            a. Motion to Dismiss for Forum Non Conveniens brought by multiple by Xanodyne

4              Pharmaceuticals, Inc. and joined by multiple Defendants.

5            b. Demurrer on Ground of Improper Joinder brought by Xanodyne Pharmaceuticals,

6              Inc. and joined by multiple Defendants.

7            c. Motion to Quash Service of Summons brought by Xanodyne Pharmaceuticals, Inc.

8       5.    *Harry D. Witthauer, et al., vs. McKesson Corporation et al.* CGC-11-515994:

9            a. Motion to Dismiss for Forum Non Conveniens brought by multiple by Xanodyne

10              Pharmaceuticals, Inc. and joined by multiple Defendants.

11            b. Demurrer on Ground of Improper Joinder brought by Xanodyne Pharmaceuticals,

12              Inc. and joined by multiple defendants.

13            c. Motion to Quash Service of Summons brought by Xanodyne Pharmaceuticals, Inc.

14       In addition to these five cases filed in San Francisco Superior Court, there are two additional

15 cases filed in Los Angeles Superior Court that concern injuries related to Propoxyphene ingestion.

16 The additional cases are *Lawrence B. Fields Robinson, etc. et al., vs. Eli Lilly and Company, et al.*,

17 KC062737 and *Rachel Rentz et al., vs. McKesson Corporation et al.*, BC483765.  Further, it is

18 expected that additional cases related to Propoxyphene ingestion will be filed in California Courts in

19 the near future.

20       These motions were scheduled to be heard on November 6, 2012 and November 8, 2012.

21 This Court allowed the motion date to be pushed back until December 18, 2012 to allow the Judicial

22 Council time to review the coordination.   As of today's date, a decision has not been made by the

23 Judicial Council. Also, Plaintiffs' will be filing an Application for Stay Order before the Judicial

24 Council.

25       On October 23, 2012, the Plaintiffs in the above referenced cases filed a Petition for

26 Coordination to consolidate these cases pursuant to *California Code of Civil Procedure § 404, et seq.*

27 and California Rules of Court 3.500, *et seq.*  In order to avoid the possibility of conflicting rulings,

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO STAY PROCEEDINGS
PENDING RESOLUTION OF PLAINTIFFS' PETITION FOR COORDINATION

1  avoid prejudice to the parties and promote judicial efficiency, Plaintiffs now ask this Court to stay

2  ruling on and hearing the motions in these various Propoxyphene cases pending a decision on

3  coordination from the Judicial Council.

## II. ARGUMENT

A.  **A Stay Should Be Granted Pending a Decision on the Plaintiffs' Motion for Coordination.**

This Court has the authority to grant Plaintiffs' request to stay the current proceedings pending a decision on coordination of the California Propoxyphene cases, as "[t]rial courts generally have the inherent power to stay proceedings in the interests of justice and to promote judicial efficiency." *Freiberg v. City of Mission Viejo*, 33 Cal. App. 4th 1484, 1489 (1995).

California Code of Civil Procedure § 187 gives this Court discretion to "adopt any suitable process or mode of proceeding . . . which may appear most comfortable to the spirit of this code." *Cal. Civ. Proc. Code* §187. This Court's authority to stay proceedings is part of its "inherent power" to "insure the orderly administration of justice". *Bailey* v. *Fosca Oil Co. Ltd.,* (1963) 216 Cal. App. 2d 813,817-818 (approving of trial court's stay pursuant to Cal. Civ. Code § 187). Moreover, the California Rules of Court Rule 3.515(a) allows courts to stay proceedings in any action being considered for coordination. Specifically, Rule 3.515 provides:

> (a) Any party may file a motion for an order under Code of Civil Procedure section 404.5 staying the proceedings in any action being considered for, or affecting an action being considered for, coordination, or the court may stay the proceedings on its own motion.

As noted earlier, this action involves plaintiffs who suffered heart related injuries as the result of using various name brand and generic Propoxyphene containing medications. It involves factual allegations and claims for relief that are similar to numerous other cases that have been filed in California. Coordination of all the California Propoxyphene cases makes sense. All the cases involve the same defective medication, allege the same or substantially similar causes of action, involve the same or substantially similar issues of law, and involve the same or substantially similar issues of material fact. As of October 23, 2012, Plaintiffs have filed a Petition for Coordination of the

- 4 -

1    cases in this action. An analysis of all factors to be considered regarding consolidation set out in

2    California Code of Civil Procedure § 400 *et seq.* weighs in favor of consolidation.  (See Declaration

3    of Elise Sanguinetti indicating that the petition has been filed and can be produced to this Court upon

4    request.)  Thus, it is very likely that these cases will indeed proceed to coordination.

5          In multiple cases, Defendants have filed multiple Demurrers on the ground of Improper

6    Joinder, multiple Motions to Dismiss for Forum Non Conveniens and multiple Motions to Quash

7    Service.  All of these motions concern issues that should be brought before the coordination judge

8    and uniformly decided at one time so as to avoid inconsistent rulings and promote the interests of

9    justice.  If the Judicial Council orders coordination, the transferee court will address the same issues

10   as this Court if the case is not stayed.

11          If this Court proceeds with the pending Motions, the Court will have to continue to expend

12   time and resources on issues that may ultimately be addressed in another forum after coordination.

13                   III.    **CONCLUSION**

14          For the foregoing reasons, the Plaintiffs' Motion To Stay Proceedings Pending Resolution of

15   Plaintiffs' Pending Petition for Coordination should be GRANTED.

16   DATED:   November 9, 2012              KHORRAMI, LLP

17

18                     By: _____

19                         ELISE R. SANGUINETTI

20

21

22

23

24

25

26

27

28

# EXHIBIT E

ELISE R. SANGUINETTI (CA SBN: 191389)
AMANDA J. GREENBURG (CA SBN: 255767)
KHORRAMI, LLP
360 22nd Street, Suite 640
Oakland, California 94612
Telephone: (510) 867-2000
Facsimile: (866) 546-7377
Email: ESanguinetti@khorrami.com

TREVOR B. ROCKSTAD (CA SBN: 277274)
DAVIS & CRUMP PC
1712 15th Street, Suite 300
Gulfport, MS 39501
Telephone: (228) 863-6000
Facsimile: (228) 864-0907
Email: Trevor.Rockstad@daviscrump.com

TARA TABATABAIE (OK Bar No. 21838)
THE SILL LAW GROUP PLLC
14005 N. Eastern Avenue
Edmond, OK 73103
Tel: (405) 509-6300
Fax: (405) 509-6268
Email: tara@sill-law.com

STEPHEN J. RANDALL (CA SBN:
PEARSON RANDALL & SCHUMACHER, PA
100 S. Fifth Street
Suite 1025
Minneapolis, MN 55402
612-767-7500
Fax: 612-767-7501
Email: srandall@prslegal.com

Attorneys for JCCP Petitioners

## JUDICIAL COUNCIL OF CALIFORNIA

## CHAIR OF THE JUDICIAL COUNCIL

| | |
|---|---|
| RACHEL RENTZ, et al., | ) LOS ANGELES COUNTY SUPERIOR |
| | ) COURT CASE NO.: BC 483765 |
| Plaintiffs, | ) |
| vs. | ) **DECLARATION OF ELISE** |
| | ) **SANGUINETTI IN SUPPORT OF** |
| MCKESSON CORPORATION, et al., | ) **PETITION FOR COORDINATION** |
| | ) *[Filed concurrently with Petition for* |
| Defendants. | ) *Coordination; Points and Authorities in* |
| | ) *Support of Petition for Coordination]* |

1

1

2  I, Elise Sanguinetti, declare and state as follows:

3      1.     I am an attorney at law duly licensed to practice law in all courts of the State of

4  California and am a managing attorney at Khorrami LLP.  I have personal knowledge of the matters

5  set forth herein, and if called upon to testify, would be competent to do so under oath.

6      2.     This petition is brought for the purpose of seeking coordination of seven (7)

7  complaints, which involve claims of numerous injured plaintiffs, alleging use of the prescription

8  medication containing the active ingredient Propoxyphene sold under various generic and brand

9  names including Darvon and Darvocet (hereinafter the "Product") and plaintiffs' consequent injuries

10 including, but not limited to, cardiac injuries and/or sudden death.  Each complaint asserts causes of

11 action arising from common claims and allegations against the defendants and each involves identical

12 issues of law.

13     3.     The names of the parties to all known pending product cases in California state courts

14 and the names and address of each party's attorney of record, along with the complete title of each

15 included action are listed in Exhibit 1 attached hereto.  The petitioners seek to coordinate all actions

16 included in Exhibit 1.

17     4.     All of the cases allege generally similar theories of liability, including strict liability,

18 negligence, breach of implied and express warranties, and violations of Business and Professions

19 Code 17200 and 17500 arising from defendants' manufacture and distribution of the Product.

20     5.     At present, no other action is known to be pending in a court of this state that shares

21 common questions of fact or law with the included actions.

22     6.     The subject cases are complex pursuant to California Rule of Court 3.400(b) and (c).

23 Not only are these cases a mass tort, they will include the following: (1) Numerous pretrial motions

24 raising difficult or novel legal issues that will be time-consuming to resolve; (2) Management of a

25 large number of witnesses or a substantial amount of documentary evidence; and (3) Coordination

26 with related actions pending in one or more courts in other counties, states or countries, or in federal

27 court.  The subject cases arise out of injuries sustained by plaintiffs due to their exposure to the

28 Product; therefore, the cases will include complex scientific and medical issues which consistently

1  trigger numerous pre-trial motions. The subject cases assert claims against large pharmaceutical

2  companies and will, therefore, necessarily involve several corporate witnesses, scientific researchers,

3  advertising and marketing consultants as well as multiple treating physicians for each plaintiff. In

4  addition, cases involving manufacture, marketing and sale of a prescription drug often result in the

5  production of large amounts of documentary evidence. The cases were not originally filed as complex

6  cases. However, pursuant to California Rule of Court (c) (5), the cases are complex as they are claim

7  involving mass tort.

8      7.    The actions sought to be coordinated meet the standards described in California Code

9  of Civil Procedure section 404.1. The actions involve common questions of law and fact that

10  predominate and are significant to the litigation. These common questions of law and fact include,

11  but are not limited to:

12          a)    whether there are design and/or manufacturing defects in the defendants'

13                Product;

14          b)    Whether the defendants failed to adequately warn physicians and consumers

15                regarding all known and knowable risks associated with the Product and/or

16                whether warnings were vitiated by defendants' advertising and marketing

17                campaigns;

18          c)    Whether the defendants' conduct in designing, manufacturing, and marketing

19                of the Product fell below the applicable duties of care owed by the defendants

20                to the plaintiffs;

21          d)    Whether the defendants intentionally, deliberately, knowingly, carelessly,

22                recklessly, or negligently misrepresented, omitted, concealed or suppressed

23                material and important information regarding the true and known risks of the

24                Product from the plaintiffs and their physicians;

25          e)    Whether the defendants' misconduct constitutes breaches of any warranties

26                recognized by law;

27          f)    Whether the defendants' conduct constitutes negligence;

28

DECLARATION OF ELISE SANGUINETTI IN SUPPORT OF PETITION FOR COORDINATION

g)    Whether the plaintiffs are entitled to compensatory damages and/or restitution, and if so, the method by which such relief should be determined; and

h)    Whether the defendants are liable for punitive or exemplary damages, a matter to be determined when appropriate and if so, the amount necessary and appropriate to punish them for their conduct, to deter, and to fulfill the other policies and purposes of punitive damages.

8.    Coordination of these related actions will serve the convenience of the parties, witnesses and counsel because discovery in these overlapping actions is likely to be duplicative if they proceed separately.  Coordination of these actions will prevent repetitive and redundant depositions regarding the same issues by witnesses.  In addition, without coordination, duplicative motions concerning the adequacy of the pleadings, the admissibility of scientific evidence and other matters are sure to arise.

9.    All cases (except the Rentz case) were filed in October and November of 2011. Shortly after filing, Defendant Eli Lilly & Company removed all five cases to federal court where they were quickly transferred and made part of In re: Darvocet, Darvon and Propoxyphene Products Liability Litigation, MDL No. 2226, before the Honorable Danny C. Reeves in the United States District Court for the Eastern District of Kentucky.   Once in the MDL, counsel for plaintiffs and petitioners fought to have their respective cases remanded back to California State Court. As such, the coordination of these actions will not severely disrupt the progress of any individual action. Below is a timeline of this activity:

| Case Name/No. | Date Filed in California Superior Court | Removal by Defendants to USDC NDCA | Remand Motions Filed by Plfs. | Remand Granted by MDL Judge, remanding case back to CA Sup. Court |
|---|---|---|---|---|
| *Freitas, et al.,* CGC-11-515537 | 10/31/2011 | 12/6/2011 | 1/4/2012 in NDCA; re-filed on 2/27/2012 in MDL | 7/2/2012 |
| *Keene, et al.,* CGC-11-516031 | 11/18/2011 | 1/24/2012 | 7/4/2012 | 7/31/2012 |
| *Rice, et al.,* CGC-11-515897 | 11/15/2011 | 1/24/2012 | 7/13/2012 | 8/7/2012 |

4

| | | | | |
|---|---|---|---|---|
| *Posey, et al.,* CGC-11-515995 | 11/18/2011 | 1/24/2012 | 7/14/2012 | 8/7/2012 |
| *Witthauer, et al.,* CGC-11-515994 | 11/18/2011 | 1/24/2012 | 7/14/2012 | 8/7/2012 |
| *LBFR et al.,* KC062737 | 12/16/2011 | 1/30/2012 | 5/18/2012 | 7/16/2012 |
| *Rentz et al.* BC 483765 | 5/3/20012 | N/A | N/A | N/A |

10.    Absent coordination, redundant duplicative discovery and motion practice in these overlapping actions would waste litigant and judicial resources.   Duplicative discovery will result in unnecessary copying costs, expert costs, depositions costs and filing fees.  In addition, the need to take the same depositions in each of these actions will likely increase travel costs for all the litigants' counsel.

11.    Failure to coordinate these actions creates a risk of inconsistent or duplicative judgments and orders.  Without coordination, two or more separate courts will decide essentially the same issues and may render different rulings on liability and other issues.  Coordination of these actions in a single court would avoid this possibility.

12.    Absent coordination, settlement of the individual actions is unlikely.  Generally, the primary motivating factors for settling cases are the elimination of further litigation, the avoidance of the risk of an adverse judgment at trial and the avoidance of additional litigation costs.  If the cases are not coordinated, the incentive to settle any of these cases is drastically reduced.  Settlement of one of these cases may not end the litigation in the other two cases, leaving defendants with a continued risk of adverse judgment and substantial litigation costs.  Only if the defendants are able to settle these claims in a coordinated action is there any realistic possibility of settlement.

8.    Attached as Exhibit 2 is a true and correct copy of the complaint, *Terry Freitas and Lori Freitas, husband and wife, et al., vs. McKesson Corporation; Eli Lilly & Company; et al.,* Case No. CGC-11-515537, filed on 10/31/2011 (San Francisco County Superior Court);

9.    Attached as Exhibit 3 is a true and correct copy of the complaint, *Mary Keene and George Keene, wife and husband, et al., vs. McKesson Corporation; Eli Lilly & Company; et al.,* Case No. CGC-11-516031, filed on 11/18/2011 (San Francisco County Superior Court);

5

1    10.    Attached as Exhibit 4 is a true and correct copy of the complaint, *Wendell Rice and*

2    *Patricia Rice, husband and wife, et al., vs. McKesson Corporation; Eli Lilly & Company; et al.*, Case

3    No. CGC-11-515897, filed on 11/15/2011 (San Francisco County Superior Court);

4    11.    Attached as Exhibit 5 is a true and correct copy of the complaint, *Tenessia Posey, et*

5    *al., vs. McKesson Corporation; Eli Lilly & Company; et al.*, Case No. CGC-11-515995, filed on

6    11/18/2011 (San Francisco County Superior Court);

7    12.    Attached as Exhibit 6 is a true and correct copy of the complaint, *Harry D. Witthauer,*

8    *a married man, et al. vs. McKesson Corporation; Eli Lilly & Company; et al.*, Case No. CGC-11-

9    515994, filed on 11/18/2011 (San Francisco County Superior Court).

10    13.    Attached as Exhibit 7 is a true and correct copy of the complaint, *Lawrence B. Fields*

11    *Robinson, etc., et al., vs. Eli Lilly and Company, et al.*, Case No. KC 062737 filed 12/16/2011 (Los

12    Angeles County Superior Court).

13    14.    Attached as Exhibit 8 is a true and correct copy of the complaint, *Rachel Rentz, et*

14    *al.,vs. McKesson Corporation; Eli Lilly & Company; et al.*, Case No. BC 483765 filed 5/3/2012 (Los

15    Angeles County Superior Court).

16    I declare under penalty of perjury under the laws of the State of California that the foregoing

17    is true and correct.

18    Executed this 23 day of October, 2012, at _____Oakland_____, California.

19

20    _Elise Sanguinetti_

21    ELISE SANGUINETTI

22

23

24

25

26

27

28

DECLARATION OF ELISE SANGUINETTI IN SUPPORT OF PETITION FOR COORDINATION

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge George King and the assigned discovery Magistrate Judge is Ralph Zarefsky.

The case number on all documents filed with the Court should read as follows:

## CV12- 9986 GHK (RZx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=============================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)         NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| MARGALIT CORBER, RENE CARO, STEVE DANTZLER, LINDA SOWARDS, LORI HUISMAN, ET AL. | see attachment |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| see attachment | see attachment |

**II. BASIS OF JURISDICTION** (Place an X in box only.)

☐ 1 U.S. Government Plaintiff  ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding  ☒ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U. S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
§ 28 U.S.C. §§ 1332, 1441, 1446, AND 1453; Removal of Product Liability Action based on Class Action Fairness Act and Federal Question

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending |  | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty ☐ 540 Mandamus/ Other |  |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations |  | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service |  | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 830 Patent ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☒ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco-mmodations |  | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 61 HIA(1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability |  | ☐ 445 American with Disabilities — Employment | ☐ 640 R.R.& Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **REAL PROPERTY** |  | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities — Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure |  | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | **IMMIGRATION** |  |  | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 462 Naturalization Application |  |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus- Alien Detainee |  |  | ☐ 871 IRS-Third Party 26 USC 7609 |
|  | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions |  |  |  |

| FOR OFFICE USE ONLY: | Case Number: | CV 12 9986 |
|---|---|---|

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

American LegalNet, Inc.
www.FormsWorkflow.com

UNITED STAT' DISTRICT COURT, CENTRAL DISTRIC' OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☐ No ☒ Yes
If yes, list case number(s): 12-cv-04399-PSG(Ex); 12-cv-00818-JFW(PLAx); 11-cv-06147-PSG(Ex); 12-cv-04399-PSG(Ex)

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
　　　　　　　　　　　　　☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
　　　　　　　　　　　　　☒ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
　　　　　　　　　　　　　☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)　List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
　　☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b)　List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
　　☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | San Francisco County, Alabama, Delaware, Indiana, Kentucky, Maryland, Nevada, North Carolina, Pennsylvania |

(c)　List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
　　**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Plaintiffs allege a substantial part of the events giving rise to this claim occurred within the County of Los Angeles | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____  Date November 20, 2012
　　　　　　　　　　　　　　　　　　　　Christopher Norton

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com

1

2

### **Attachment to Civil Cover Sheet CV-71**

3

### **Item I.(a) — Defendants**

4    MCKESSON CORPORATION; ELI LILLY AND COMPANY; AAIRPHARMA,
5    INC; AAIPHARMA LLC; AAI DEVELOPMENT SERVICES, INC.; NEOSAN
     PHARMACEUTICALS INC; XANODYNE PHARMACEUTICALS, INC.;
6    QUALITEST PHARMACEUTICALS, INC.; VINTAGE PHARMACEUTICALS,
     INC.; PROPST DISTRIBUTION, INC.; BRENN DISTRIBUTION, INC.; BRENN
7    MANUFACTURING, INC.; VINTAGE PHARMACEUTICALS, LLC;
     GENERICS INTERNATIONAL (US), INC.; GENERICS BIDCO I, LLC;
8    GENERICS BIDCO II, LLC; GENERICS INTERNATIONAL (US PARENT),
     INC.; ENDO PHARMACEUTICALS, INC.; ENDO PHARMACEUTICALS
9    HOLDINGS INC.; CORNERSTONE BIOPHARMA, INC.; CORNERSTONE
     BIOPHARMA HOLDINGS, INC.; TEVA BIOPHARMACEUTICALS, INC.;
10   TEVA PHARMACEUTICALS USA, INC.; MYLAN PHARMACEUTICALS,
     INC.; MYLAN, INC.; COVIDIEN PLC; COVIDIEN INC.; MALLINCKRODT
11   INC.; WATSON PHARMACEUTICALS, INC.; ABLE LABORATORIES;
     ARISTOS PHARMACEUTICALS, INC.; and DOES 1 through 50, inclusive,

12

13   ### **Item I.(b) — Attorneys**

14   Attorneys for Plaintiffs

| | |
|---|---|
| Elise R. Sanguinetti, Esq. | Stephen J. Randall, Esq. |
| Amanda J. Greenburg, Esq. | Pearson, Randall & Schumacher, PA |
| Khorrami, LLP | 100 S. Fifth Street |
| 360 22nd Street | Suite 1025 |
| Suite 640 | Fifth Street Towers |
| Oakland, CA  94612 | Minneapolis, MN  55402 |
| Tele: (866)546-7266 | Tele: (612)767-7500 |
| Fax: (866)546-7377 | Fax: (612)767-7501 |
| Stephen D. Behnke, Esq. | |
| Wright & Schulte, LLC | |
| 812 E. National Raod | |
| Dayton, OH  45377 | |
| Tele: (937)435-7500 | |
| Fax: (937)435-7511 | |

26

27

28

1

Attorneys for Defendants

2

| | |
|---|---|
| Farley J. Neuman<br>Pavan L. Rosati<br>Patricia L. Bonheyo<br>GOODMAN NEUMAN<br>HAMILTON LLP<br>417 Montgomery Street, 10th Floor<br>San Francisco, California 94104<br>Tel: 415.705.0400; Fax:<br>415.705.0411<br>fneuman@gnhllp.com<br>prosati@gnhllp.com<br>pbonheyo@gnhllp.com<br>Attorneys for Defendant McKesson<br>Corporation | James M. Neudecker<br>REED SMITH LLP<br>101 Second Street, Suite 1800<br>San Francisco, CA 94105<br>Tel: 415.543.8700; Fax: 415.391.8269<br>jneudecker@reedsmith.com<br>Attorneys for Defendant Eli Lilly and<br>Company |
| Janet H. Kwuon<br>REED SMITH LLP<br>355 South Grand Avenue, Suite 2900<br>Los Angeles, CA 90071<br>Tel: 213.457.8000; Fax:<br>213.457.8080<br>jkwuon@reedsmith.com<br>Attorneys for Defendant Eli Lilly and<br>Company | Adam R. Salvas<br>Kenneth M. Seeger<br>455 Market Street, Suite 1530<br>San Francisco, CA 94105<br>Tel: 415.981.9260; Fax: 415.981.9266<br>asalvas@seegersalvas.com<br>kseeger@seegersalvas.com<br>Attorneys for Defendants Vintage<br>Pharmaceuticals, LLC; Generics<br>International (US), Inc.; Generics Bidco<br>I, LLC; Generics Bidco II, LLC; Generics<br>International (US Parent), Inc.; Endo<br>Pharmaceuticals Inc.; and Endo<br>Pharmaceuticals Holdings Inc. |
| Carolyn Taylor<br>Tammara N. Tukloff<br>MORRIS POLICH & PURDY, LLP<br>600 W. Broadway, Suite 500<br>San Diego, CA 92101<br>Tel: 619.557-0404; Fax:<br>619.557.0460<br>Attorneys for Defendants<br>Brenn Distribution, Inc. f/k/a<br>Propst Distribution, Inc. f/k/a<br>Qualitest Pharmaceuticals, Inc.; and<br>Brenn Manufacturing, Inc. f/k/a<br>Vintage Pharmaceuticals, Inc. | Karen Woodward<br>Christopher P. Norton<br>SEDGWICK LLP<br>801 S. Figueroa Street, 19th Floor<br>Los Angeles, California 900117-5556<br>karen.woodward@sedgwicklaw.com<br>Christopher.norton@sedgwicklaw.com<br>Tel: 213.426.6900; Fax: 213.426.6921<br>Attorneys for Defendant Xanodyne<br>Pharmaceuticals, Inc. |
| Ginger Pigott<br>Amy B. Alderfer<br>GREENBERG TRAURIG, LLP<br>1840 Century Park East, Suite 1900<br>Los Angeles, CA 90067<br>Tel: (310) 586-7700; Fax: (310) 586-7800<br>Attorneys for Defendant<br>Teva Pharmaceuticals USA, Inc. | |

2

ATTACHMENT TO CIVIL COVER SHEET

ATL 18,831,336